# EXHIBIT  D

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life  )
Term Parole Consideration  )    CDC No: D-22031
Hearing of:  )
  )
ROGELIO CORDOBA  )
_____)


CALIFORNIA TRAINING FACILITY

SOLEDAD, CALIFORNIA

SEPTEMBER 12, 2006

4:35 p.m.


PANEL PRESENT:

Belinda Harris-Ritter, Presiding Commissioner
Ramon Estrada, Deputy Commissioner


OTHERS PRESENT:

Rogelio Cordoba, Inmate
Marianne Tardiff, Attorney for Inmate
Michael J. Montagma, Deputy District Attorney
Correctional Officers Unidentified


CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____  No        See Review of Hearing
_____  Yes       Transcript Memorandum


**Shelley Kelber   Northern California Court Reporters**

INDEX

| | Page |
|---|---|
| Proceedings | 1 |
| Case Factors | 7 |
| Pre-Commitment Factors | 12 |
| Post-Commitment Factors | 17 |
| Parole Plans | 26 |
| Closing Statements | 40 |
| Recess | 45 |
| Decision | 46 |
| Adjournment | 52 |
| Transcriber Certification | 53 |

--oOo-

1

| | |
|---|---|
| 1 | **P R O C E E D I N G S** |
| 2 | **PRESIDING COMMISSIONER HARRIS-RITTER:** Okay. |
| 3 | Are we on? |
| 4 | **DEPUTY COMMISSIONER ESTRADA:** Yes, we're on. |
| 5 | **PRESIDING COMMISSIONER HARRIS-RITTER:** Okay. |
| 6 | Thank you. Good afternoon. We are on the record. |
| 7 | This is a subsequent parole consideration hearing for |
| 8 | Rogelio Cordoba, CDC Number D-22031. Today's date is |
| 9 | September 12th, 2006, and the time is 4:35 p.m. We're |
| 10 | located at CTF, Soledad. The inmate was received on |
| 11 | January 17, 1986, from Los Angeles County. The life |
| 12 | term began on June 11, 1986 and the minimum eligible |
| 13 | parole date is November 12, 1995. The controlling |
| 14 | offense for which the inmate has been committed is |
| 15 | murder in the second degree, case number LA A762389, |
| 16 | count one, Penal Code section 187, and Penal Code |
| 17 | section 12022.5 for use of firearm, to wit, a handgun. |
| 18 | This hearing is being tape-recorded. For the purpose |
| 19 | of voice identification we will go around the room, |
| 20 | state our first name, our last name, spell our last |
| 21 | name, and then, Mr. Cordoba, when we get to you if you |
| 22 | would also give your CDC number we would really |
| 23 | appreciate that, okay. Thank you. I will start and go |
| 24 | to my left. I am Belinda Harris-Ritter, H-A-R-R-I-S - |
| 25 | R-I-T-T-E-R, Commissioner, Board of Parole Hearings. |
| 26 | **DEPUTY COMMISSIONER ESTRADA:** Ramon Estrada, E- |
| 27 | S-T-R-A-D-A, Deputy Commissioner, Board of Parole |

1    Hearings.

2         **DEPUTY DISTRICT ATTORNEY MONTAGMA:**   Michael J.

3    Montagma, M-O-N-T-A-G-M-A, Deputy D-A, LA County.

4         **ATTORNEY TARDIFF:**  Marianne Tardiff, T-A-R-D-I-

5    F-F, attorney for Mr. Cordoba.

6         **INMATE CORDOBA:**  Rogelio Cordoba, C-O-R-D-O-B-

7    A, D-22031.

8         **PRESIDING COMMISSIONER HARRIS-RITTER:**  Thank

9    you.  We also have two correctional peace officers in

10   the room for security purposes.  Mr. Cordoba, there's a

11   sheet of paper right there in front of you, relating to

12   the Americans with Disabilities Act issues.  Could you

13   be kind enough to read that aloud into the record for

14   us.  Thank you.

15        **INMATE CORDOBA:**

16            "The ADA, Americans with Disabilities

17            Act.  The Americans with Disabilities

18            Act, ADA, is a law to help people with

19            disabilities.  Disabilities are problems

20            that make it harder for some people to

21            see, hear, breathe, talk, walk, learn,

22            think, work, or take care of themselves

23            than it is for others.  Nobody can be

24            kept out of public places or activities

25            because of disabilities.  If you have a

26            disability, you have the right to ask

27            for help to get ready for your BPT

3

1          hearing, get to the hearing, talk, read

2          forms and papers, and understand the·

3          hearing process.  BPT will look at what

4          you ask for to make sure that you have a

5          disability that is covered by the ADA,

6          and that you have asked for the right

7          kind of help.  If you do not get help,

8          or if you don't think you got the kind

9          of help you need, ask for a BPT 1074

10         Grievance Form.  You can also get help

11         to fill it out."

12              **PRESIDING COMMISSIONER HARRIS-RITTER:**  Great,

13   thank you very much.  And I also note in your file that

14   on 8/23/05 you signed BPT form 1073 indicating that you

15   had no disabilities identified from the file review and

16   do not need any help in your parole hearing related to

17   any issues under the Americans with Disabilities Act.

18   Is that information still correct?

19              **INMATE CORDOBA:**  Yes, ma'am.

20              **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay.

21   Thank you.  And, Counsel, are there any ADA issues that

22   you believe need further discussion regarding your

23   client's ability to fully participate in today's

24   hearing?

25              **ATTORNEY TARDIFF:**  No.

26              **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay.

27   Thank you.  Mr. Cordoba, we will reach a decision today

4

1   and inform you whether or not we find you suitable for

2   parole.  We will tell you the reasons for our decision

3   and, if you're found suitable for parole, the length of

4   your confinement will be explained to you.  Before we

5   recess the hearing to deliberate on our decision the

6   district attorney's representative, your attorney, and

7   you will be given an opportunity to make a final

8   statement regarding your suitability.  Your statement

9   will be limited to why you feel you are suitable for

10  parole.  We will then recess, clear the room, and

11  Commissioner Estrada and I will deliberate.  Once we've

12  completed our deliberations we will resume the hearing

13  and announce our decision.  The California Code of

14  Regulations state that regardless of time served, a

15  life inmate shall be found unsuitable for, and denied,

16  parole, if in the judgment of the panel the inmate

17  would pose an unreasonable risk or danger to society if

18  released from prison.  You have certain rights related

19  to your hearing.  Those include the right to a timely

20  notice of the hearing, the right to review your Central

21  File and the right to present relevant documents.

22  Counselor, have your client's rights been met?

23          **ATTORNEY TARDIFF:**  Yes.

24          **PRESIDING COMMISSIONER HARRIS-RITTER:**  Thank

25  you.  And, Mr. Cordoba, you also have a right to an

26  impartial panel.  Do you have any objections to the

27  panel?

5

1          **INMATE CORDOBA:**  No, ma'am.

2          **PRESIDING COMMISSIONER HARRIS-RITTER:**  Thank

3    you.  Counselor, do you have any objections to the

4    panel?

5          **ATTORNEY TARDIFF:**  No.

6          **PRESIDING COMMISSIONER HARRIS-RITTER:**  You will

7    receive a copy of our tentative written decision today.

8    The decision becomes final in 120 days and a copy of

9    the decision and a copy of the transcript will be sent

10   to you.  In 2004 the regulations related to an appeal

11   of our decisions changed.  So if you have questions

12   regarding an appeal, you should ask your attorney or

13   visit the prison law library, all right?

14         **INMATE CORDOBA:**  Yes, ma'am.

15         **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay,

16   good.  You are not required to admit or discuss your

17   commitment offense, however the panel does accept as

18   true the findings of the court, do you understand?

19         **INMATE CORDOBA:**  Yes, ma'am.

20         **PRESIDING COMMISSIONER HARRIS-RITTER:**  Thank

21   you.  Commissioner Estrada, is there any confidential

22   material in the file that will be used in this hearing?

23         **DEPUTY COMMISSIONER ESTRADA:**  There is

24   confidential information in the inmate's Central File,

25   and I don't believe it will be used today.

26         **PRESIDING COMMISSIONER HARRIS-RITTER:**  Thank

27   you.  I have passed the hearing checklist, I believe,

6

1    right, the Deputy District Attorney has it.  Miss

2    Tardiff, have you seen it already?

3            **ATTORNEY TARDIFF:**  Yes, I have.

4            **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay.

5    Thank you.

6            **ATTORNEY TARDIFF:**  I have the documents.

7            **DEPUTY DISTRICT ATTORNEY MONTAGMA:**  I also have

8    all the documents.

9            **PRESIDING COMMISSIONER HARRIS-RITTER:**  Great.

10   Then I'll take this into submission as Exhibit 1.  Are

11   there any additional documents to be submitted?

12           **ATTORNEY TARDIFF:**  No.

13           **PRESIDING COMMISSIONER HARRIS-RITTER:**  All

14   right.  Are there any preliminary objections?

15           **ATTORNEY TARDIFF:**  No.

16           **PRESIDING COMMISSIONER HARRIS-RITTER:**  And will

17   Mr. Cordoba be speaking with the panel?

18           **ATTORNEY TARDIFF:**  Except for the commitment

19   offense, and I have a little statement regarding the

20   commitment offense.

21           **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay.

22           **ATTORNEY TARDIFF:**  That I can read into the

23   record later, when it would be an appropriate time.

24           **PRESIDING COMMISSIONER HARRIS-RITTER:**  All

25   right.  That's fine.  Then -- at this time Mr. Cordoba,

26   if you could raise your right hand I'll go ahead and

27   swear you in.  Do you solemnly swear or affirm that the

1    testimony you give at this hearing will be truth, the

2    whole truth, and nothing but the truth?

3              **INMATE CORDOBA:**  Yes.

4              **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay.

5    Thank you.  All right, at this time then I will turn to

6    the appellate opinion.  At the bottom of page 4 -- the

7    page numbers are up at the top right and they're hard

8    to see.

9              **ATTORNEY TARDIFF:**  Thanks.

10             **PRESIDING COMMISSIONER HARRIS-RITTER:**  At the

11   bottom of page 4 begins with the factual statement.

12   And this is the appellate opinion in the Court of

13   Appeal of the State of California, Second Appellate

14   District, Division 1, and it was, it's dated, it looks

15   like 9/15/1988.  In the high upper right hand corner,

16   and it's also stamped June 30th, 1988, by the deputy

17   clerk.  That was probably when it was received.  It's

18   the People v Rogelio Cordoba and Rodney Smith.

19             "On January 30th, 1985, at about 3:00

20             p.m. (inaudible) Harris was walking with

21             four friends in the area of 46th Street

22             and Crenshaw, in Los Angeles.  Defendant

23             Rodney Tommy Smith came around the

24             corner, approached the group, and said

25             'Now what's up,' and then started

26             shooting.  Defendant Smith, known on the

27             street as Snowman, fired four shots and

·8

1    a bullet struck Harris just above the

2    ankle.  Harris received medical

3    attention for this injury.  The bullet

4    passed in and out of Harris's ankle and

5    leg, he has scars as a result.  On

6    February 1st, 1985, between 3:00 and 4:00

7    p.m., Willie Rubin, Andre West and

8    Lawrence McIntosh were at the

9    intersection of 9th Avenue and 48th

10   Street in Los Angeles.  Defendant Smith

11   drove up to that location in a beige

12   automobile.  There were a number of

13   passengers in the vehicle, including

14   some girls.  Defendant Smith fired a

15   shot toward Willie Rubin and Andre West,

16   but did not hit either of them, and

17   drove away.  The next day, on February

18   2nd, 1985, Ronnie Luke, L-U-K-E, saw

19   Defendant Smith and Defendant Cordoba,

20   street name Loco Dog, together.  He saw

21   them depart in Defendant Smith's

22   automobile.  At about 7:00 p.m. Willie

23   Rubin and Marvin McIntosh were standing

24   on the sidewalk in front of a residence

25   at 4817 South 9th Street, Los Angeles,

26   waiting for a friend.  Rubin observed a

27   beige automobile coming down the street.

9

1          The car slowed down, the lights were

2     turned off, the car continued proceeding

3     toward Rubin and McIntosh, and passed

4     them.  Rubin and McIntosh, having seen

5     the car approaching with the lights off,

6     thought the situation suspicious and

7     took refuge behind two cars parked in

8     the driveway at 4817.  The car passed

9     4817, and continued to the front of the

10    property next door, where it stopped.

11    Two shots were fired from the car.

12    McIntosh was struck in the head by a

13    bullet, fell to the ground and died from

14    the wound.  Rubin heard someone inside

15    the car say 'cuz,' and that's spelled C-

16    U-Z, and the car sped from the scene.

17    There was testimony that the word cuz

18    was one that was likely to be used by

19    some gang member who was hostile to the

20    Blood gang members.  Ronnie Luke saw

21    Defendant Smith later on the evening of

22    February 2nd, 1985.  Smith told Luke that

23    he and Defendant Cordoba had gone riding

24    for the Fifties-hood.  The Fifties is a

25    gang associated with the Bloods, also a

26    gang.  The hood refers to a

27    neighborhood, an area where members of a

1    particular gang live or gather.  The

2    Fifties-hood therefore was a

3    neighborhood where Fifties live or

4    gather.  Smith told Luke he and Cordoba

5    had blasted some Fifties."

6    Now, Mr. Cordoba, I understand that you're not going to

7    be discussing the crime itself, but I'd like to know

8    how do you feel today about your participation in it?

9        INMATE CORDOBA:  I'm very remorseful

10   (inaudible) I take full responsibility for the crime

11   that which I committed against Mr. Marvin McIntosh.

12       **PRESIDING COMMISSIONER HARRIS-RITTER:**  Were you

13   involved in a gang?

14       **INMATE CORDOBA:**  No, ma'am.

15       **PRESIDING COMMISSIONER HARRIS-RITTER:**  Were you

16   involved in other criminal activity with these same

17   people?

18       **INMATE CORDOBA:**  No, ma'am.

19       **PRESIDING COMMISSIONER HARRIS-RITTER:**  Can you

20   tell us how you got yourself to be in that situation

21   that you were in at the time the crime was committed?

22       **INMATE CORDOBA:**  That day, or that night, I was

23   supposed to go and DJ at a party in Riverside and I

24   didn't have no way to get there, so I asked (inaudible)

25   could he give me a ride.  So, but we decided to go to a

26   McDonalds and on the way back from McDonalds, that's

27   when the incident happened.

11

1    **PRESIDING COMMISSIONER HARRIS-RITTER:** So you

2 never got to Riverside? Is that correct?

3    **INMATE CORDOBA:** Yes, afterward.

4    **PRESIDING COMMISSIONER HARRIS-RITTER:** Oh, you

5 did go to Riverside.

6    **INMATE CORDOBA:** Yes, after we came back from

7 McDonalds.

8    **PRESIDING COMMISSIONER HARRIS-RITTER:** Did you

9 know those people prior to that crime?

10    **INMATE CORDOBA:** Yes, I knew them.

11    **PRESIDING COMMISSIONER HARRIS-RITTER:** The

12 people who were shot?

13    **INMATE CORDOBA:** Yes.

14    **PRESIDING COMMISSIONER HARRIS-RITTER:** And how

15 did you know them?

16    **INMATE CORDOBA:** Because I used to play

17 basketball at the high school.

18    **PRESIDING COMMISSIONER HARRIS-RITTER:** Your

19 prior criminal record, it does include an arrest when

20 you were a juvenile, it was an arrest for robbery.  Do

21 you recall that?

22    **INMATE CORDOBA:** Yes, ma'am.

23    **PRESIDING COMMISSIONER HARRIS-RITTER:** What

24 happened in that situation?

25    **INMATE CORDOBA:** Well, the way that situation

26 was down, there was some guys coming around the area,

27 the neighborhood, stealing the kids' bikes, so

12

1  (inaudible) kids on the block, I decided to go get the

2  bikes back.  I was arrested, but it wasn't for stealing

3  the bike.

4           PRESIDING COMMISSIONER HARRIS-RITTER:  You

5  (inaudible) the stolen bikes?

6           INMATE CORDOBA:  Yeah, (inaudible) I went back

7  to get it for the kids in the neighborhood.

8           PRESIDING COMMISSIONER HARRIS-RITTER:  Okay.

9  And then a year later you have, it looks like an arrest

10 with no disposition, in February of 1984, from

11 trespassing at a junior high school?

12          INMATE CORDOBA:  That was the same.

13          PRESIDING COMMISSIONER HARRIS-RITTER:  Same

14 situation?

15          INMATE CORDOBA:  Same thing as with the bikes,

16 with the bicycles.  The guys coming up to the high

17 school, the junior high school and stealing the kids'

18 bicycle and I was only going up there to make sure they

19 didn't steal any bikes.  So they arrest me for

20 trespassing.

21          PRESIDING COMMISSIONER HARRIS-RITTER:  Okay.

22 And those are your only two prior crimes, is that

23 right?

24          INMATE CORDOBA:  Yes, ma'am.

25          PRESIDING COMMISSIONER HARRIS-RITTER:  In the

26 crime report it indicates that you were never an

27 official gang member, but you played basketball with

13

1   them, just like you told me, right?

2           INMATE CORDOBA:   (inaudible)

3           PRESIDING COMMISSIONER HARRIS-RITTER:   And, you

4   grew up, is it with both your parents in the house?

5           INMATE CORDOBA:   Yes, ma'am.

6           PRESIDING COMMISSIONER HARRIS-RITTER:   And you

7   moved here to California from the Virgin Islands,

8   right?

9           INMATE CORDOBA:   Yes, ma'am.

10          PRESIDING COMMISSIONER HARRIS-RITTER:   But you

11  moved to the Virgin Islands from Panama.  And how old

12  were you when you came to California?

13          INMATE CORDOBA:   I think I was about 13.

14          PRESIDING COMMISSIONER HARRIS-RITTER:   How

15  much?

16          INMATE CORDOBA: Thirteen.

17          PRESIDING COMMISSIONER HARRIS-RITTER:   Okay.   I

18  have problems, I have an ear infection, so it's hard

19  for me to hear today.  And how old were you when you

20  went from Panama to the Virgin Islands?

21          INMATE CORDOBA:   Nine.

22          PRESIDING COMMISSIONER HARRIS-RITTER:   Okay.

23  And did you have any trouble in school here?

24          INMATE CORDOBA:   No, ma'am.

25          PRESIDING COMMISSIONER HARRIS-RITTER:   Did you

26  drop out of school or were you still in school?

27          INMATE CORDOBA:   I dropped out in the 12th grade

14

1   (inaudible) I dropped out.

2          PRESIDING COMMISSIONER HARRIS-RITTER:   Did you

3   participate in any activities at school?

4          INMATE CORDOBA:   Yes.

5          PRESIDING COMMISSIONER HARRIS-RITTER:   What was

6   that?

7          INMATE CORDOBA:   Well, I did drama class.

8          PRESIDING COMMISSIONER HARRIS-RITTER:   Anything

9   else?

10          INMATE CORDOBA:   Matter of fact, I said I

11   played in sports; football and basketball and I ran in

12   track.

13          PRESIDING COMMISSIONER HARRIS-RITTER:   Were you

14   on any school teams?

15          INMATE CORDOBA:   Football teams, yeah.

16          PRESIDING COMMISSIONER HARRIS-RITTER:   Okay.

17          INMATE CORDOBA:   Football and basketball.

18          PRESIDING COMMISSIONER HARRIS-RITTER:   So that

19   wasn't just participating in inter-murals, it was

20   actually on a team?

21          INMATE CORDOBA:   On a team, yes ma'am.

22          PRESIDING COMMISSIONER HARRIS-RITTER:   Okay.

23   And, were these guys, that you were hanging out with,

24   people who had been friends of yours since elementary

25   school, or junior high?

26          INMATE CORDOBA:   I wouldn't say friends, it was

27   just guys I had I been in (inaudible) same, you know,

15

1  at the same, you know, elementary school, I played

2  basketball on an (inaudible).

3           PRESIDING COMMISSIONER HARRIS-RITTER:  Okay.

4  And that's why you asked the guy for a ride, right?

5           INMATE CORDOBA:  Yes, because I knew him.

6           PRESIDING COMMISSIONER HARRIS-RITTER:  Okay.

7  Do you have anything you want to add about your social

8  history that I haven't talked to you about?

9           INMATE CORDOBA:  No, ma'am.

10           PRESIDING COMMISSIONER HARRIS-RITTER:  You want

11  to tell me about your brothers and sisters?  How you

12  get along?

13           INMATE CORDOBA:  Well, we get along.  We're a

14  tight knit family.  In 1987 my sister was, perished in

15  the line of fire in Panama.  There was an invasion,

16  when America invaded Panama in 1987, she was basically

17  in the line of fire.  (inaudible) so she died doing

18  that and they took her body and put it into the ocean.

19  When I left Panama she was, when I was a kid, I really

20  didn't, wasn't around her that much, but she decided to

21  stay with our grandmother in Panama.  My two brothers,

22  they came out here with us, both of them have their own

23  businesses now.  My brother, Rodolfo, he got his

24  business in graphic art and design and landscaping.

25  And my other brother, he's teaching, he has a Tae Kwon

26  Do class, Orlando.

27           PRESIDING COMMISSIONER HARRIS-RITTER:  Okay.

1    And your mother and father are still here?

2          **INMATE CORDOBA:** Yes, ma'am.

3          **PRESIDING COMMISSIONER HARRIS-RITTER:** Have you

4    -- have a lot of contact with your parents and your

5    brothers?

6          **INMATE CORDOBA:** Yeah, they come to visit.

7          **PRESIDING COMMISSIONER HARRIS-RITTER:** Okay,

8    and they also send you letters?

9          **INMATE CORDOBA:** Yes.

10         **PRESIDING COMMISSIONER HARRIS-RITTER:** What

11    about on the phone?  Do you call them?

12         **INMATE CORDOBA:** Yes, once a week.

13         **PRESIDING COMMISSIONER HARRIS-RITTER:** Okay.

14    Commissioner Estrada, do you have any questions you'd

15    like to ask about the prior criminal history or social

16    background?

17         **DEPUTY COMMISSIONER ESTRADA:** I have a question

18    regarding your nickname, Loco Doc?

19         **INMATE CORDOBA:** Yeah.

20         **DEPUTY COMMISSIONER ESTRADA:** Loco Doc?

21         **INMATE CORDOBA:** I don't know, you know, about

22    the Loco.  My nickname was just Doc, and I got that

23    name put on (inaudible) coach back in the days when I

24    was playing basketball and the coach wanted us to us

25    take a name of a very good basketball player, so I

26    chose one like Doctor J, so all my friends started

27    calling me the Doc.  That's where the name Doc came

1  from.

2  **DEPUTY COMMISSIONER ESTRADA:**  And they didn't

3  call you Loco Doc?

4  **INMATE CORDOBA:**  No, sir.

5  **DEPUTY COMMISSIONER ESTRADA:**  That's all I have

6  for right now.

7  **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay.

8  Well, then at this time I'm going to turn the hearing

9  over to Commissioner Estrada to talk about your post

10  conviction factors.  After he's finished with that then

11  he'll give the hearing back to me and we'll talk about

12  parole plans, okay?

13  **DEPUTY COMMISSIONER ESTRADA:**  Thank you.  Good

14  afternoon, Mr. Cordoba.

15  **INMATE CORDOBA:**  (inaudible)

16  **DEPUTY COMMISSIONER ESTRADA:**  (inaudible) post

17  conviction information through your Central Files, as a

18  life prisoner, evaluation report prepared for the

19  November 2005 calendar by correction counselor I

20  (inaudible), post conviction progress report covering

21  the period of September 2004 (inaudible) prepared by

22  (inaudible) Baker and (inaudible) Valtajar, V-A-L-T-A-

23  J-A-R.  And a psychological evaluation prepared for the

24  June 2006 calendar by Dr. Macomber, spelled M-A-C-O-M-

25  B-E-R.  As (inaudible) last parole consideration

26  hearing on November 1st, 2004, it was held that

27  (inaudible) denied parole for one year and recommended

18

1  that the inmate stay disciplinary free, get self-help,

2  earn positive chronos, and get a GED.  (inaudible)

3  score last year was 19 and continues to be 19, correct?

4          INMATE CORDOBA:  Yes, sir.

5          DEPUTY COMMISSIONER ESTRADA:  (inaudible)

6  continues to be (inaudible), correct?

7          INMATE CORDOBA:  Yes, sir.

8          DEPUTY COMMISSIONER ESTRADA:  In reviewing your

9  Central File and the (inaudible) Report, and the

10  psychological report, there are indications that you

11  completed vocational welding.

12          INMATE CORDOBA:  Yes, sir.

13          DEPUTY COMMISSIONER ESTRADA:  You have that

14  certificate?

15          INMATE CORDOBA:  Yes, sir.

16          DEPUTY COMMISSIONER ESTRADA:  Okay.  Thank you.

17  Okay, July -- He completed vocational welding on July

18  3rd, 1992, correct?

19          INMATE CORDOBA:  Yes, sir.

20          DEPUTY COMMISSIONER ESTRADA:  And this is your

21  license?

22          INMATE CORDOBA:  Yes, sir.

23          DEPUTY COMMISSIONER ESTRADA:  Okay, very good.

24  Now, and I also see you completed vocational training

25  technology?

26          INMATE CORDOBA:  Yes, sir.

27          DEPUTY COMMISSIONER ESTRADA:  Okay. And that

19

1    was about, you have the certificate for that?  -- Okay,

2    this is dated February 5th, 2004, training technology,

3    from Valley Adult School, your certificate of

4    completion.  Do you have anything else?

5         **INMATE CORDOBA:**  You mentioned something about

6    my GED?  Getting a GED?

7         **DEPUTY COMMISSIONER ESTRADA:**  We're not there,

8    we're still on vocational.

9         **INMATE CORDOBA:**  Oh, vocational, no sir.

10        **DEPUTY COMMISSIONER ESTRADA:**  Okay.  Now, now

11   we're doing the GED.  I did see that in your Central

12   File, that you completed your GED on May 28th, 1997,

13   correct?

14        **INMATE CORDOBA:**  Yes, sir.

15        **DEPUTY COMMISSIONER ESTRADA:**  Okay.  Have you

16   done any, anything else regarding upgrading

17   academically?

18        **INMATE CORDOBA:**  Besides the GED, no sir.

19        **DEPUTY COMMISSIONER ESTRADA:**  Okay.  Now, are

20   you working?

21        **INMATE CORDOBA:**  Yes, sir.

22        **DEPUTY COMMISSIONER ESTRADA:**  Where are you

23   working?

24        **INMATE CORDOBA:**  Recreational department.

25        **DEPUTY COMMISSIONER ESTRADA:**  Oh, yeah, here's

26   an indication that you started out there in 4/2005.

27   (inaudible) supervisor's report?

′ 20

1       **INMATE CORDOBA:**  There should be in my file.

2  (inaudible).

3       **DEPUTY COMMISSIONER ESTRADA:**  From, from

4  recreational --

5       **INMATE CORDOBA:**  Yes.

6       **DEPUTY COMMISSIONER ESTRADA:**  -- worker?  I

7  could not find anything.

8       **INMATE CORDOBA:**  (inaudible)

9       **DEPUTY COMMISSIONER ESTRADA:**  They did your

10  (inaudible) review?

11       **INMATE CORDOBA:**  Yes, sir.

12       **DEPUTY COMMISSIONER ESTRADA:**  (inaudible) The

13  only thing in your file is your completion of the

14  vocational training technology, there's nothing else

15  regarding any type of work.  (inaudible)

16       **INMATE CORDOBA:**  No, sir (inaudible).

17       **DEPUTY COMMISSIONER ESTRADA:**  I thought you

18  declined to review your (inaudible) Central File.  You

19  signed an A2305 and you declined to review your Central

20  File.

21       **INMATE CORDOBA:**  I did, that was when, my board

22  hearing was postponed, I believe.

23       **DEPUTY COMMISSIONER ESTRADA:**  So (inaudible)

24  after that?

25       **INMATE CORDOBA:**  Yes.

26       **DEPUTY COMMISSIONER ESTRADA:**  Okay, okay,

27  there's nothing in the Central File (inaudible).  No, I

1    don't see (inaudible).

2         INMATE CORDOBA:  Yes, my instructor gave me one

3    that's --

4         DEPUTY COMMISSIONER ESTRADA:  (inaudible).

5         INMATE CORDOBA:  No, what I did was, before I

6    went to the counselor and had (inaudible) --

7         DEPUTY COMMISSIONER ESTRADA:  Did you get a

8    copy?

9         INMATE CORDOBA:  Yeah, it was in (inaudible).

10        DEPUTY COMMISSIONER ESTRADA:  Oh, (inaudible)

11   indicating that you're working as a recreational

12   worker?

13        INMATE CORDOBA:  Recreational worker.  What my

14   job is, is --

15        DEPUTY COMMISSIONER ESTRADA:  Yeah.

16        INMATE CORDOBA:   -- I run the football and

17   basketball league here at Central, Central (inaudible).

18        DEPUTY COMMISSIONER ESTRADA:  Okay.  You have

19   any laudatory chronos indicating your participation?

20        INMATE CORDOBA:  No, sir.

21        DEPUTY COMMISSIONER ESTRADA:  Okay.

22   (inaudible) psychiatric treatment, correct?

23        INMATE CORDOBA:  Correct.

24        DEPUTY COMMISSIONER ESTRADA:  And the only

25   thing I see that you've completed during this reporting

26   period has been a series of lectures on January 5th,

27   2005, on how to (inaudible) and not get angry.

22

1           **INMATE CORDOBA:**  Yes.

2           **DEPUTY COMMISSIONER ESTRADA:**  Okay.  And you

3    haven't done any other self-help, correct?

4           **INMATE CORDOBA:**  I'm currently in a RAG

5    program.

6           **DEPUTY COMMISSIONER ESTRADA:**  A what program?

7           **INMATE CORDOBA:**  RAG, R-A-G, Re-entry Activity

8    Group Program.

9           **DEPUTY COMMISSIONER ESTRADA:**  (inaudible)

10          **INMATE CORDOBA:**  (inaudible)

11          **PRESIDING COMMISSIONER HARRIS-RITTER:**  And your

12   anger management.

13          **DEPUTY COMMISSIONER ESTRADA:**  Okay.  This does

14   indicate that you're an active member in good standing.

15    Then let me (inaudible) re-entry activity group, RAG,

16   okay.  This is (inaudible) preparedness program --

17   (inaudible) parole plans and assisting the particular

18   needs of the individual.  Have you been on parole

19   before?

20          **INMATE CORDOBA:**  No, sir.

21          **DEPUTY COMMISSIONER ESTRADA:**  (inaudible)

22          **INMATE CORDOBA:**  (inaudible) and find out

23   (inaudible) and pass it on to a sponsor, which is

24   (inaudible).

25          **DEPUTY COMMISSIONER ESTRADA:**  So you should

26   have some real good parole plans then right?

27          **INMATE CORDOBA:**  Yes, sir.

1      **DEPUTY COMMISSIONER ESTRADA:** Okay.

2  (inaudible) certificate of completion of anger

3  management for, and that was completed on 12/3/04.

4  (inaudible) Anything else?

5      **INMATE CORDOBA:** No, sir.

6      **DEPUTY COMMISSIONER ESTRADA:** Okay. Since

7  you've been in state prison you've received a total of

8  two 115s, the last of them on June 23rd, 1988, for theft

9  of state food, and you were found guilty and you were

10  ordered on 20 hours of extra duty, and the one before

11  that was on November 19, 1987, for threatening staff

12  and you got 30 days (inaudible). The last 115 was 18

13  years ago, 18 years, 3 months?

14      **INMATE CORDOBA:** Yes, sir.

15      **DEPUTY COMMISSIONER ESTRADA:** Okay. There's no

16  violence (inaudible) before that. Now, you have total

17  of (inaudible) chronos and your last one was December

18  27th, 1995, for, talking responsibility for (inaudible),

19  so you have not had any (inaudible) problems for

20  (inaudible) almost nine months.

21      **INMATE CORDOBA:** Yes sir, correct.

22      **DEPUTY COMMISSIONER ESTRADA:** Okay. Going to

23  your (inaudible) indicates that prior to release the

24  prisoner could benefit from maintaining a disciplinary

25  free record, participating in self-help (inaudible) and

26  participating (inaudible) college correspondence

27  courses. Are you doing any college correspondence

1    courses?

2         **INMATE CORDOBA:**  No, sir.

3         **DEPUTY COMMISSIONER ESTRADA:**  Okay.  And

4    participating in a work program, I guess that would be

5    your recreational worker?

6         **INMATE CORDOBA:**  Yes, sir.

7         **DEPUTY COMMISSIONER ESTRADA:**  Okay.  Are you

8    (inaudible) prepared for you and was completed for this

9    hearing by Dr. Macomber and the doctor indicates a

10   diagnosis of Axis I, no mental disorder, Axis II, no

11   personality disorder, and you have a (inaudible) score

12   of 85.  Now, in regards to the view of the life crime,

13   it does indicate that you accept the official version

14   of the offense and you accept full responsibility for

15   your actions (inaudible) feel badly about (inaudible)

16   accidentally killed as a result of your action.

17   (inaudible) accidentally killed?

18         **INMATE CORDOBA:**  No, sir. I did not say

19   accidentally.

20         **DEPUTY COMMISSIONER ESTRADA:**  Huh?

21         **INMATE CORDOBA:**  I did not say accidentally.

22         **DEPUTY COMMISSIONER ESTRADA:**  Okay.  And

23   indicated that he did not know about, anything about

24   guns and that he had never shot one before (inaudible)

25   gun and ordered him to shoot, he did.  It was dark and

26   he did not aim and, however, he accidentally, again,

27   shot the 19-year-old victim.  These were individuals

25

1    whom he had played basketball with, he had no animosity

2    or hatred towards them at all.  Okay.  In regards to

3    assessment of dangerousness, the doctor indicates that

4    this was a third examination by a licensed psychologist

5    to assess dangerousness.  They all agree that he does

6    not pose a risk to the institution or to society at

7    this point in his life.  He has never been involved in

8    a racial riot, assault of another, possession of

9    weapons or other (inaudible) with regards to inmate's

10   violence potential they designate below average.

11   (inaudible) for dangerous behavior when released to the

12   community, I agree with the prior three psychologists

13   and stated that he poses no more risk to society than

14   the average citizen in the community.  He does not pose

15   any more risk to society than the average citizen.  In

16   fact, (inaudible) probably poses less risk to the

17   community than the average citizen.  This man has no

18   history of drugs and/or alcohol abuse or gang

19   membership.  There are no significant risk factors in

20   this case.  In regards to recommendations I (inaudible)

21   do have strong family support (inaudible) vocational

22   programs and that you have several alternate job

23   opportunity (inaudible) and that you do have

24   (inaudible).

25           **INMATE CORDOBA:**  Yes, sir.

26           **DEPUTY COMMISSIONER ESTRADA:**  (inaudible) this

27   one says you need an interview, I don't know  --

1      **PRESIDING COMMISSIONER HARRIS-RITTER:**  Can I, I

2  want to touch, OK, that's fine.

3      **ATTORNEY TARDIFF:**  (inaudible)

4      **(Off the record)**

5      **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay,

6  we're back on the record, everyone who was previously

7  present is still in -- is present again.

8      **ATTORNEY TARDIFF:**  I'm going to (inaudible)

9  that my client is willing to discuss the commitment

10  offense with you.

11      **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay.

12      **ATTORNEY TARDIFF:**  I just talked to him about

13  it, I think it's important that he clear a few things

14  up.

15      **PRESIDING COMMISSIONER HARRIS-RITTER:**  I

16  appreciate that very much, particularly in light of the

17  question regarding what's in the psych report.  You

18  want to go ahead and --

19      **DEPUTY COMMISSIONER ESTRADA:**  Yeah, I'm almost

20  finished.

21      **PRESIDING COMMISSIONER HARRIS-RITTER:**  That's

22  fine and then we'll go back to the crime.

23      **DEPUTY COMMISSIONER ESTRADA:**  Okay. (inaudible)

24  an INS hold from Panama.  I don't see a immigration

25  ruling in the Central File.  I don't know, it just says

26  that you need an interview, but, an immigration hold, I

27  don't see one.

1      **PRESIDING COMMISSIONER HARRIS-RITTER:**  Did you

2  have an interview in April with anybody related to

3  that?

4      **INMATE CORDOBA:**  (inaudible) my counselor

5  informed me that I had (inaudible).

6      **DEPUTY COMMISSIONER ESTRADA:**  Because I checked

7  both files and there's nothing in there about it too,

8  and I checked up on it and I thought I had just a piece

9  of paper potential, there is a potential that you need,

10  you're going to need an interview.

11      **INMATE CORDOBA:**  Yeah.

12      **DEPUTY COMMISSIONER ESTRADA:**  But it's

13  (inaudible) you are here illegally they will contact

14  immigration (inaudible).

15      **INMATE CORDOBA:**  Yes.

16      **DEPUTY COMMISSIONER ESTRADA:**  (inaudible).

17      **INMATE CORDOBA:**  Yes.

18      **DEPUTY COMMISSIONER ESTRADA:**  Anyway, to finish

19  up, it does indicate your family is now legal,

20  naturalized citizens and you are registered for the

21  process.  However, he does have residence in Panama as

22  well as several other family members who live there.

23  (inaudible) Okay, now, (inaudible) Mr. Cordoba?

24      **INMATE CORDOBA:**  No, sir.

25      **DEPUTY COMMISSIONER ESTRADA:**  Okay, Counsel?

26      **ATTORNEY TARDIFF:**  No, not at this time.

27      **DEPUTY COMMISSIONER ESTRADA:**  Okay.  With that

28

1   I return to the Chair.

2          PRESIDING COMMISSIONER HARRIS-RITTER:   Thank

3   you very much.   Let's go back and talk about the crime

4   now.   Mr. Cordoba, can you tell us why you were in that

5   car shooting that gun that night?

6          INMATE CORDOBA:   Well, on that night, when we

7   were, when we were coming from McDonalds, Mr. Smith,

8   said that someone was shooting at him.   I didn't see

9   anyone shooting at him, because I had the car seat

10  back.   You know, the driver's seat, the passenger seat,

11  I mean, excuse me, (inaudible) I didn't see nobody

12  shooting (inaudible) but I didn't see nobody shooting

13  at us, but he said that somebody was shooting at us, so

14  he reached up under the car seat, handed me a gun and

15  told me (inaudible).   It was a (inaudible) and stuck

16  the gun --

17         PRESIDING COMMISSIONER HARRIS-RITTER:   Okay.

18  And you did, right?

19         INMATE CORDOBA:   (inaudible) fired one shot and

20  we left.   He kept driving on.

21         PRESIDING COMMISSIONER HARRIS-RITTER:   Were you

22  not stopped in front of that house at 4817 when you did

23  that?

24         INMATE CORDOBA:   Probably slowed down, yes.

25  Slowed down, might have stopped, I don't remember.

26         PRESIDING COMMISSIONER HARRIS-RITTER:   Okay.

27         INMATE CORDOBA:   I know we slowed down.

29

1        PRESIDING COMMISSIONER HARRIS-RITTER:   And you

2    just shot out the window --

3        INMATE CORDOBA:   Just shot out the window.

4        PRESIDING COMMISSIONER HARRIS-RITTER:    -- and

5    accidentally hit somebody right in the head?

6        INMATE CORDOBA:   Without, yeah, without aiming.

7        PRESIDING COMMISSIONER HARRIS-RITTER:   Okay.

8    The report says that you accidentally, that somebody

9    accidentally got shot.   You indicated you did not use

10   that word accidentally.   Do you recall what you did say

11   to the psychologist?

12       INMATE CORDOBA:   No, I don't recall.

13       PRESIDING COMMISSIONER HARRIS-RITTER:   Okay. Go

14   ahead.

15       INMATE CORDOBA:   The reason why -- I may have

16   said accidentally is because, like I said, when he got

17   shot, because I didn't mean to kill anyone or hurt

18   anyone, I was just shooting because they scared me.

19       PRESIDING COMMISSIONER HARRIS-RITTER:   But you

20   know when you stick a gun out a window and pull the

21   trigger --

22       INMATE CORDOBA:   Yes, I know.

23       PRESIDING COMMISSIONER HARRIS-RITTER:   There's

24   a real good chance somebody's going to get hit, right?

25       INMATE CORDOBA:   Yes.

26       PRESIDING COMMISSIONER HARRIS-RITTER:   Okay.

27   All right.   Do you have any questions you'd like to ask

30

1   him about the crime itself, Commissioner Estrada?

2           **DEPUTY COMMISSIONER ESTRADA:**  No, not yet, no.

3           **PRESIDING COMMISSIONER HARRIS-RITTER:**  Were the

4   other people, who else, were just two of you in the

5   car?

6           **INMATE CORDOBA:**  (inaudible)

7           **PRESIDING COMMISSIONER HARRIS-RITTER:**  Was the

8   other guy a gang member?

9           **INMATE CORDOBA:**  Yes, ma'am.

10           **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay.

11   Were the people that you shot at gang members?

12           **INMATE CORDOBA:**  (inaudible)

13           **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay.

14   (inaudible) Let's look at your parole plan now.  A

15   number of support letters have been received and let me

16   go through the ones I have in the file first and then

17   we'll deal with the one your attorney gave me today.

18   There's one from your mother, dated June 19th, 2006, who

19   lives in Los Angeles and indicated that if you're

20   released here you can live with her.  And there's one

21   from Reverend Richard Martini, pastor of the Church of

22   the Transfiguration in Los Angeles, who sends a letter

23   in support of you dated May 17th, 2006.  There's one

24   from your cousin Delfino Lewis in Columbus, Georgia,

25   who writes June 5th, 2006, in support of you.  There's

26   one, June 1st, 2006, from Empire Mainstay Maintenance

27   Service, which is in Rialto, I think that's just over

1    the line in San Bernardino County, and it's a job offer

2    from Rodolfo Cordoba, is he your brother?

3         **INMATE CORDOBA:**  My brother.

4         **PRESIDING COMMISSIONER HARRIS-RITTER:**  All

5    right.  And a letter from May 29th, 2006 from your

6    father, with a Los Angeles address, and states, on my

7    son's release from prison his family and I back in

8    Panama will receive him home and have a place for him

9    to stay (inaudible) over.  So is he saying that he

10   would also go to Panama?

11        **INMATE CORDOBA:**  Yes, ma'am.

12        **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay.

13   And then November 17th, 2004, a letter from your uncle,

14   is it your uncle Ambrose or --

15        **INMATE CORDOBA:**  Ambrose, that's right.

16        **PRESIDING COMMISSIONER HARRIS-RITTER:**    -- All

17   right. In Panama, this has been translated and says

18   that here in Panama I have my own house with three

19   bedrooms.  My son Armando works with the police

20   department as a musician, he lives with his girlfriend

21   so you can live with me.  They also have two businesses

22   here in Panama, a fast food and another of a restaurant

23   for all.  We have (inaudible) construction and can work

24   with me.  So it appears I would offer you, with his

25   brother-in-law (inaudible) import-export business.

26   He's also willing to help you so you don't have to

27   worry about work or where to live.  And (inaudible)

32

1    letters in the file and here we have a letter of

2    support from Earl (inaudible) Williams (inaudible)

3    Trucking Company, and they're offering you a job, is

4    that correct?

5            INMATE CORDOBA:  Yes, ma'am.

6            PRESIDING COMMISSIONER HARRIS-RITTER:  And I

7    note you have the date on there, but I believe that's

8    August 25th, on the envelope, of 2006?  So there's a job

9    offer from Victory Upholstery Studio, from Victor, and

10   what is Victor's last name?

11           INMATE CORDOBA:  That's my father's friend.

12           PRESIDING COMMISSIONER HARRIS-RITTER:  Okay.  I

13   can't read his handwriting, so I don't know his last

14   name.  You know what it is?

15           INMATE CORDOBA:  No, ma'am.

16           PRESIDING COMMISSIONER HARRIS-RITTER:  Okay.

17   He's willing to offer you, it's okay if you don't --

18           INMATE CORDOBA:  (inaudible)

19           PRESIDING COMMISSIONER HARRIS-RITTER:   -- I'm

20   willing to offer him an entry level position with our

21   firm and the position will begin at minimum wage

22   earnings and that's located in Los Angeles.  Then

23   there's a letter dated Friday, August 18th, 2006, from

24   Jerry's Upholstery (sic), from Jerry Walsh saying he's

25   a friend of the family and he would offer you a job in

26   his welding shop.  And there's a letter from

27   (inaudible) Preschool in Los Angeles on Vermont,

33

1    offering you -- from Faron Davison, a owner, Davison,

2    D-A-V-I-S-O-N, Faron, F-A-R-O-N, offering you an entry

3    level position with the childcare center, dated, the

4    envelope is dated August 25th.  And then a letter from

5    Bob's Sewer and Drain Cleaning, Incorporated, offering

6    you a job.  And offering to assist you financially in

7    any small way.  And that's also dated August 28th, with

8    the envelope. There's the original letter from your

9    brother, from Empire Mainstay, that I've already

10   referred to.  Then there's another letter, this one is

11   from Columbus, Georgia, from (inaudible) dated June 5th,

12   2006, she's your aunt?

13            **INMATE CORDOBA:**  Yes, ma'am.

14            **PRESIDING COMMISSIONER HARRIS-RITTER:**  And she

15   supports (inaudible) another copy of the letter from

16   Reverend Martini from the Church of the Transfiguration

17   that I've already referred to.  And here's a letter

18   dated June 22nd from a (inaudible) Alexander and this is

19   a letter of support as well.  And that's dated June

20   22nd.  There's another copy of the letter from your aunt

21   (inaudible) in Georgia.  Here we have (inaudible) a

22   letter from your father that I already read, another

23   copy, and another copy of the letter from your mother.

24    So we seem to have some confusion to be determined

25   here related to whether or not you'd be deported to

26   Panama, if you are paroled.  That will, that will need

27   to be cleared up.  So I would recommend that you

34

1    contact your counselor and try to get that straightened

2    out.  But anyway, you have job offers here or you have

3    a job offer in Panama, and you also have a residence in

4    Panama and a residence with your mother, is that right?

5     Did I remember that correctly?  All right.  And, is

6    there anything else that you would like to add related

7    to your parole plans that we haven't talked about?

8              INMATE CORDOBA:  No, ma'am.

9              PRESIDING COMMISSIONER HARRIS-RITTER:  Okay.

10   Do you have any questions regarding parole plans that

11   you'd like to ask, Commissioner Estrada?

12             DEPUTY COMMISSIONER ESTRADA:  No.

13             PRESIDING COMMISSIONER HARRIS-RITTER:  All

14   right.  Then I'll move on to note that the Penal Code

15   section 3042 notices were sent out and in response to

16   those notices we do have Mr. Montagma from the district

17   attorney's office in L-A County here.

18             DEPUTY COMMISSIONER ESTRADA:  I do have a

19   question.

20             PRESIDING COMMISSIONER HARRIS-RITTER:  Okay.

21             DEPUTY COMMISSIONER ESTRADA:  Okay, I'll make

22   it quick here.  And this is in regards to the appellate

23   decision.  You (inaudible) correct?

24             INMATE CORDOBA:  Correct.

25             DEPUTY COMMISSIONER ESTRADA:  You've never been

26   a member of the (inaudible) Crips?

27             INMATE CORDOBA:  No, sir.

1      **DEPUTY COMMISSIONER ESTRADA:**  Or the
2  (inaudible)?

3      **INMATE CORDOBA:**  No, sir, I just live in the
4  neighborhood.

5      **DEPUTY COMMISSIONER ESTRADA:**  You just live in
6  the neighborhood, huh?

7      **INMATE CORDOBA:**  Yes, sir.

8      **DEPUTY COMMISSIONER ESTRADA:**  Okay (inaudible)
9  on page (inaudible) as they drove by and then fired one
10  shot.

11      **INMATE CORDOBA:**  That's not true.

12      **DEPUTY COMMISSIONER ESTRADA:**  Okay.  Then the
13  next paragraph, at the bottom, the last sentence,
14  (inaudible) to check out the story and (inaudible) was
15  interviewed by police detective and told him that
16  Defendant Smith had told him that he and Defendant
17  Cordoba just shot at some Bloods on 9th Avenue.  The
18  following morning, February 3rd, Luke saw Defendant
19  Smith again (inaudible) was dead and Smith had said
20  "Then Loco is in trouble." Are you Doc or Loco Doc?

21      **INMATE CORDOBA:**  Doc sir.  I'm not allowed to
22  go by that name, I changed my name.  I'm a Muslim, my
23  name is Malachi, sir.

24      **DEPUTY COMMISSIONER ESTRADA:**   -- Okay, I have
25  nothing else.

26      **PRESIDING COMMISSIONER HARRIS-RITTER:**  Thank
27  you.  As I indicated Penal Code section 3042 notices

1    were sent out.  Those notices go to agencies with a

2    direct interest in the case and in response to that we

3    have Mr. Montagma from the district attorney's office

4    in Los Angeles County who is going to be able to ask

5    you questions and make a closing statement.  At this

6    time, if you have, do you have any additional questions

7    Commissioner Estrada on any area?

8           **DEPUTY COMMISSIONER ESTRADA:**  I have none.

9           **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay.

10   Thank you.  Then I'll go to the deputy district

11   attorney, Mr. Montagma, do you have any questions for

12   Mr. Cordoba?

13          **DEPUTY DISTRICT ATTORNEY MONTAGMA:**  Mr.

14   Cordoba, when you described to the commissioner, how

15   you fired the shot, you had you hand up higher than

16   your head, apparently the gun pointed (inaudible)?

17          **INMATE CORDOBA:**  To the side, inaudible) over

18   the top of the car.

19          **DEPUTY DISTRICT ATTORNEY MONTAGMA:**  You were on

20   the passenger side, is that correct?

21          **INMATE CORDOBA:**  Yes, sir.

22          **DEPUTY DISTRICT ATTORNEY MONTAGMA:**  And did you

23   fire with your right or your left hand?

24          **INMATE CORDOBA:**  Right hand.

25          **DEPUTY DISTRICT ATTORNEY MONTAGMA:**  So you

26   would have had to go like this?

27          **INMATE CORDOBA:**  No.  (inaudible) on this side.

1          **PRESIDING COMMISSIONER HARRIS-RITTER:**  So the

2    victim was on the driver's side?

3          **INMATE CORDOBA:**  On the driver's side.

4          **PRESIDING COMMISSIONER HARRIS-RITTER:**  Of the

5    car.  And you shot over the car.

6          **INMATE CORDOBA:**  Over the car.

7          **DEPUTY DISTRICT ATTORNEY MONTAGMA:**  You shot

8    over the top of the car?

9          **INMATE CORDOBA:**  Yes.

10         **PRESIDING COMMISSIONER HARRIS-RITTER:**  From the

11   passenger side.

12         **DEPUTY DISTRICT ATTORNEY MONTAGMA:**  From the

13   passenger side.  You're on the passenger side.

14         **PRESIDING COMMISSIONER HARRIS-RITTER:**  Yes.

15         **DEPUTY DISTRICT ATTORNEY MONTAGMA:**  (inaudible)

16   like this, is that correct?

17         **INMATE CORDOBA:**  Yes, sir.

18         **DEPUTY DISTRICT ATTORNEY MONTAGMA:**  This was a

19   blue stone revolver?

20         **INMATE CORDOBA:**  Excuse me?

21         **DEPUTY DISTRICT ATTORNEY MONTAGMA:**  A blue

22   stone revolver?

23         **INMATE CORDOBA:**  I don't remember (inaudible)

24         **DEPUTY DISTRICT ATTORNEY MONTAGMA:**  You know

25   Rodney Luke, is that correct sir?

26         **INMATE CORDOBA:**  Yeah, I know Rodney Luke.

27         **DEPUTY DISTRICT ATTORNEY MONTAGMA:**  Did you

1  ever have this or a similar type gun or any gun at all

2  in your possession before this day?

3        **INMATE CORDOBA:**  No, sir.

4        **DEPUTY DISTRICT ATTORNEY MONTAGMA:**   Mr. Luke

5  told the police that he'd seen you in the recent past

6  with a blue stone revolver, is that true?

7        **INMATE CORDOBA:**  No, sir.

8        **DEPUTY DISTRICT ATTORNEY MONTAGMA:**   It's not

9  true?

10        **INMATE CORDOBA:**  No, sir.

11        **DEPUTY DISTRICT ATTORNEY MONTAGMA:**   At any

12  prior board hearing did you indicate that you were a

13  member of (inaudible) Crips?

14        **INMATE CORDOBA:**  Never.

15        **DEPUTY DISTRICT ATTORNEY MONTAGMA:**  How many

16  shots did you fire?

17        **INMATE CORDOBA:**  I only remember one but

18  (inaudible) they say that I fired two, so I guess two

19  shots.

20        **DEPUTY DISTRICT ATTORNEY MONTAGMA:**  But you

21  were trying to point your gun in the direction of these

22  two men?

23        **INMATE CORDOBA:**  Excuse me?

24        **DEPUTY DISTRICT ATTORNEY MONTAGMA:**  You were

25  trying to point your gun in the direction of these two

26  men?

27        **INMATE CORDOBA:**  No, I didn't even know where

39

1    they was at. I was firing in the direction where Mr.

2    Smith had told me they was at.

3            **DEPUTY DISTRICT ATTORNEY MONTAGMA:** I have

4    nothing further.

5            **PRESIDING COMMISSIONER HARRIS-RITTER:** Thank

6    you. Miss Tardiff?

7            **ATTORNEY TARDIFF:** So originally you got into

8    the automobile for what purpose?

9            **INMATE CORDOBA:** To go to a party, to DJ a

10   party in Riverside.

11           **ATTORNEY TARDIFF:** And Mr. Smith was going to

12   that same party?

13           **INMATE CORDOBA:** Yes, ma'am.

14           **ATTORNEY TARDIFF:** So when he gave you the gun

15   why did you, I don't understand why you would be so

16   willing to shoot a gun?

17           **INMATE CORDOBA:** He said, he said (inaudible)

18   out of fear I gave it a shot.

19           **ATTORNEY TARDIFF:** Fear of who?

20           **INMATE CORDOBA:** Fear of him, the gang member.

21           **ATTORNEY TARDIFF:** You thought you would be

22   shot at, he told you that you would be shot at?

23           **INMATE CORDOBA:** Yes, ma'am.

24           **ATTORNEY TARDIFF:** Okay, so you did it to

25   prevent yourself from being shot?

26           **INMATE CORDOBA:** Yes, ma'am.

27           **ATTORNEY TARDIFF:** (inaudible)

40

1        **PRESIDING COMMISSIONER HARRIS-RITTER:**  Closing

2    statements?

3        **DEPUTY DISTRICT ATTORNEY MONTAGMA:**  I really

4    don't have much to say.  I think his explanation of the

5    crime leaves a lot to be desired.  Whether or not he

6    was actually a gang member, he clear was associating

7    with the Crips, for the record, we oppose parole at

8    this time.  Thank you.

9        **PRESIDING COMMISSIONER HARRIS-RITTER:**  Thank

10   you.  Miss Tardiff?

11       **ATTORNEY TARDIFF:**  Thank you.  In terms of Mr.

12   Cordoba's pre-incarceration history, he did come from a

13   stable family, a close family.  The probation officer's

14   report indicates he had a steady employment history.

15   He had no prior criminal history, as a juvenile or

16   adult, this was a first offense, first conviction.  His

17   story, his version of the commitment offense has always

18   been the same.  You go back and look, even in the

19   probation officer's report -- and I have found that

20   when someone, when an inmate's not being truthful about

21   his commitment offense the story usually does not stay

22   the same, but in this case it has.  And indeed it may

23   sound foolish or something, but it's never, it's never

24   changed.  So I think that in terms of truthfulness,

25   he's telling the truth.  This gang activity thing has

26   always been an issue and I'm not sure if this even

27   needs to keep being gone into, the fact is in the

1    probation officer's report they couldn't verify he was

2    a member of a gang.  Let's see -- The problem is, you

3    know, when you live down in that area and you go to

4    school with those guys, it's inevitable that you're

5    going to be hanging out with them at some point, but in

6    any event, I can't find it now -- but the probation

7    officer's report says although defendant denies any

8    gang membership, he states he lives in the area of the

9    (inaudible) Crips.  It couldn't be verified that he was

10   a member of a gang.  The, which one was it, the psych

11   eval from '04, it was an addendum to deal with one

12   issue only, and that is address the gang affiliation

13   issue.  And in that report it states that, okay, on one

14   hand, there's a, it does get confusing, and I think the

15   confusion comes from page 4 of the '02 psych points

16   out, or states, regarding the question about gang

17   involvement Inmate Cordoba states "I have never been

18   involved in gangs before, that was the first time I'd

19   used a gun."  In the July 29th, '99 report it states "on

20   one hand he was associated with the Crips." The next

21   paragraph it states although "though he may not have

22   been a member of the Crips gang he obviously did know

23   them."  He has no apparent criminal history, no

24   apparent juvenile criminal history.  Due to several

25   factors it's concluded that, this is a conclusion,

26   concluding no substantiation of any gang activity other

27   than what appears to be written in previous psych

42

1    reports.  So, they conclude that there is no gang

2    involvement.  Since he's been incarcerated he's

3    educationally upgraded himself, with a GED, two

4    vocations.  He has participated in self-help for many

5    years, more recently anger management and another anger

6    management course.  He's continued to work in a steady

7    fashion.  His psych evals from '96 have been positive.

8    The most recent one, the '06, states that there's no

9    indication of gang membership, doing well, no gang

10   involvement in CDC, there's no substance abuse history.

11   His remorse and sorrow appear genuine.  The crime was

12   related to immaturity, poor judgment and peer pressure.

13   He has zero violent history, both in and out of CDC,

14   and note that the prior two evaluations states the

15   inmate poses no risk of danger.  He's been involved in

16   no violence (inaudible), possession of weapons or

17   aggressive behavior.  The testing procedure, level of

18   service inventory revised, gave him a 1.4, which is

19   extremely low risk.  And due to his life experiences,

20   his risk is the same of the average citizen.  It

21   concluded that there was no mental, emotional

22   disorders, strong family support, acquired vocational

23   skills, job offers, the trades he's learned are in high

24   demand.  He has dual parole plans.  His prognosis is

25   excellent for successful adjustment in the community.

26   The '04 doesn't really reach a conclusion.  The 1/31/03

27   is positive.  He demonstrates good judgment, impulse

1    control, expressed genuine remorse.  This went into the

2    gang involvement on page 4.  It states Inmate Cordoba's

3    statement that I've never been involved in gangs.  It

4    concludes, in light of his statements it would appear

5    he has never been properly implicated or trained by a

6    responsible, law-abiding adult in the use of firearms.

7    And thus did not fully understand the impact of his

8    behavior and the resultant consequences.  He showed

9    insight and empathy, and his potential, his risk

10   potential is no more than the average citizen in the

11   community.  And in '99, his current level of insight

12   and judgment supports a positive prediction of

13   successful adaptation to community living, no more than

14   the average citizen.  In '96 it was the same.  So, for

15   10 years he's had good psych evals.  He's got good

16   parole plans, and I will submit on that, thank you.

17          **PRESIDING COMMISSIONER HARRIS-RITTER:**    Thank

18   you.  Mr. Cordoba, do you have a statement you'd like

19   to make?

20          **INMATE CORDOBA:**    Yes, there is, I have a

21   letter, I wrote this down.  Dear Commissioner, it is

22   with deep and sincere remorse and regret that I accept

23   full and complete responsibility for the crime of

24   murder, committed against Mr. Marvin McIntosh, and his

25   family.  The crime of murder was committed by me during

26   a drive-by shooting in which I was the responsible

27   person (inaudible) laws of God and the laws of this

44

1    society (inaudible).  My actions were wrong and with my

2    heart and soul I pray daily for forgiveness.  Over the

3    years of this imprisonment I've made an honest effort

4    to make amends for the negative behavior that has

5    characterized my life in the past, and in order to

6    improve my conscious contact with (inaudible) I've

7    relied on daily prayers and meditation of God

8    (inaudible).  Fortunately, the California Department of

9    Correction has made this process of improvement

10    possible through the self-help programs and I have

11    taken (inaudible) program.  It has been essential for

12    my life to have the strong support from family and

13    friends, my parents, (inaudible) Cordoba have provided

14    a strong (inaudible) foundation for my life.  It is a

15    strong belief in the Lord.  We have maintained a

16    healing fellowship.  Every human life is precious in

17    the sight of the Lord.  And this understanding God

18    (inaudible) all life is in (inaudible) the holy God and

19    every soul is connected in life, each one is a member

20    of the human family.  To emphasize (inaudible) life of

21    Marvin McIntosh, which I am guilty of taking away and

22    shall remain in remorse, with prayers for his soul and

23    forgiveness on earth as it is in heaven.  To you, as

24    the board of prison terms, and as commissioner of the

25    board, I submit this letter of responsibility, in

26    humble respect (inaudible) I do pray that the Lord

27    shall be with you in the work that you are doing on

45

1    behalf of this great state.   Thank you very much.

2         **PRESIDING COMMISSIONER HARRIS-RITTER:**   Thank

3    you Mr. Cordoba.   It is now 22 minutes before 6:00 p.m.

4    We will recess to deliberate.

5

6

7                         **R E C E S S**

8                         --o0o--

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

1       **CALIFORNIA BOARD OF PAROLE HEARINGS**

2                   **D E C I S I O N**

3          **DEPUTY COMMISSIONER ESTRADA:**  We're on.

4          **PRESIDING COMMISSIONER HARRIS-RITTER:**  Thank

5    you.  We're back on the record.  All parties previously

6    noted as present are present, and the time is 6:00 p.m.

7     In the matter of Inmate Rogelio Cordoba, the panel has

8    reached the following decision.  Mr. Cordoba, the panel

9    reviewed all the information received from the public

10   and relied on the following circumstances in concluding

11   that the prisoner is not suitable for parole and would

12   pose an unreasonable risk of danger to society or a

13   threat to public safety if released from prison.  This

14   is a one-year denial.  It is based on the commitment

15   offense.  The offense was carried out in an especially

16   callous manner.  The offense was carried out in a

17   dispassionate and calculated manner.  The offense was

18   carried out in a manner which demonstrates an

19   exceptionally callous disregard for human suffering.

20   The motive for the crime was very trivial in relation

21   to the offense.  These conclusions are drawn from the

22   statement of facts in the appellate opinion at page 4-

23   6, and I quote:

24               "On January 30th, 1985, at about 3:00

25               p.m. (inaudible) Harris was walking with

26               four friends in the area on 46th Street

27   **ROGELIO CORDOBA D-22031   DECISION PAGE 1   9/12/06**

1      and Crenshaw in Los Angeles.  Defendant

2      Rodney Tommy Smith came around a corner,

3      approached the group, and said 'now

4      what's up', and then started shooting.

5      Defendant Smith, known on the street as

6      Snowman, fired four shots and a bullet

7      struck Harris just above the ankle.

8      Harris received medical attention for

9      this injury.  The bullet passed in and

10     out of Harris's ankle and leg and he has

11     scars as a result.  The next day, on

12     February 1st, 1985, before 3:00 and 4:00

13     p.m., Roy Rubin, Andre West, and Maurice

14     McIntosh were at the intersection of 9th

15     Avenue and 48th Street in Los Angeles.

16     Defendant Smith drove up to that

17     location in a beige automobile.  There

18     were a number of passengers in the

19     vehicle, including some girls.

20     Defendant Smith fired a shot towards Roy

21     Rubin and Andre West, but did not hit

22     either of them, and drove away.  The

23     following day, on February 2nd, 1985,

24     Ronnie Luke saw Defendant Smith and

25     Defendant Cordoba together.  He saw them

26     depart in Defendant Smith's automobile.

27  **ROGELIO CORDOBA D-22031  DECISION PAGE 2  9/12/06**

48

1      At about 7:00 p.m. Roy Rubin and Marvin

2      McIntosh were standing on the sidewalk

3      in front of the residence at 4817 South

4      9th Street, Los Angeles, waiting for a

5      friend.  Rubin observed a beige

6      automobile coming down the street.  The

7      car slowed down, the lights were turned

8      off, the car continued proceeding

9      towards Rubin and McIntosh and passed

10      them.  Rubin and McIntosh, having seen

11      the car approaching with the lights off,

12      thought the situation suspicious and

13      took refuge behind two cars parked in

14      the driveway at 4817.  The car passed

15      4817 and continued to the front of the

16      property next door, where it stopped.

17      Two shots were fired from the car.

18      McIntosh was struck in the head by a

19      bullet, fell to the ground, and died

20      from the wound.  Rubin heard someone

21      inside the car say 'cuz', C-U-Z, and the

22      car sped from the scene.  There was

23      testimony that the word cuz was one that

24      would likely be used by some gang member

25      who was (inaudible) the Blood gang

26      member.  Ronnie Luke saw Defendant

27    **ROGELIO CORDOBA D-22031  DECISION PAGE 3  9/12/06**

1           Smith later on the evening of February

2           2nd, 1985.  Smith told Luke that he and

3           Defendant Cordoba had gone riding

4           through the Fifties hood.  The Fifties

5           is a gang associated with the Bloods,

6           also a gang.  The hood refers to a

7           neighborhood, in the area where the

8           members of a particular gang live or

9           gather, the Fifties hood therefore is a

10          neighborhood where Fifties live or

11          gather.  Smith told Luke he and Cordoba

12          had blasted some Fifties."

13  The prisoner has an escalating pattern of criminal

14  conduct.  The prisoner has only, has six 128As, the

15  last of which was in 1995, related to the count and

16  only two 115s, the last was 18 years ago, for theft of

17  state food.  In the psychological report dated May 5th,

18  2006, and authored by Dr. Macomber, is inclusive to

19  this panel in that it at page 3 Dr. Macomber reports

20  that the inmate said he accidentally shot the victim

21  and Mr. Cordoba states he did not say it was

22  accidental.  We believe that this needs to be clarified

23  in another evaluation.  The parole plans are excellent

24  parole plans except we need to have clarification as to

25  whether there is an INS hold from Panama.  We talked to

26  you a little bit about that, I think you could talk to

27  **ROGELIO CORDOBA D-22031   DECISION PAGE 4   9/12/06**

1    your counselor and get that cleared up one way or the

2    other, just for your own benefit, but that'll need to

3    be done before -- I would recommend that you do that

4    before the next panel.  Because then that can be

5    answered unequivocally.  The hearing panel notes the

6    responses to PT3042 notices indicate opposition to a

7    finding of parole suitability, specifically the

8    district attorney for Los Angeles County.  The panel

9    makes the following findings:  The prisoner needs to

10   better articulate his participation in the commitment

11   offense and his relationship to the others involved.

12   Nevertheless the prisoner should be commended for

13   receiving his GED in 1997, vocational welding being

14   completed in 1992, receiving his welding license, his

15   vocational training technology certificate in 2004, and

16   18 years since the last 115 and 11 years since the last

17   128A.  However, these positive aspects of his behavior

18   do not outweigh the fact of his unsuitability at this

19   particular time.  Mr. Cordoba, the panel really is torn

20   in this, but we believe you need more insight into why

21   you were associating with known gang members in a way

22   that resulted in you committing a murder.  We have

23   trouble with that.  And it's true your counsel says you

24   haven't changed your story over the years, but there

25   are different shadings that are put into your story,

26   not necessarily by you.

27   **ROGELIO CORDOBA D-22031   DECISION PAGE 5   9/12/06**

51

1  We weren't comfortable with the way the situation is

2  right now, as far as the explanations.  We needed more

3  than that and when you get a decision from a panel it

4  will be a tentative decision.  It will have to go

5  through decision review and the governor's office.  And

6  what happened and why you were there with those people

7  will have to be articulated clearly enough for it not

8  to just be the panel granting it tentatively, but also

9  it going through decision review and the governor's

10  office.  And so your plans are excellent for wherever

11  you will go, whether it's California or Panama, you

12  know, you'll just need to update those, but the INS

13  hold question should be answered and we do think some

14  insight into -- they were known gang members to you,

15  and getting, in that kind of a situation, you've got to

16  think about how you put yourself in that place.  We're

17  asking for a new psych report because we want to

18  clarify the problem with the way the last one was

19  written regarding the word accidentally, we don't think

20  that's fair to you to have that sitting like that, from

21  your testimony to us.  So we've requested this report,

22  based on the panel's belief that the prisoner's current

23  mental health is an important issue. And in a new full

24  evaluation the panel requests that the clinician

25  specifically address the following and we request that

26  it be the extent to which the prisoner has explored

27  **ROGELIO CORDOBA D-22031  DECISION PAGE 6  9/12/06** the

52

1    commitment offense and come to terms with the

2    underlying causes.  And a review of Dr. Macomber's

3    report regarding the commitment offense and clarify the

4    inmate's description of what actually occurred.  That

5    concludes the reading of the decision.  Commissioner

6    Estrada, if you have anything you'd like to add?

7          **DEPUTY COMMISSIONER ESTRADA:**  Good luck to you

8    Mr. Cordoba.

9          **PRESIDING COMMISSIONER HARRIS-RITTER:**  Thank

10    you.  That concludes the hearing, it is now 6:06 p.m.

11

12

13

14                    **A D J O U R N M E N T**

15                        --oOo--

16

17

18

19

20

21

22

23    **PAROLE DENIED ONE YEAR**

24    **THIS DECISION WILL BE FINAL ON: January 10, 2007**

25    **YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT**

26    **DATE, THE DECISION IS MODIFIED.**

27    **ROGELIO CORDOBA D-22031   DECISION PAGE 7   9/12/06**

53

## CERTIFICATE AND DECLARATION

### OF TRANSCRIBER

I, SHELLEY KELBER, a duly designated

transcriber, NORTHERN CALIFORNIA COURT REPORTERS, do

hereby declare and certify under penalty of perjury

that I have transcribed tape(s) which total one in

number and cover a total of pages numbered 1 - 52, and

which recording was duly recorded at CORRECTIONAL

TRAINING FACILITY, SOLEDAD, CALIFORNIA, in the matter

of the SUBSEQUENT PAROLE CONSIDERATION HEARING of

ROGELIO CORDOBA, CDC Number D-22031, on September 12,

2006, and that the foregoing pages constitute a true,

complete, and accurate transcription of the

aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party

in the above-captioned matter and have no interest in

the outcome of the hearing.  Dated NOVEMBER 25, 2006 at

Sacramento, California.

Shelley Kelber, Transcriber

**Northern California Court Reporters**