# EXHIBIT  F

ORIGINAL

Name   ROGELIO CORDOBA

Address   P.O. BOX 689   ZW-240L

SOLEDAD, CA 93960-0689

CDC or ID Number   D-22031

RECEIVED

SUPREME COURT
FILED

MAR 2 0 2007

CLERK SUPREME COURT

MAR 2 0 2007

CALIFORNIA SUPREME COURT  Frederick K. Ohlrich Clerk

_____

*(Court)*                           Deputy

ROGELIO CORDOBA
Petitioner
                    vs.
BOARD OF PRISON HEARINGS
Respondent

PETITION FOR WRIT OF HABEAS CORPUS

# S151104

No. _____
*(To be supplied by the Clerk of the Court)*

## INSTRUCTIONS — READ CAREFULLY

- **If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.**

- **If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.**

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies.

- If you are filing this petition in the California Supreme Court, file the original and thirteen copies.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rules 56.5 and 201(h)(1) of the California Rules of Court [as amended effective January 1, 1999]. Subsequent amendments to Rule 44(b) may change the number of copies to be furnished the Supreme Court and Court of Appeal.

Page one of six

Form Approved by the
Judicial Council of California
MC-275 [Rev  January 1, 1999]

PETITION FOR WRIT OF HABEAS CORPUS

Penal Code, § 1473 et seq.,
Cal. Rules of Court, rules 56.5, 201(h)

This petition concerns:

☐ A conviction          ☒ Parole

☐ A sentence            ☐ Credits

☐ Jail or prison conditions    ☐ Prison discipline

☐ Other (specify): _____

1. Your name:    ROGELIO CORDOBA

2. Where are you incarcerated?    CORRECTIONAL TRAINING FACILITY-SOLEDAD

3. Why are you in custody?    ☒ Criminal Conviction    ☐ Civil Commitment

   *Answer subdivisions a. through i. to the best of your ability.*

   a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

      SECOND DEGREE MURDER WITH FIREARM

   b. Penal or other code sections:    PC 187 / PC 12022.5

   c. Name and location of sentencing or committing court:    LOS ANGELES SUPERIOR COURT

   d. Case number:    LA A762389

   e. Date convicted or committed:    1/17/86

   f. Date sentenced:

   g. Length of sentence:    17 years to life

   h. When do you expect to be released?    Unknown

   i. Were you represented by counsel in the trial court?    ☒ Yes.    ☐ No. If yes, state the attorney's name and address:

4. What was the LAST plea you entered? (check one)

   ☒ Not guilty    ☐ Guilty    ☐ Nolo Contendere    ☐ Other: _____

5. If you pleaded not guilty, what kind of trial did you have?

   ☐ Jury    ☒ Judge without a jury    ☐ Submitted on transcript    ☐ Awaiting trial

6.  GROUNDS FOR RELIEF
    Ground 1:  State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

SEE ATTACHED

a.  Supporting facts:
    Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what time *(when)* or place *(where).* (If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)

SEE ATTACHED

b.  Supporting cases, rules, or other authority (optional):
    *(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

SEE ATTACHED

1 ROGELIO CORDOBA  D-22031
  P.O. BOX 689        ZW-240L
2 SOLEDAD, CA  93960-0689
          in pro per
3

4

5                      SUPREME COURT OF CALIFORNIA

6

7

8

9 In re CORDOBA                    )  Case No.: _____
     Petitioner,                   )
10                                 )  PETITION FOR WRIT OF HABEAS
                                   )  CORPUS
11        v.                       )
                                   )
12 B. CURRY, WARDEN (A), et al,    )
     Respondent                    )
13                                 )
                                   )
14                                 )
                                   )
15                                 )
                                   )
16                                 )
                                   )
17 _____  )

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**TITLE**                                          **PAGE**

Cover                                              1

Table of Contents                                 2

Points and Authorities                            3 – 4

Judicial MC-275                                   5 – 19
    Ground 1                  7 – 14
    Ground 2                  14 – 15

Conclusion                                        16

Prayer for Relief                                 17

Proof of Service by Mail                          18

Exhibit 'A'                                       19 – 98
  (Hearing Transcript 2006)

Exhibit 'B'                                       98 – 102
  (Psychological Evaluation)

Exhibit 'C'                                       102 – 109
  Life Prisoner Evaluation Report (LPER)

# TABLE OF AUTHORITIES

| AUTHORITY | PAGE |
|---|---|

### CONSTITUTIONAL AUTHORITIES

| AUTHORITY | PAGE |
|---|---|
| U.S. CONSTITUTION, AMENDMENT 7, 14 | 5, 6, 9, 10, 11, 14, 15 |
| CALIFORNIA CONSTITUTION, ARTICLE I, SECTIONS 7, 15 | 5, 6, 9, 10, 11, 14, 15 |

### FEDERAL CASE LAW

| | PAGE |
|---|---|
| Biggs v. Terhune, (2003 9th Cir.)<br>334 F.3d 910 | 5, 6, 8, 9, |
| Irons v. Warden of Solano<br>(2005) 358 F.Supp. 936 | 12 |
| Martin v. Marshall<br>(2006) 431 F.Supp.2d 1038 | 11 |
| McQuillion v. Ducan, (9th Cir.)<br>306 F.3d 895 | 5, 6 |
| Rio v. BPT Commissioners<br>(2006) ND No. C 05-1483 MPH | 12 |
| Rosenkrantz v. Marshall<br>(2006) 444 F.Supp.2d 1063 | 11 |

### STATE CASE LAW

| | PAGE |
|---|---|
| In re Capistran, (2003)<br>107 Cal.App.4th 1299 | 13, 14 |
| In re Caswell, (10/10/01)<br>92 Cal.App.4th 1017 | 13, 14 |
| In re Elkins<br>2006 DJDAR 14489 | 10 |
| In re Jackson, (1985)<br>39 Cal.App.3rd 464 | 13, 14 |
| In re Lee<br>(2006) 143 Cal.App.4th 1400 | 10 |
| In re Minnis,<br>7 Cal.3d at p. 647 | 6 |
| In re Norman Morrall, (2002)<br>102 Cal.App.4th 280 | 5, 6, 8, 13, 14 |
| In re Edward Ramirez, (2001);<br>94 Cal.App.4th 549 | 5, 6, 9, 10 13, 14 |
| In re Rodriguez,<br>(1975) 14 C.3d 639 | 13, 14 |
| In re Rosenkrantz (2002)<br>29 Cal.App.4th 659 | 5, 6 |

1

## STATE CASE LAW

2

3   In re Rosenkrantz,                                              13, 14
    95 Cal.App.4th 358

4   In re George Scott                                              5, 8
    119 Cal.App.4th

5   In re Mark Smith, (2003)                                        5
    Cal.App.4th 343

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
## TABLE OF AUTHORITIES PAGE 2
3
**PENAL CODE**                                          **PAGE**

§ 3000(b)(1)                                            5

§ 3041(a)                                               10, 11

§ 3041(b)                                               5, 6

§ 3041.5                                                5, 6, 9

§ 3041.5(b)(2)                                          13

§ 5076.2                                                13

## CALIFORNIA CODE of REGULATIONS

**CCR SECTION**                                         **PAGE**

CCR § 2000(b) (48) [Good Cause]                         13, 14

CCR § 2000(b) (61) [Material Evidence]                  13, 14

CCR § 2000(b) (89) [Relevant Evidence]                  13, 14

CCR § 2400 et seq.                                      13, 14

§ 2282(a)                                               8

§ 2402(a)                                               6

§ 2402(c)(1)(D)                                         8

§ 2403(c)                                               6, 9

§ 3375.2(7)(A)                                          8

Cover Page of MC-275 goes here

Page 2 of MC-275 goes here

**THE BOARD OF PRISON TERMS ILLEGALLY USED PENAL CODE SECTION 3041(b) [THE EXCEPTION] TO FIND PETITIONER UNSUITABLE FOR PAROLE, AS THERE IS NOT A MODICUM OF EVIDENCE THAT PETITIONER IS A <u>CURRENT</u> THREAT TO SOCIETY OR OTHERWISE UNSUITABLE FOR PAROLE. THE DECISION WAS ARBITRARY AND CAPRICIOUS VIOLATING PETITIONER'S STATE AND FEDERAL DUE PROCESS RIGHTS.**

On SEPTEMBER 12, 2006, Petitioner ROGELIO CORDOBA, D-22031 (hereinafter "Petitioner"), was provided a Life Term Parole Consideration Hearing before the Board of Parole Hearings (hereinafter "Board", "BPH", or "Panel"); Please refer to Exhibit 'A' which is the Hearing Transcript (hereinafter "HT" or "Transcript"). Said Hearing was Petitioner's SEVENTH parole suitability hearing. Petitioner's Minimum Eligible Parole Date (hereinafter "MEPD"), was NOVEMBER 12, 1995.[1] The purpose of this Board hearing was for the setting of Petitioner's term uniformly [2] to his offense and for a finding of suitability for parole (See Penal Code § 3041.5; <u>In re Edward Ramirez</u>, 94 Cal.App.4th 541 (2001); <u>McQuillion v. Ducan</u>, (9th Cir.) 306 F.3d 895; <u>In re Norman Morrall</u>, (2002) 102 Cal.App.4th 280; <u>In re Rosenkrantz</u>, (2002) 29 Cal.App.4th 660; <u>In re Mark Smith</u>, (2003) Cal.App.4th 343; and the recent <u>Biggs v. Terhune</u>, (2003 9th Cir.) 334 F.3d 910.

The result of this Board hearing was an erroneous and unlawful finding of unsuitability and a release date was not set. Instead, Petitioner was given a ONE (1) year denial and did not appeal this decision through the administrative remedy because the Board has eliminated the BPT Appeals Unit and no longer allows for the filing of administrative appeals on BPT denials

---

1 – The Court of Appeal in <u>In re George Scott</u>, (2004) 119 Cal.App.4th 871, reaffirmed the rationale of the <u>Ramirez</u> and <u>Smith</u> Courts when it declared "...parole is the <u>rule</u>, rather than the exception, and conviction for second degree murder does not automatically render one unsuitable. (<u>In re Smith</u>, (2003) 114 Cal.App.4th 343, 366). <u>In re Ramirez</u>, supra, 94 Cal.App.4th 549 ...[a]ll violent crimes demonstrate the perpetrator's potential for posing a grave risk to public safety, yet parole is mandatory for violent felons serving determinate sentences. Penal Code § 3000 subd. (b)(1).) And the Legislature has clearly expressed its intent that when murders – who are the great majority of inmates serving indeterminate sentences – <u>approach their minimum eligible parole date, the Board shall normally set a parole release date</u>..." (id, at p. 570).

2. – The Court of Appeal on June 24, 2004, in <u>In re George Scott</u>, supra, 119 Cal.App.4th at 887 fn. 7, also reaffirmed the Legislative Intent of Uniform terms by stating: "The first two sentences of the DSL declare 'that the purpose of imprisonment for a crime is punishment' and that [t]his purpose is best served by terms proportionate to the seriousness of the offense with provisions for uniformity in the sentences of offenders committing the same offense under similar circumstances. (Penal Code § 1170, subd. (a)(1).) Nothing in the DSL or its legislative history suggests that legislative concern with uniformity was limited to those serving determinate terms. Penal Code § 3041 shows that this interest <u>does</u> extend to individuals such as [this Petitioner] who are serving indeterminate life terms. (Id., citing <u>Ramirez</u>, supra 94 Cal.App.4th at 559).

1    of parole for indeterminately sentenced prisoners such as Petitioner. Petitioner submits that the

2    Board's regulation, that is the California Code of Regulations (hereinafter "CCR"), § 2402(a)

3    **DEMANDS that the Board set a release date unless Petitioner <u>CURRENTLY</u> presents an**

4    **unreasonable risk of danger to the public.** Petitioner submits that the representing District

5    Attorney did not provide any new and/or additional evidence whatsoever that Petitioner is an

6    unreasonable risk of danger to the public or otherwise unsuitable for parole.

7    Additionally, Petitioner submits that the Board speaks in meaningless generalities and fails

8    to address the exact nature of Petitioner's <u>CURRENT</u> character. By not doing so, the Board

9    violated the intent and spirit of Penal Code (hereinafter "PC"), § 3041.5 [3] and <u>In re Ramirez</u>,

10   supra, which dictates that the Board shall normally set a parole release date. (citing <u>Biggs v.</u>

11   <u>Terhune</u>, supra).

12   The Court in <u>Biggs</u>, supra, held that the Board's continued use of the crime (or any other

13   unchanging circumstances) as a basis for denial of parole when Petitioner's Institutional

14   Behavior remains exemplary may be a violation of both State and Federal Due Process.

15   Since his incarceration, Petitioner has had two Rules Violations Reports, a serious one on

16   11/19/87 for threatening staff and an administrative one on 6/23/88 for theft of state food. He

17   has had no occurrence of serious or violent disciplinary action since 1988, thus exemplifying a

18   model prisoner. There has been thereafter a continuous EIGHTEEN (18) year history free of

19   any serious violent disciplinary action or occurrence. Petitioner submits that the Board's failure

20   to uniformly measure his offense and set his term proportionately to others similarly situated

21   and to find him suitable for parole violates both State and Federal due Process. Also, the

22   current policy of the Board, which will be discussed more fully infra, is the setting of a parole

23   date which is all too often the exception rather than the norm, and thus violates Petitioner's

24   Liberty Interest that is present in a parole date; <u>In re Rosenkrantz</u>, supra; <u>McQuillion v. Ducan</u>,

25   supra; <u>Biggs v. Terhune</u>, supra. At the Petitioner's board hearing the BPT relied solely on

26   3 – There is no evidence that the crime is "particularly egregious" to justify the use of the exception clause of PC
27   § 3041(b); <u>In re Norman Morrall</u>, supra, the court concluded "[W]e agree that an inmate cannot be denied parole
     simply on the type of offense he committed." (See also <u>In re Minnis</u>, 7 Cal.3d at p. 647). To the contrary, it falls
     squarely in the Board's own proportionality matrix CCR § 2403(c) at axis B-II. Without post-conviction credits
28   Petitioner has served twenty two (22) years. Adding post conviction credits he has served twenty seven (27) plus
     years, essentially reaching his matrix as required. There is no evidence that Petitioner is a current risk or threat to
     society and the Board's conclusions are not supported by the record. (See <u>Biggs</u>, supra).

Petitioner's commitment offense and prior history to justify its unlawful finding of
unsuitability. Beginning at page 48 of Exhibit 'A', the HT, the Board stated:

"It is based on the commitment offense." (line 14-15)

"The offense was carried out in an especially callous manner. The offense was carried

out in a dispassionate and calculated manner. The offense was carried out in a manner

which demonstrates an exceptionally callous disregard for human suffering. The

motive for the crime was very trivial in relation to the." (HT-46 lines 15-21)

In addition, and with regard to the Petitioner's suitability, the board erred in disregarding

Petitioner's Mental Health Evaluation which is supportive of release (please refer to HT

DECISION pg. 24 lines 7-27 line). Petitioner's Psychiatric Reports have been much

instructive. Specifically, Dr. M. Macomber, Ph.D., CTF-Soledad, Staff Psychologist, stated:

"Mr. CORDOBA has been doing very well in the institutional environment. He has

been disciplinary free for over 18 years. In the institution he has never been involved

in any gang activities, although we do have frequent racial, gang related riots at this

prison. He also has no history of drug or of alcohol use. Axis One, no mental

disorder. Axis Two, no personality disorder, a GAF score of 85." (See Exhibit 'B' pg.

2, Psychological Evaluation, Current Mental Status)

And under "Assessment of Dangerousness" Dr. Macomber stated:

"In considering potential for dangerous behavior in the institution, this man has been

seen since 2002 by two additional psychologists. This is his third examination by a

licensed psychologist to assess dangerousness. They all agree that he does not pose a

risk to the institution or to society at this point in his life. Compared to other inmates,

violence potential is definitely below average." (Id., p. 3)

B. In considering potential for dangerous behavior when released to the community, I

agree with the prior three psychologists that stated that he poses no more risk to

society than the average citizen in the community. This is supported by the

administration of the Level of Service Inventory-Revised, which is an actuarial

measure that assesses criminal history, substance abuse history, vocational

achievement, social relationships and other factors to determine **current** risk level on

parole. His score places him at the 1.4 cumulative frequency for prison inmates. This

means that if 100 men were released on parole, he would do better on parole than 98

of them. This is a very low risk level. He does not pose any more risk to society than

the average citizen. In fact, due to his life experiences, he probably poses less risk to

the community than the average citizen."

Additionally, the Board ignored that Petitioner has been deemed by the California

Department of corrections a **Model** prisoner with A-1-A status, and **Not** a threat to society, and

that Petitioner's crime is not "particularly egregious" (especially cruel and callous) by placing

Petitioner in a Level II prison setting. [4]

Also, in the Life Prisoner Evaluation Report (hereinafter "LPER") attached as Exhibit 'C',

Petitioner's Correctional Counselor, CC-I Baker, states:

"Cordoba overall pattern of behavior since his last subsequent hearing is considered

exceptional. Prior to release the prisoner could benefit from maintaining a

disciplinary free record, participating in self-help therapy when available and

participating in any available college correspondence courses." **(Exhibit 'C')**

Again, in In re Norman G. Morrall, supra, the Court concluded; "A refusal to consider the

particular circumstances relevant to an inmate's individual suitability for parole would be

contrary to law." Moreover, the Court in Biggs, supra, addressed the Board's continued illegal

use of the crime and/or prior history to justify a denial of parole:

"... **a continued reliance... on an unchanging factor, the circumstances of**

**the offense and conduct prior to imprisonment, runs contrary to the**

**rehabilitative goals espoused by the prison system and could result in a due**

**process violation". (Biggs, supra, 334 F.3d at 917).**

---

4. California Code of Regulations, Title 15, section 3375.2 subd. (7)(A) states: "An inmate serving any life term shall not be housed in a Level I or II facility if any of the following case factors are present: The Commitment Offense involved... unusual violence...." And on June 24, 2004, the Court of Appeal in In re George Scott, supra, 119 Cal.App.4th at 892 fn. 11, found that the Board's regulations provide that even if the crime is "exceptionally callous" an inmate may be found suitable for parole. The Court declared that "Under the Board regulations, base terms for life prisoners are not calculated until after an inmate is deemed suitable for release. (§ 2282, subd. (a).) The regulations therefore contemplate that an inmate may be deemed suitable for release even though his offense demonstrated "exceptionally callous disregard for human suffering." (§ 2402, subd, (c)(1)(D).)" (Id)

1    In Biggs, supra, the appeal was pursuant to his initial suitability hearing. The Petitioner has

2  now had EIGHT Board hearings and submits that his most recent denial rests solely on the

3  commitment offense, (as did his previous ones), and therefore violates both State and Federal

4  Due Process. Most importantly, there is no evidence that the public safety requires a lengthier

5  period of incarceration (please refer to PC § 3041 (b)), in relation to other instances of the

6  same crime please refer to PC § 3041.5.

7    Petitioner submits that understanding and perspective of the crime is compelled by the

8  Board's own proportionality matrix (please refer to CCR Division 2, § 2403(c). The matrix

9  scale and rating of the more common and routine variations of murder appear to a codification

10  of when a crime of this nature can be more egregious than average.

11    Petitioner submits that his crime falls squarely in the matrix [category B-II, 18-19-20

12  years]. With post conviction credits, Petitioner has exceeded the maximum by more than

13  SEVEN (7) years and without post conviction credit application, Petitioner has served his

14  matrix. The Board fails in any attempt to substantiate why Petitioner's crime is so heinous as to

15  require that Petitioner be exempted time and time again from the general rule that a parole date

16  shall normally be set; please see In re Ramirez, supra, wherein the court states:

17    **"The Board must weigh the inmate's criminal conduct not against ordinary**

18    **social norms, but against other instances of the same crime or crimes. (Ramirez,**

19    **supra, Cal.App.4th at p. 570).**

20    Petitioner submits that the record is devoid of the Board making such a comparison.

21  Similarly, Petitioner's Psychiatric Report evidence, like Biggs, supra, is supportive of release;

22  contrary to the Board's erroneous and specious findings (please see Exhibit 'A' and 'B'). The

23  court in Biggs, addressed the Board's illegal usage of needed therapy and other illegal reasons

24  to justify a highly illegal denial. The Court concluded:

25    **"The record in this case and the transcript of Biggs' hearing before the Board**

26    **clearly show that many of the conclusions and factors relied upon by the Board**

27    **were devoid of evidentiary basis." (Biggs, supra, 334 F.3d at p. 915)**

28    The Court in Biggs, supra, went on to warn the Board that while there was "some

evidence" to use the crime as a basis for denial at his initial hearing, the board's continued use

1  of the crime as a basis for continual denials would be a violation of Biggs Federal due process

2  rights. Petitioner submits that the Board's sole usage of the initial commitment offense and/or

3  prior social history, on a continual basis to deny him a parole date has violated his 5th and 14th

4  Amendment rights under the United States Constitution to not be deprived of his liberty.

5     **"[T]o ensure that a state created parole scheme serves the public interest**

6     **purposes of rehabilitation and deterrence, the Parole Board must be cognizant**

7     **not only of the factors required by the state statute to be considered. but also the**

8     **concepts embodied in the Constitution requiring due process of law... "[Please**

9     **see e.g. in Greenholtz, 442 U.S. at 7-8.].") (Biggs, supra, 334 F.3d at p. 916)**

10

11     **"The Parole Board's sole supportable reliance on the gravity of the offense and**

12     **conduct prior to imprisonment to justify denial of Parole can be initially justified**

13     **as fulfilling the requirements set forth by state law. Over time however, should**

14     **Biggs continue to demonstrate exemplary behavior and evidence of**

15     **rehabilitation, denying him a parole date simply because of the nature of his**

16     **offense and prior conduct would raise serious questions involving his liberty**

17     **interest in parole...(Id)**

18     Petitioner also submits that the Board has adopted an anti and/or no parole policy per se, or

19  a policy of under-inclusion demonstrating a policy of systematic bias; granting only an

20  approximate 232 parole dates out of over 11,000 parole hearings, thus violating the legislative

21  intent of PC § 3041(a) that; "...a parole date shall normally be set in a manner that will provide

22  uniform terms for offenders with crimes of similar gravity and magnitude...". And, violating

23  Petitioner's State and Federal due process rights as well (please see In re Ramirez, supra, at

24  page 565). Petitioner contends that the evidenced behavior by a quasi-judicial Board, of a

25  policy demonstrating an approximate 98.5% denial rate, supports the premise that such a policy

26  exists (i.e. anti and/or no parole policy of under-inclusion or systematic bias): this policy

27  violates the strictures of substantive due process.

28

1    The existence of said policy in denying parole may explain why the Board only grants

2    parole in less than two (2) percent of the cases it hears; it also explains the bias demonstrated in

3    the present case.

4    In this case, Petitioner's own circumstances, the Board's pronouncement of numerous

5    unlawful conclusions, not supported by the record, violates the process due to Petitioner under

6    the State and Federal Constitutions. Based upon the herein-demonstrated bias, the Board's

7    decision cannot be shielded by the "some evidence" standard. The only appropriate remedy is

8    an independent review.

9    Petitioner respectfully requests that the Court take a look and compare this case with others

10    where the circumstances were more aggravated, yet reviewing courts found that due process

11    was violated and the "some evidence" standard not met.

12    The Court in In re Wen Lee (2006) 143 Cal.App.4th 1400, [a multiple victims case with one

13    person dead], found that Lee's crimes were not "especially heinous, atrocious or cruel."

14    Additionally, the Court held, "Besides not being especially atrocious, heinous or callous, Lee's

15    crimes have little, if any, predictive value for future criminality. Simply from the passing of

16    time, Lee's crimes **almost 20 years ago** have lost much of their usefulness in foreseeing the

17    likelihood of future offenses than if he had committed them five or ten years ago." Further,

18    "The test is not whether some evidence supports the reasons cited for denying parole, but

19    whether some evidence indicates a parolee's release unreasonably endangers public safety."

20    Some evidence of the existence of a particular factor does not necessarily equate to some

21    evidence the parolee's release unreasonably endangers public safety.

22    In In re Jeffrey Elkins, 2006 DJDAR 14489, Elkins beat his victim over the head with a

23    baseball bat, robbed him, put the body in his car trunk and drove to a remote area where he

24    dumped the body. He was convicted by a jury in 1980. **He served 26 years.** The Court wrote,

25    "The commitment offense, this court has observed, is an unsuitability factor that is immutable

26    and whose predictive value 'may be very questionable after a long period of time.' (*Scott II*,

27    supra, 133 Cal.App.4th at pp. 594-595, fn. Omitted.) We have also noted, as has our Supreme

28    Court, strong legal and scientific support that 'predictions of future dangerousness are

exceedingly unreliable,' even where the passage of time is not a factor and the assessment is

made by an expert. Reliance on an immutable factor, without regard to or consideration of subsequent circumstances, may be unfair, run contrary to the rehabilitative goals espoused by the prison system, and result in a due process violation. A parole hearing does not ordinarily provide a prisoner a very good opportunity to show his offense was not committed 'in an especially heinous, atrocious or cruel manner,' even if such evidence exists and the prisoner is willing to run the risk his effort to make such a showing will be seen as unwillingness to accept responsibility and therefore evidence of unsuitability."

"Our case, while resting on state due process (Cal. Const., art. I, section 7, subd. (a)), compares favorably to cases affording habeas corpus relief on federal due process grounds, against parole denials for California inmates with exemplary post-offense records who had been sentenced to terms of at least 15 years to life for second degree murder . In one, the same inmate earlier involved in our Supreme Court's decision in *Rosenkrantz* had offended at age 18, shooting a younger brother's friend [while lying in wait] who had revealed the inmate's homosexuality to the inmate's intolerant father. The inmate's 'perfect prison record' and gains of nearly **two decades** included, like Elkins' act of jeopardizing his own safety to protect a correctional officer, saving the life of a fellow inmate. The Court found due process violated when the former Board of Prison Terms denied parole, as it had before, based solely on the gravity of the commitment offense. (Rosenkrantz v. Marshall (C.D. Cal. 2006 444 F.Supp.2d 1063, 1065, 1070.)

"In a second such case, former Governor Davis had reversed a BPT suitability determination, stressing principally the gravity of the commitment offense. (Martin v. Marshall (2006) 431 F.Supp.2d 1038) After first finding no support for other grounds, the court turned to the factors surrounding and preceding the offense, which included the 26-year-old petitioner fleeing the scene of his fatally shooting a drug dealer acquaintance and bystander in a blaze of gunfire at a restaurant, wounding yet another bystander, and without seeking medical assistance for any of his victims. The court reasoned: 'Petitioner has surpassed his minimum sentence, and has already been found suitable for parole by two decision-making bodies ... He has been in prison for approximately 26 years and has taken advantage of numerous rehabilitation and enrichment programs. He has exceeded his minimum sentence by

approximately six years … The Governor's sole reliance on the circumstance of the offense

and conduct prior to the offense, constitutes a due process violation.'"

"A third instructive case is Irons v. Warden of Solano (2005) 358 F.Supp.936 (Irons) (app.

pending sub nom. Irons v. Carey (9th Cir. 2005) 408 F.3d 1165, No. 05-15275), where an

inmate serving 17 years to life was found unsuitable for parole at his 5th hearing before the

BPT. The facts of the offense, again, in many respects far worse than those before us. The

petitioner killed a fellow boarder after an argument in which the victim denied stealing from

the landlords, as the landlords had claimed. The petitioner loaded a handgun, went to the

victim's room, fired 12 rounds into him, said he was going to let him bleed to death and, when

the victim complained of the pain, took out a buck knife and stabbed him twice in the back.

The petitioner later borrowed a car and drove the body to an isolated coastal location where he

released it into the surf. The BPT had relied exclusively on the facts of the commitment offense

and the petitioner's drug use at the time. The Court wrote: 'Important in assessing any due

process violation is the fact that continuous reliance on unchanging circumstances transforms

an offense for which California law provides eligibility for parole into a de facto life

imprisonment without the possibility of parole … The circumstances of the crimes will always

be what they were, and petitioner's motive for committing them will always be trivial.

Petitioner has no hope for ever obtaining parole except that a panel in the future will arbitrarily

hold that the circumstances were not that serious or the motive was more than trivial.' … **After**

**15 or so years** in the caldron of prison life, not exactly an ideal therapeutic environment to say

the least, and after repeated demonstrations that despite the recognized hardships of prison, this

petitioner does not posses those attributes, the predictive ability of the circumstances of the

crime is near zero."

Finally, in Rio v. BPT Commissioners, ND No. C 05-1483 MPH (Dec. 2006), a case

involving a petitioner convicted of second degree murder even though not the actual shooter,

Judge Patel wrote: "The BPT considered the circumstances of the murder and concluded that it

was an carried out in a cruel and callous manner, carried out in a manner which demonstrates

exceptionally callous disregard for human suffering, and was done for a trivial motive." Rio

and his crime partners Amaro and Willie went to Roberto Hernandez's apartment under the

1   pretense of purchasing jewelry. During the robbery, Willie shot Hernandez in the back of the

2   head. The Judge went on to say, "There was not sufficient evidence to support the finding that

3   the circumstances of the commitment offense tended to show unsuitability. The BPT looked at

4   the killing without any attention paid to Rio's role in that killing. The BPT's approach fails to

5   distinguish between the actual killer and those who may be held liable based on their role in the

6   crime such as aiding and abetting or under a felony murder theory as it rates all of them the

7   same on the dangerousness scale. Not only does that approach seem contrary to common sense,

8   it also is contrary to the wording of the regulation. The regulation calls for the BPT to consider

9   whether 'the prisoner committed the offense in an especially heinous, atrocious or cruel

10  manner,' indicating that the focus is on the parole candidate's particular actions in the killing

11  … Here, Rio was present when his crime partner killed the victim. The evidence also was that

12  Rio was there for a robbery and the shooting of the victim was rather unexpected to Rio. There

13  was no evidence that Rio was the leader of the criminal episode, and no evidence that Rio

14  directed the killing or otherwise urged the killer to kill. Under the circumstances, his crime

15  partner's execution-style killing does not provide some evidence that Rio 'committed the

16  offense in an especially heinous, atrocious or cruel manner.' The state may hold a person

17  criminally liable when his crime partner kills during a robbery, but the BPT has a different

18  chore. The BPT is charged with determining whether a prisoner is suitable for parole, not

19  whether he may be held liable for the killing in the first place. The evidence in the record does

20  not support a finding that Rio committed the offense in an especially heinous, atrocious or

21  cruel manner."

22  //

23  //

24  //

25

26

27

28

**CONCLUSION**

The Board's decision was arbitrary and capricious. The Petitioner did not receive a fair hearing, nor will he ever.

Petitioner submits and contends that the finding of unsuitability was arbitrary and capricious:

   1). Due to the Board carrying out it's political function of adhering to a no or anti-parole policy;

   2). Due to the Board's acting contrary to the intent and spirit of PC § 3041 (a);

   3). Due to basing its decisions on unsupported allegations; and

   4). Due to the Board's refusal to adhere to aforementioned decisions and the controlling authorities.

Petitioner prays this Court order him released and /or discharged, or at the very least, direct the Board to issue a decision within ten (10) days granting parole, setting his term "uniformly" as mandated by the legislature.

//

//

//

**PRAYER FOR RELIEF**

1. Issue an Order to Show Cause on an expedited basis.

2. Appoint Counsel.

3. Conduct an Evidentiary Hearing.

4. Order Petitioner's appearance before the Court.

5. Order Petitioner taken back before the Board for a finding of suitability within ten (10) days, or in the alternative, order Petitioner released forthwith;

6. Declaratory relief, and

7. Any other relief this Court deems fair, just and appropriate.

7. Ground 2 or Ground _____ (*if applicable*):

_____

_____

_____

_____

a. Supporting facts:

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

b. Supporting cases, rules, or other authority:

_____

_____

_____

_____

_____

8. Did you appeal from the conviction, sentence, or commitment?  ☐ Yes.  ☐ No.    If yes, give the following information:
  a.  Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"):

_____

  b.  Result: _____    c.  Date of decision: _____

  d.  Case number or citation of opinion, if known: _____

  e.  Issues raised:  (1) _____

      (2) _____

      (3) _____

  f.  Were you represented by counsel on appeal?  ☐ Yes.  ☐ No.  If yes, state the attorney's name and address, if known:

_____

9.  Did you seek review in the California Supreme Court?  ☐ Yes.  ☐ No.    If yes, give the following information:

  a.  Result: _____    b.  Date of decision: _____

  c.  Case number or citation of opinion, if known: _____

  d.  Issues raised:  (1) _____

      (2) _____

      (3) _____

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:

_____

_____

11. Administrative Review:
  a.  If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:

_____

_____

_____

_____

_____

_____

_____

_____

  b.  Did you seek the highest level of administrative review available?  ☐ Yes.  ☐ No.
    *Attach documents that show you have exhausted your administrative remedies.*

MC-275 [Rev. January 1, 1999]    **PETITION FOR WRIT OF HABEAS CORPUS**    Page five of six

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or issue in any court? ☐ Yes. If yes, continue with number 13. ☐ No. If no, skip to number 15.

13. a. (1) Name of court: _____

(2) Nature of proceeding (for example, "habeas corpus petition"): _____

(3) Issues raised: (a) _____

(b) _____

(4) Result (Attach order or explain why unavailable): _____

(5) Date of decision: _____

b. (1) Name of court: _____

(2) Nature of proceeding: _____

(3) Issues raised: (a) _____

(b) _____

(4) Result (Attach order or explain why unavailable): _____

(5) Date of decision: _____

c. For additional prior petitions, applications, or motions, provide the same information on a separate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

_____

_____

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See In re Swain (1949) 34 Cal.2d 300, 304.)

_____

_____

16. Are you presently represented by counsel? ☐ Yes. ☐ No. If yes, state the attorney's name and address, if known:

_____

_____

17. Do you have any petition, appeal, or other matter pending in any court? ☐ Yes. ☐ No. If yes, explain:

_____

_____

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:

_____

_____

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date: 3-18-07

_Rogelio Cordoba_
(SIGNATURE OF PETITIONER)

# EXHIBIT "A"
# (HEARING TRANSCRIPT)

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

INMATE
COPY

In the matter of the Life ⟩
Term Parole Consideration ⟩    CDC No: D-22031
Hearing of: ⟩
⟩
ROGELIO CORDOBA ⟩
_____⟩

CALIFORNIA TRAINING FACILITY

SOLEDAD, CALIFORNIA

SEPTEMBER 12, 2006

4:35 p.m.

PANEL PRESENT:

Belinda Harris-Ritter, Presiding Commissioner
Ramon Estrada, Deputy Commissioner

OTHERS PRESENT:

Rogelio Cordoba, Inmate
Marianne Tardiff, Attorney for Inmate
Michael J. Montagma, Deputy District Attorney
Correctional Officers Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____ No          See Review of Hearing
_____ Yes         Transcript Memorandum

Shelley Kelber    Northern California Court Reporters

## INDEX

| | Page |
|---|---|
| Proceedings | 1 |
| Case Factors | 7 |
| Pre-Commitment Factors | 12 |
| Post-Commitment Factors | 17 |
| Parole Plans | 26 |
| Closing Statements | 40 |
| Recess | 45 |
| Decision | 46 |
| Adjournment | 52 |
| Transcriber Certification | 53 |

--oOo--

1

1          P R O C E E D I N G S

2               PRESIDING COMMISSIONER HARRIS-RITTER:    Okay.

3     Are we on?

4               DEPUTY COMMISSIONER ESTRADA:    Yes, we're on.

5               PRESIDING COMMISSIONER HARRIS-RITTER:    Okay.

6     Thank you.   Good afternoon.   We are on the record.

7     This is a subsequent parole consideration hearing for

8     Rogelio Cordoba, CDC Number D-22031.   Today's date is

9     September 12th, 2006, and the time is 4:35 p.m.   We're

10    located at CTF, Soledad.   The inmate was received on

11    January 17, 1986, from Los Angeles County.   The life

12    term began on June 11, 1986 and the minimum eligible

13    parole date is November 12, 1995.   The controlling

14    offense for which the inmate has been committed is

15    murder in the second degree, case number LA A762389,

16    count one, Penal Code section 187, and Penal Code

17    section 12022.5 for use of firearm, to wit, a handgun.

18    This hearing is being tape-recorded.   For the purpose

19    of voice identification we will go around the room,

20    state our first name, our last name, spell our last

21    name, and then, Mr. Cordoba, when we get to you if you

22    would also give your CDC number we would really

23    appreciate that, okay.   Thank you.   I will start and go

24    to my left.   I am Belinda Harris-Ritter, H-A-R-R-I-S -

25    R-I-T-T-E-R, Commissioner, Board of Parole Hearings.

26               DEPUTY COMMISSIONER ESTRADA:    Ramon Estrada, E-

27    S-T-R-A-D-A, Deputy Commissioner, Board of Parole

2

1    Hearings.

2          **DEPUTY DISTRICT ATTORNEY MONTAGMA:**  Michael J.

3    Montagma, M-O-N-T-A-G-M-A, Deputy D-A, LA County.

4          **ATTORNEY TARDIFF:**  Marianne Tardiff, T-A-R-D-I-

5    F-F, attorney for Mr. Cordoba.

6          **INMATE CORDOBA:**  Rogelio Cordoba, C-O-R-D-O-B-

7    A, D-22031.

8          **PRESIDING COMMISSIONER HARRIS-RITTER:**  Thank

9    you.  We also have two correctional peace officers in

10   the room for security purposes.  Mr. Cordoba, there's a

11   sheet of paper right there in front of you, relating to

12   the Americans with Disabilities Act issues.  Could you

13   be kind enough to read that aloud into the record for

14   us.  Thank you.

15         **INMATE CORDOBA:**

16            "The ADA, Americans with Disabilities,

17            Act.  The Americans with Disabilities

18            Act, ADA, is a law to help people with

19            disabilities.  Disabilities are problems

20            that make it harder for some people to

21            see, hear, breathe, talk, walk, learn,

22            think, work, or take care of themselves

23            than it is for others.  Nobody can be

24            kept out of public places or activities

25            because of disabilities.  If you have a

26            disability, you have the right to ask

27            for help to get ready for your BPT

3

1        hearing, get to the hearing, talk, read

2        forms and papers, and understand the

3        hearing process.  BPT will look at what

4        you ask for to make sure that you have a

5        disability that is covered by the ADA,

6        and that you have asked for the right

7        kind of help.  If you do not get help,

8        or if you don't think you got the kind

9        of help you need, ask for a BPT 1074

10       Grievance Form.  You can also get help

11       to fill it out."

12            PRESIDING COMMISSIONER HARRIS-RITTER:  Great,

13   thank you very much.  And I also note in your file that

14   on 8/23/05 you signed BPT form 1073 indicating that you

15   had no disabilities identified from the file review and

16   do not need any help in your parole hearing related to

17   any issues under the Americans with Disabilities Act.

18   Is that information still correct?

19            INMATE CORDOBA:  Yes, ma'am.

20            PRESIDING COMMISSIONER HARRIS-RITTER:  Okay.

21   Thank you.  And, Counsel, are there any ADA issues that

22   you believe need further discussion regarding your

23   client's ability to fully participate in today's

24   hearing?

25            ATTORNEY TARDIFF:  No.

26            PRESIDING COMMISSIONER HARRIS-RITTER:  Okay.

27   Thank you.  Mr. Cordoba, we will reach a decision today

4

1   and inform you whether or not we find you suitable for

2   parole.  We will tell you the reasons for our decision

3   and, if you're found suitable for parole, the length of

4   your confinement will be explained to you.  Before we

5   recess the hearing to deliberate on our decision the

6   district attorney's representative, your attorney, and

7   you will be given an opportunity to make a final

8   statement regarding your suitability.  Your statement

9   will be limited to why you feel you are suitable for

10  parole.  We will then recess, clear the room, and

11  Commissioner Estrada and I will deliberate.  Once we've

12  completed our deliberations we will resume the hearing

13  and announce our decision.  The California Code of

14  Regulations state that regardless of time served, a

15  life inmate shall be found unsuitable for, and denied,

16  parole, if in the judgment of the panel the inmate

17  would pose an unreasonable risk or danger to society if

18  released from prison.  You have certain rights related

19  to your hearing.  Those include the right to a timely

20  notice of the hearing, the right to review your Central

21  File and the right to present relevant documents.

22  Counselor, have your client's rights been met?

23          ATTORNEY TARDIFF:  Yes.

24          PRESIDING COMMISSIONER HARRIS-RITTER:  Thank

25  you.  And, Mr. Cordoba, you also have a right to an

26  impartial panel.  Do you have any objections to the

27  panel?

5

1           **INMATE CORDOBA:**  No, ma'am.

2           **PRESIDING COMMISSIONER HARRIS-RITTER:**  Thank

3   you.  Counselor, do you have any objections to the

4   panel?

5           **ATTORNEY TARDIFF:**  No.

6           **PRESIDING COMMISSIONER HARRIS-RITTER:**  You will

7   receive a copy of our tentative written decision today.

8   The decision becomes final in 120 days and a copy of

9   the decision and a copy of the transcript will be sent

10  to you.  In 2004 the regulations related to an appeal

11  of our decisions changed.  So if you have questions

12  regarding an appeal, you should ask your attorney or

13  visit the prison law library, all right?

14          **INMATE CORDOBA:**  Yes, ma'am.

15          **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay,

16  good.  You are not required to admit or discuss your

17  commitment offense, however the panel does accept as

18  true the findings of the court, do you understand?

19          **INMATE CORDOBA:**  Yes, ma'am.

20          **PRESIDING COMMISSIONER HARRIS-RITTER:**  Thank

21  you.  Commissioner Estrada, is there any confidential

22  material in the file that will be used in this hearing?

23          **DEPUTY COMMISSIONER ESTRADA:**  There is

24  confidential information in the inmate's Central File,

25  and I don't believe it will be used today.

26          **PRESIDING COMMISSIONER HARRIS-RITTER:**  Thank

27  you.  I have passed the hearing checklist, I believe,

6

1   right, the Deputy District Attorney has it.   Miss

2   Tardiff, have you seen it already?

3           ATTORNEY TARDIFF:   Yes, I have.

4           PRESIDING COMMISSIONER HARRIS-RITTER:   Okay.

5   Thank you.

6           ATTORNEY TARDIFF:   I have the documents.

7           DEPUTY DISTRICT ATTORNEY MONTAGMA:   I also have

8   all the documents.

9           PRESIDING COMMISSIONER HARRIS-RITTER:   Great.

10   Then I'll take this into submission as Exhibit 1.   Are

11   there any additional documents to be submitted?

12           ATTORNEY TARDIFF:   No.

13           PRESIDING COMMISSIONER HARRIS-RITTER:   All

14   right.   Are there any preliminary objections?

15           ATTORNEY TARDIFF:   No.

16           PRESIDING COMMISSIONER HARRIS-RITTER:   And will

17   Mr. Cordoba be speaking with the panel?

18           ATTORNEY TARDIFF:   Except for the commitment

19   offense, and I have a little statement regarding the

20   commitment offense.

21           PRESIDING COMMISSIONER HARRIS-RITTER:   Okay.

22           ATTORNEY TARDIFF:   That I can read into the

23   record later, when it would be an appropriate time.

24           PRESIDING COMMISSIONER HARRIS-RITTER:   All

25   right.   That's fine.   Then -- at this time Mr. Cordoba,

26   if you could raise your right hand I'll go ahead and

27   swear you in.   Do you solemnly swear or affirm that the

7

1    testimony you give at this hearing will be truth, the

2    whole truth, and nothing but the truth?

3            INMATE CORDOBA:  Yes.

4            PRESIDING COMMISSIONER HARRIS-RITTER:  Okay.

5    Thank you.  All right, at this time then I will turn to

6    the appellate opinion.  At the bottom of page 4 -- the

7    page numbers are up at the top right and they're hard

8    to see.

9            ATTORNEY TARDIFF:  Thanks.

10           PRESIDING COMMISSIONER HARRIS-RITTER:  At the

11   bottom of page 4 begins with the factual statement.

12   And this is the appellate opinion in the Court of

13   Appeal of the State of California, Second Appellate

14   District, Division 1, and it was, it's dated, it looks

15   like 9/15/1988.  In the high upper right hand corner,

16   and it's also stamped June 30th, 1988, by the deputy

17   clerk.  That was probably when it was received.  It's

18   the People v Rogelio Cordoba and Rodney Smith.

19               "On January 30th, 1985, at about 3:00

20               p.m. (inaudible) Harris was walking with

21               four friends in the area of 46th Street

22               and Crenshaw, in Los Angeles.  Defendant

23               Rodney Tommy Smith came around the

24               corner, approached the group, and said

25               'Now what's up,' and then started

26               shooting.  Defendant Smith, known on the

27               street as Snowman, fired four shots and

8

1    a bullet struck Harris just above the

2    ankle.   Harris received medical

3    attention for this injury.   The bullet

4    passed in and out of Harris's ankle and

5    leg, he has scars as a result.   On

6    February 1st, 1985, between 3:00 and 4:00

7    p.m., Willie Rubin, Andre West and

8    Lawrence McIntosh were at the

9    intersection of 9th Avenue and 48th

10   Street in Los Angeles.   Defendant Smith

11   drove up to that location in a beige

12   automobile.   There were a number of

13   passengers in the vehicle, including

14   some girls.   Defendant Smith fired a

15   shot toward Willie Rubin and Andre West,

16   but did not hit either of them, and

17   drove away.   The next day, on February

18   2nd, 1985, Ronnie Luke, L-U-K-E, saw

19   Defendant Smith and Defendant Cordoba,

20   street name Loco Dog, together.   He saw

21   them depart in Defendant Smith's

22   automobile.   At about 7:00 p.m. Willie

23   Rubin and Marvin McIntosh were standing

24   on the sidewalk in front of a residence

25   at 4817 South 9th Street, Los Angeles,

26   waiting for a friend.   Rubin observed a

27   beige automobile coming down the street.

9

1    The car slowed down, the lights were

2    turned off, the car continued proceeding

3    toward Rubin and McIntosh, and passed

4    them.  Rubin and McIntosh, having seen

5    the car approaching with the lights off,

6    thought the situation suspicious and

7    took refuge behind two cars parked in

8    the driveway at 4817.  The car passed

9    4817, and continued to the front of the

10   property next door, where it stopped.

11   Two shots were fired from the car.

12   McIntosh was struck in the head by a

13   bullet, fell to the ground and died from

14   the wound.  Rubin heard someone inside

15   the car say 'cuz,' and that's spelled C-

16   U-Z, and the car sped from the scene.

17   There was testimony that the word cuz

18   was one that was likely to be used by

19   some gang member who was hostile to the

20   Blood gang members.  Ronnie Luke saw

21   Defendant Smith later on the evening of

22   February 2nd, 1985.  Smith told Luke that

23   he and Defendant Cordoba had gone riding

24   for the Fifties-hood.  The Fifties is a

25   gang associated with the Bloods, also a

26   gang.  The hood refers to a

27   neighborhood, an area where members of a

10

1           particular gang live or gather.  The

2           Fifties-hood therefore was a

3           neighborhood where Fifties live or

4           gather.  Smith told Luke he and Cordoba

5           had blasted some Fifties."

6    Now, Mr. Cordoba, I understand that you're not going to

7    be discussing the crime itself, but I'd like to know

8    how do you feel today about your participation in it?

9           INMATE CORDOBA:  I'm very remorseful

10   (inaudible) I take full responsibility for the crime

11   that which I committed against Mr. Marvin McIntosh.

12          PRESIDING COMMISSIONER HARRIS-RITTER:  Were you

13   involved in a gang?

14          INMATE CORDOBA:  No, ma'am.

15          PRESIDING COMMISSIONER HARRIS-RITTER:  Were you

16   involved in other criminal activity with these same

17   people?

18          INMATE CORDOBA:  No, ma'am.

19          PRESIDING COMMISSIONER HARRIS-RITTER:  Can you

20   tell us how you got yourself to be in that situation

21   that you were in at the time the crime was committed?

22          INMATE CORDOBA:  That day, or that night, I was

23   supposed to go and DJ at a party in Riverside and I

24   didn't have no way to get there, so I asked (inaudible)

25   could he give me a ride.  So, but we decided to go to a

26   McDonalds and on the way back from McDonalds, that's

27   when the incident happened.

11

1        PRESIDING COMMISSIONER HARRIS-RITTER:   So you

2   never got to Riverside? Is that correct?

3        INMATE CORDOBA:  Yes, afterward.

4        PRESIDING COMMISSIONER HARRIS-RITTER:   Oh, you

5   did go to Riverside.

6        INMATE CORDOBA:  Yes, after we came back from

7   McDonalds.

8        PRESIDING COMMISSIONER HARRIS-RITTER:   Did you

9   know those people prior to that crime?

10        INMATE CORDOBA:  Yes, I knew them.

11        PRESIDING COMMISSIONER HARRIS-RITTER:   The

12   people who were shot?

13        INMATE CORDOBA:  Yes.

14        PRESIDING COMMISSIONER HARRIS-RITTER:   And how

15   did you know them?

16        INMATE CORDOBA:  Because I used to play

17   basketball at the high school.

18        PRESIDING COMMISSIONER HARRIS-RITTER:   Your

19   prior criminal record, it does include an arrest when

20   you were a juvenile, it was an arrest for robbery.  Do

21   you recall that?

22        INMATE CORDOBA:  Yes, ma'am.

23        PRESIDING COMMISSIONER HARRIS-RITTER:   What

24   happened in that situation?

25        INMATE CORDOBA:  Well, the way that situation

26   was down, there was some guys coming around the area,

27   the neighborhood, stealing the kids' bikes, so

12

1   (inaudible) kids on the block, I decided to go get the

2   bikes back. I was arrested, but it wasn't for stealing

3   the bike.

4          PRESIDING COMMISSIONER HARRIS-RITTER:  You

5   (inaudible) the stolen bikes?

6          INMATE CORDOBA:  Yeah, (inaudible) I went back

7   to get it for the kids in the neighborhood.

8          PRESIDING COMMISSIONER HARRIS-RITTER:  Okay.

9   And then a year later you have, it looks like an arrest

10  with no disposition, in February of 1984, from

11  trespassing at a junior high school?

12         INMATE CORDOBA:  That was the same.

13         PRESIDING COMMISSIONER HARRIS-RITTER:  Same

14  situation?

15         INMATE CORDOBA:  Same thing as with the bikes,

16  with the bicycles.  The guys coming up to the high

17  school, the junior high school and stealing the kids'

18  bicycle and I was only going up there to make sure they

19  didn't steal any bikes.  So they arrest me for

20  trespassing.

21         PRESIDING COMMISSIONER HARRIS-RITTER:  Okay.

22  And those are your only two prior crimes, is that

23  right?

24         INMATE CORDOBA:  Yes, ma'am.

25         PRESIDING COMMISSIONER HARRIS-RITTER:  In the

26  crime report it indicates that you were never an

27  official gang member, but you played basketball with

13

1    them, just like you told me, right?

2         INMATE CORDOBA:   (inaudible)

3         PRESIDING COMMISSIONER HARRIS-RITTER:   And, you

4    grew up, is it with both your parents in the house?

5         INMATE CORDOBA:   Yes, ma'am.

6         PRESIDING COMMISSIONER HARRIS-RITTER:   And you

7    moved here to California from the Virgin Islands,

8    right?

9         INMATE CORDOBA:   Yes, ma'am.

10        PRESIDING COMMISSIONER HARRIS-RITTER:   But you

11   moved to the Virgin Islands from Panama.   And how old

12   were you when you came to California?

13        INMATE CORDOBA:   I think I was about 13.

14        PRESIDING COMMISSIONER HARRIS-RITTER:   How

15   much?

16        INMATE CORDOBA: Thirteen.

17        PRESIDING COMMISSIONER HARRIS-RITTER:   Okay.   I

18   have problems, I have an ear infection, so it's hard

19   for me to hear today.   And how old were you when you

20   went from Panama to the Virgin Islands?

21        INMATE CORDOBA:   Nine.

22        PRESIDING COMMISSIONER HARRIS-RITTER:   Okay.

23   And did you have any trouble in school here?

24        INMATE CORDOBA:   No, ma'am.

25        PRESIDING COMMISSIONER HARRIS-RITTER:   Did you

26   drop out of school or were you still in school?

27        INMATE CORDOBA:   I dropped out in the 12th grade

14

1    (inaudible) I dropped out.

2             PRESIDING COMMISSIONER HARRIS-RITTER:  Did you

3    participate in any activities at school?

4             INMATE CORDOBA:  Yes.

5             PRESIDING COMMISSIONER HARRIS-RITTER:  What was

6    that?

7             INMATE CORDOBA:  Well, I did drama class.

8             PRESIDING COMMISSIONER HARRIS-RITTER:  Anything

9    else?

10            INMATE CORDOBA:  Matter of fact, I said I

11   played in sports; football and basketball and I ran in

12   track.

13            PRESIDING COMMISSIONER HARRIS-RITTER:  Were you

14   on any school teams?

15            INMATE CORDOBA:  Football teams, yeah.

16            PRESIDING COMMISSIONER HARRIS-RITTER:  Okay.

17            INMATE CORDOBA:  Football and basketball.

18            PRESIDING COMMISSIONER HARRIS-RITTER:  So that

19   wasn't just participating in inter-murals, it was

20   actually on a team?

21            INMATE CORDOBA:  On a team, yes ma'am.

22            PRESIDING COMMISSIONER HARRIS-RITTER:  Okay.

23   And, were these guys, that you were hanging out with,

24   people who had been friends of yours since elementary

25   school, or junior high?

26            INMATE CORDOBA:  I wouldn't say friends, it was

27   just guys I had I been in (inaudible) same, you know,

15

1   at the same, you know, elementary school, I played

2   basketball on an (inaudible).

3          PRESIDING COMMISSIONER HARRIS-RITTER:   Okay.

4   And that's why you asked the guy for a ride, right?

5          INMATE CORDOBA:   Yes, because I knew him.

6          PRESIDING COMMISSIONER HARRIS-RITTER:   Okay.

7   Do you have anything you want to add about your social

8   history that I haven't talked to you about?

9          INMATE CORDOBA:   No, ma'am.

10          PRESIDING COMMISSIONER HARRIS-RITTER:   You want

11   to tell me about your brothers and sisters?   How you

12   get along?

13          INMATE CORDOBA:   Well, we get along.   We're a

14   tight knit family.   In 1987 my sister was, perished in

15   the line of fire in Panama.   There was an invasion,

16   when America invaded Panama in 1987, she was basically

17   in the line of fire.   (inaudible) so she died doing

18   that and they took her body and put it into the ocean.

19   When I left Panama she was, when I was a kid, I really

20   didn't, wasn't around her that much, but she decided to

21   stay with our grandmother in Panama.   My two brothers,

22   they came out here with us, both of them have their own

23   businesses now.   My brother, Rodolfo, he got his

24   business in graphic art and design and landscaping.

25   And my other brother, he's teaching, he has a Tae Kwon

26   Do class, Orlando.

27          PRESIDING COMMISSIONER HARRIS-RITTER:   Okay.

16

1    And your mother and father are still here?

2         INMATE CORDOBA:  Yes, ma'am.

3         PRESIDING COMMISSIONER HARRIS-RITTER:  Have you

4    -- have a lot of contact with your parents and your

5    brothers?

6         INMATE CORDOBA:  Yeah, they come to visit.

7         PRESIDING COMMISSIONER HARRIS-RITTER:  Okay,

8    and they also send you letters?

9         INMATE CORDOBA:  Yes.

10        PRESIDING COMMISSIONER HARRIS-RITTER:  What

11   about on the phone?  Do you call them?

12        INMATE CORDOBA:  Yes, once a week.

13        PRESIDING COMMISSIONER HARRIS-RITTER:  Okay.

14   Commissioner Estrada, do you have any questions you'd

15   like to ask about the prior criminal history or social

16   background?

17        DEPUTY COMMISSIONER ESTRADA:  I have a question

18   regarding your nickname, Loco Doc?

19        INMATE CORDOBA:  Yeah.

20        DEPUTY COMMISSIONER ESTRADA:  Loco Doc?

21        INMATE CORDOBA:  I don't know, you know, about

22   the Loco.  My nickname was just Doc, and I got that

23   name put on (inaudible) coach back in the days when I

24   was playing basketball and the coach wanted us to us

25   take a name of a very good basketball player, so I

26   chose one like Doctor J, so all my friends started

27   calling me the Doc.  That's where the name Doc came

17

1   from.

2       **DEPUTY COMMISSIONER ESTRADA:**   And they didn't

3   call you Loco Doc?

4       **INMATE CORDOBA:**   No, sir.

5       **DEPUTY COMMISSIONER ESTRADA:**   That's all I have

6   for right now.

7       **PRESIDING COMMISSIONER HARRIS-RITTER:**   Okay.

8   Well, then at this time I'm going to turn the hearing

9   over to Commissioner Estrada to talk about your post

10  conviction factors.  After he's finished with that then

11  he'll give the hearing back to me and we'll talk about

12  parole plans, okay?

13      **DEPUTY COMMISSIONER ESTRADA:**   Thank you.  Good

14  afternoon, Mr. Cordoba.

15      **INMATE CORDOBA:**   (inaudible)

16      **DEPUTY COMMISSIONER ESTRADA:**   (inaudible) post

17  conviction information through your Central Files, as a

18  life prisoner, evaluation report prepared for the

19  November 2005 calendar by correction counselor I

20  (inaudible), post conviction progress report covering

21  the period of September 2004 (inaudible) prepared by

22  (inaudible) Baker and (inaudible) Valtajar, V-A-L-T-A-

23  J-A-R.  And a psychological evaluation prepared for the

24  June 2006 calendar by Dr. Macomber, spelled M-A-C-O-M-

25  B-E-R.  As (inaudible) last parole consideration

26  hearing on November 1st, 2004, it was held that

27  (inaudible) denied parole for one year and recommended

18

1    that the inmate stay disciplinary free, get self-help,
2    earn positive chronos, and get a GED. (inaudible)
3    score last year was 19 and continues to be 19, correct?
4          **INMATE CORDOBA:** Yes, sir.
5          **DEPUTY COMMISSIONER ESTRADA:** (inaudible)
6    continues to be (inaudible), correct?
7          **INMATE CORDOBA:** Yes, sir.
8          **DEPUTY COMMISSIONER ESTRADA:** In reviewing your
9    Central File and the (inaudible) Report, and the
10   psychological report, there are indications that you
11   completed vocational welding.
12         **INMATE CORDOBA:** Yes, sir.
13         **DEPUTY COMMISSIONER ESTRADA:** You have that
14   certificate?
15         **INMATE CORDOBA:** Yes, sir.
16         **DEPUTY COMMISSIONER ESTRADA:** Okay. Thank you.
17   Okay, July -- He completed vocational welding on July
18   3rd, 1992, correct?
19         **INMATE CORDOBA:** Yes, sir.
20         **DEPUTY COMMISSIONER ESTRADA:** And this is your
21   license?
22         **INMATE CORDOBA:** Yes, sir.
23         **DEPUTY COMMISSIONER ESTRADA:** Okay, very good.
24   Now, and I also see you completed vocational training
25   technology?
26         **INMATE CORDOBA:** Yes, sir.
27         **DEPUTY COMMISSIONER ESTRADA:** Okay. And that

19

1    was about, you have the certificate for that?  -- Okay,

2    this is dated February 5th, 2004, training technology,

3    from Valley Adult School, your certificate of

4    completion.  Do you have anything else?

5              INMATE CORDOBA:  You mentioned something about

6    my GED?  Getting a GED?

7              DEPUTY COMMISSIONER ESTRADA:  We're not there,

8    we're still on vocational.

9              INMATE CORDOBA:  Oh, vocational, no sir.

10             DEPUTY COMMISSIONER ESTRADA:  Okay.  Now, now

11   we're doing the GED.  I did see that in your Central

12   File, that you completed your GED on May 28th, 1997,

13   correct?

14             INMATE CORDOBA:  Yes, sir.

15             DEPUTY COMMISSIONER ESTRADA:  Okay.  Have you

16   done any, anything else regarding upgrading

17   academically?

18             INMATE CORDOBA:  Besides the GED, no sir.

19             DEPUTY COMMISSIONER ESTRADA:  Okay.  Now, are

20   you working?

21             INMATE CORDOBA:  Yes, sir.

22             DEPUTY COMMISSIONER ESTRADA:  Where are you

23   working?

24             INMATE CORDOBA:  Recreational department.

25             DEPUTY COMMISSIONER ESTRADA:  Oh, yeah, here's

26   an indication that you started out there in 4/2005.

27   (inaudible) supervisor's report?

20

1          INMATE CORDOBA:   There should be in my file.

2    (inaudible).

3          DEPUTY COMMISSIONER ESTRADA:   From, from

4    recreational --

5          INMATE CORDOBA:   Yes.

6          DEPUTY COMMISSIONER ESTRADA:   -- worker?   I

7    could not find anything.

8          INMATE CORDOBA:   (inaudible)

9          DEPUTY COMMISSIONER ESTRADA:   They did your

10   (inaudible) review?

11         INMATE CORDOBA:   Yes, sir.

12         DEPUTY COMMISSIONER ESTRADA:   (inaudible) The

13   only thing in your file is your completion of the

14   vocational training technology, there's nothing else

15   regarding any type of work.   (inaudible)

16         INMATE CORDOBA:   No, sir (inaudible).

17         DEPUTY COMMISSIONER ESTRADA:   I thought you

18   declined to review your (inaudible) Central File.   You

19   signed an A2305 and you declined to review your Central

20   File.

21         INMATE CORDOBA:   I did, that was when, my board

22   hearing was postponed, I believe.

23         DEPUTY COMMISSIONER ESTRADA:   So (inaudible)

24   after that?

25         INMATE CORDOBA:   Yes.

26         DEPUTY COMMISSIONER ESTRADA:   Okay, okay,

27   there's nothing in the Central File (inaudible).   No, I

21

1    don't see (inaudible).

2            **INMATE CORDOBA:**  Yes, my instructor gave me one

3    that's --

4            **DEPUTY COMMISSIONER ESTRADA:**  (inaudible).

5            **INMATE CORDOBA:**  No, what I did was, before I

6    went to the counselor and had (inaudible) --

7            **DEPUTY COMMISSIONER ESTRADA:**  Did you get a

8    copy?

9            **INMATE CORDOBA:**  Yeah, it was in (inaudible).

10           **DEPUTY COMMISSIONER ESTRADA:**  Oh, (inaudible)

11   indicating that you're working as a recreational

12   worker?

13           **INMATE CORDOBA:**  Recreational worker.  What my

14   job is, is --

15           **DEPUTY COMMISSIONER ESTRADA:**  Yeah.

16           **INMATE CORDOBA:**   -- I run the football and

17   basketball league here at Central, Central (inaudible).

18           **DEPUTY COMMISSIONER ESTRADA:**  Okay.  You have

19   any laudatory chronos indicating your participation?

20           **INMATE CORDOBA:**  No, sir.

21           **DEPUTY COMMISSIONER ESTRADA:**  Okay.

22   (inaudible) psychiatric treatment, correct?

23           **INMATE CORDOBA:**  Correct.

24           **DEPUTY COMMISSIONER ESTRADA:**  And the only

25   thing I see that you've completed during this reporting

26   period has been a series of lectures on January 5th,

27   2005, on how to (inaudible) and not get angry.

22

1        INMATE CORDOBA:  Yes.

2        DEPUTY COMMISSIONER ESTRADA:  Okay. And you

3   haven't done any other self-help, correct?

4        INMATE CORDOBA:  I'm currently in a RAG

5   program.

6        DEPUTY COMMISSIONER ESTRADA:  A what program?

7        INMATE CORDOBA:  RAG, R-A-G, Re-entry Activity

8   Group Program.

9        DEPUTY COMMISSIONER ESTRADA:  (inaudible)

10       INMATE CORDOBA:  (inaudible)

11       PRESIDING COMMISSIONER HARRIS-RITTER:  And your

12   anger management.

13       DEPUTY COMMISSIONER ESTRADA:  Okay.  This does

14   indicate that you're an active member in good standing.

15    Then let me (inaudible) re-entry activity group, RAG,

16   okay.  This is (inaudible) preparedness program --

17   (inaudible) parole plans and assisting the particular

18   needs of the individual.  Have you been on parole

19   before?

20       INMATE CORDOBA:  No, sir.

21       DEPUTY COMMISSIONER ESTRADA:  (inaudible)

22       INMATE CORDOBA:  (inaudible) and find out

23   (inaudible) and pass it on to a sponsor, which is

24   (inaudible).

25       DEPUTY COMMISSIONER ESTRADA:  So you should

26   have some real good parole plans then right?

27       INMATE CORDOBA:  Yes, sir.

23

1        DEPUTY COMMISSIONER ESTRADA:  Okay.

2   (inaudible) certificate of completion of anger

3   management for, and that was completed on 12/3/04.

4   (inaudible) Anything else?

5        INMATE CORDOBA:  No, sir.

6        DEPUTY COMMISSIONER ESTRADA:  Okay.  Since

7   you've been in state prison you've received a total of

8   two 115s, the last of them on June 23rd, 1988, for theft

9   of state food, and you were found guilty and you were

10  ordered on 20 hours of extra duty, and the one before

11  that was on November 19, 1987, for threatening staff

12  and you got 30 days (inaudible).  The last 115 was 18

13  years ago, 18 years, 3 months?

14       INMATE CORDOBA:  Yes, sir.

15       DEPUTY COMMISSIONER ESTRADA:  Okay.  There's no

16  violence (inaudible) before that.  Now, you have total

17  of (inaudible) chronos and your last one was December

18  27th, 1995, for, talking responsibility for (inaudible),

19  so you have not had any (inaudible) problems for

20  (inaudible) almost nine months.

21       INMATE CORDOBA:  Yes sir, correct.

22       DEPUTY COMMISSIONER ESTRADA:  Okay.  Going to

23  your (inaudible) indicates that prior to release the

24  prisoner could benefit from maintaining a disciplinary

25  free record, participating in self-help (inaudible) and

26  participating (inaudible) college correspondence

27  courses.  Are you doing any college correspondence

24

1   courses?

2          INMATE CORDOBA:  No, sir.

3          DEPUTY COMMISSIONER ESTRADA:  Okay.  And

4   participating in a work program, I guess that would be

5   your recreational worker?

6          INMATE CORDOBA:  Yes, sir.

7          DEPUTY COMMISSIONER ESTRADA:  Okay.  Are you

8   (inaudible) prepared for you and was completed for this

9   hearing by Dr. Macomber and the doctor indicates a

10  diagnosis of Axis I, no mental disorder, Axis II, no

11  personality disorder, and you have a (inaudible) score

12  of 85.  Now, in regards to the view of the life crime,

13  it does indicate that you accept the official version

14  of the offense and you accept full responsibility for

15  your actions (inaudible) feel badly about (inaudible)

16  accidentally killed as a result of your action.

17  (inaudible) accidentally killed?

18          INMATE CORDOBA:  No, sir. I did not say

19  accidentally.

20          DEPUTY COMMISSIONER ESTRADA:  Huh?

21          INMATE CORDOBA:  I did not say accidentally.

22          DEPUTY COMMISSIONER ESTRADA:  Okay.  And

23  indicated that he did not know about, anything about

24  guns and that he had never shot one before (inaudible)

25  gun and ordered him to shoot, he did.  It was dark and

26  he did not aim and, however, he accidentally, again,

27  shot the 19-year-old victim.  These were individuals

25

1    whom he had played basketball with, he had no animosity

2    or hatred towards them at all.  Okay.  In regards to

3    assessment of dangerousness, the doctor indicates that

4    this was a third examination by a licensed psychologist

5    to assess dangerousness.  They all agree that he does

6    not pose a risk to the institution or to society at

7    this point in his life.  He has never been involved in

8    a racial riot, assault of another, possession of

9    weapons or other (inaudible) with regards to inmate's

10   violence potential they designate below average.

11   (inaudible) for dangerous behavior when released to the

12   community, I agree with the prior three psychologists

13   and stated that he poses no more risk to society than

14   the average citizen in the community.  He does not pose

15   any more risk to society than the average citizen.  In

16   fact, (inaudible) probably poses less risk to the

17   community than the average citizen.  This man has no

18   history of drugs and/or alcohol abuse or gang

19   membership.  There are no significant risk factors in

20   this case.  In regards to recommendations I (inaudible)

21   do have strong family support (inaudible) vocational

22   programs and that you have several alternate job

23   opportunity (inaudible) and that you do have

24   (inaudible).

25            INMATE CORDOBA:  Yes, sir.

26            DEPUTY COMMISSIONER ESTRADA:  (inaudible) this

27   one says you need an interview, I don't know  --

26

1          PRESIDING COMMISSIONER HARRIS-RITTER:  Can I, I

2  want to touch, OK, that's fine.

3          ATTORNEY TARDIFF:  (inaudible)

4                    **(Off the record)**

5          PRESIDING COMMISSIONER HARRIS-RITTER:  Okay,

6  we're back on the record, everyone who was previously

7  present is still in -- is present again.

8          ATTORNEY TARDIFF:  I'm going to (inaudible)

9  that my client is willing to discuss the commitment

10  offense with you.

11          PRESIDING COMMISSIONER HARRIS-RITTER:  Okay.

12          ATTORNEY TARDIFF:  I just talked to him about

13  it, I think it's important that he clear a few things

14  up.

15          PRESIDING COMMISSIONER HARRIS-RITTER:  I

16  appreciate that very much, particularly in light of the

17  question regarding what's in the psych report.  You

18  want to go ahead and --

19          DEPUTY COMMISSIONER ESTRADA:  Yeah, I'm almost

20  finished.

21          PRESIDING COMMISSIONER HARRIS-RITTER:  That's

22  fine and then we'll go back to the crime.

23          DEPUTY COMMISSIONER ESTRADA:  Okay. (inaudible)

24  an INS hold from Panama.  I don't see a immigration

25  ruling in the Central File.  I don't know, it just says

26  that you need an interview, but, an immigration hold, I

27  don't see one.

27

1          PRESIDING COMMISSIONER HARRIS-RITTER:  Did you

2    have an interview in April with anybody related to

3    that?

4          INMATE CORDOBA:  (inaudible) my counselor

5    informed me that I had (inaudible).

6          DEPUTY COMMISSIONER ESTRADA:  Because I checked

7    both files and there's nothing in there about it too,

8    and I checked up on it and I thought I had just a piece

9    of paper potential, there is a potential that you need,

10   you're going to need an interview.

11         INMATE CORDOBA:  Yeah.

12         DEPUTY COMMISSIONER ESTRADA:  But it's

13   (inaudible) you are here illegally they will contact

14   immigration (inaudible).

15         INMATE CORDOBA:  Yes.

16         DEPUTY COMMISSIONER ESTRADA:  (inaudible)

17         INMATE CORDOBA:  Yes.

18         DEPUTY COMMISSIONER ESTRADA:  Anyway, to finish

19   up, it does indicate your family is now legal,

20   naturalized citizens and you are registered for the

21   process.  However, he does have residence in Panama as

22   well as several other family members who live there.

23   (inaudible) Okay, now, (inaudible) Mr. Cordoba?

24         INMATE CORDOBA:  No, sir.

25         DEPUTY COMMISSIONER ESTRADA:  Okay, Counsel?

26         ATTORNEY TARDIFF:  No, not at this time.

27         DEPUTY COMMISSIONER ESTRADA:  Okay.  With that

28

1    I return to the Chair.

2          PRESIDING COMMISSIONER HARRIS-RITTER:  Thank

3    you very much.  Let's go back and talk about the crime

4    now.  Mr. Cordoba, can you tell us why you were in that

5    car shooting that gun that night?

6          INMATE CORDOBA:  Well, on that night, when we

7    were, when we were coming from McDonalds, Mr. Smith,

8    said that someone was shooting at him.  I didn't see

9    anyone shooting at him, because I had the car seat

10   back.  You know, the driver's seat, the passenger seat,

11   I mean, excuse me, (inaudible) I didn't see nobody

12   shooting (inaudible) but I didn't see nobody shooting

13   at us, but he said that somebody was shooting at us, so

14   he reached up under the car seat, handed me a gun and

15   told me (inaudible).  It was a (inaudible) and stuck

16   the gun --

17         PRESIDING COMMISSIONER HARRIS-RITTER:  Okay.

18   And you did, right?

19         INMATE CORDOBA:  (inaudible) fired one shot and

20   we left.  He kept driving on.

21         PRESIDING COMMISSIONER HARRIS-RITTER:  Were you

22   not stopped in front of that house at 4817 when you did

23   that?

24         INMATE CORDOBA:  Probably slowed down, yes.

25   Slowed down, might have stopped, I don't remember.

26         PRESIDING COMMISSIONER HARRIS-RITTER:  Okay.

27         INMATE CORDOBA:  I know we slowed down.

29

1        PRESIDING COMMISSIONER HARRIS-RITTER:   And you

2   just shot out the window --

3        INMATE CORDOBA:   Just shot out the window.

4        PRESIDING COMMISSIONER HARRIS-RITTER:     -- and

5   accidentally hit somebody right in the head?

6        INMATE CORDOBA:   Without, yeah, without aiming.

7        PRESIDING COMMISSIONER HARRIS-RITTER:   Okay.

8   The report says that you accidentally, that somebody

9   accidentally got shot.   You indicated you did not use

10   that word accidentally.   Do you recall what you did say

11   to the psychologist?

12        INMATE CORDOBA:   No, I don't recall.

13        PRESIDING COMMISSIONER HARRIS-RITTER:   Okay. Go

14   ahead.

15        INMATE CORDOBA:   The reason why -- I may have

16   said accidentally is because, like I said, when he got

17   shot, because I didn't mean to kill anyone or hurt

18   anyone, I was just shooting because they scared me.

19        PRESIDING COMMISSIONER HARRIS-RITTER:   But you

20   know when you stick a gun out a window and pull the

21   trigger --

22        INMATE CORDOBA:   Yes, I know.

23        PRESIDING COMMISSIONER HARRIS-RITTER:   There's

24   a real good chance somebody's going to get hit, right?

25        INMATE CORDOBA:   Yes.

26        PRESIDING COMMISSIONER HARRIS-RITTER:   Okay.

27   All right.   Do you have any questions you'd like to ask

30

1   him about the crime itself, Commissioner Estrada?

2         DEPUTY COMMISSIONER ESTRADA:  No, not yet, no.

3         PRESIDING COMMISSIONER HARRIS-RITTER:  Were the

4   other people, who else, were just two of you in the

5   car?

6         INMATE CORDOBA:  (inaudible)

7         PRESIDING COMMISSIONER HARRIS-RITTER:  Was the

8   other guy a gang member?

9         INMATE CORDOBA:  Yes, ma'am.

10         PRESIDING COMMISSIONER HARRIS-RITTER:  Okay.

11   Were the people that you shot at gang members?

12         INMATE CORDOBA:  (inaudible)

13         PRESIDING COMMISSIONER HARRIS-RITTER:  Okay.

14   (inaudible) Let's look at your parole plan now.  A

15   number of support letters have been received and let me

16   go through the ones I have in the file first and then

17   we'll deal with the one your attorney gave me today.

18   There's one from your mother, dated June 19th, 2006, who

19   lives in Los Angeles and indicated that if you're

20   released here you can live with her.  And there's one

21   from Reverend Richard Martini, pastor of the Church of

22   the Transfiguration in Los Angeles, who sends a letter

23   in support of you dated May 17th, 2006.  There's one

24   from your cousin Delfino Lewis in Columbus, Georgia,

25   who writes June 5th, 2006, in support of you.  There's

26   one, June 1st, 2006, from Empire Mainstay Maintenance

27   Service, which is in Rialto, I think that's just over

31

1    the line in San Bernardino County, and it's a job offer

2    from Rodolfo Cordoba, is he your brother?

3              INMATE CORDOBA:  My brother.

4              PRESIDING COMMISSIONER HARRIS-RITTER:  All

5    right.  And a letter from May 29th, 2006 from your

6    father, with a Los Angeles address, and states, on my

7    son's release from prison his family and I back in

8    Panama will receive him home and have a place for him

9    to stay (inaudible) over.  So is he saying that he

10   would also go to Panama?

11             INMATE CORDOBA:  Yes, ma'am.

12             PRESIDING COMMISSIONER HARRIS-RITTER:  Okay.

13   And then November 17th, 2004, a letter from your uncle,

14   is it your uncle Ambrose or --

15             INMATE CORDOBA:  Ambrose, that's right.

16             PRESIDING COMMISSIONER HARRIS-RITTER:    -- All

17   right.  In Panama, this has been translated and says

18   that here in Panama I have my own house with three

19   bedrooms.  My son Armando works with the police

20   department as a musician, he lives with his girlfriend

21   so you can live with me.  They also have two businesses

22   here in Panama, a fast food and another of a restaurant

23   for all.  We have (inaudible) construction and can work

24   with me.  So it appears I would offer you, with his

25   brother-in-law (inaudible) import-export business.

26   He's also willing to help you so you don't have to

27   worry about work or where to live.  And (inaudible)

32

1   letters in the file and here we have a letter of

2   support from Earl (inaudible) Williams (inaudible)

3   Trucking Company, and they're offering you a job, is

4   that correct?

5        INMATE CORDOBA:  Yes, ma'am.

6        PRESIDING COMMISSIONER HARRIS-RITTER:  And I

7   note you have the date on there, but I believe that's

8   August 25th, on the envelope, of 2006?  So there's a job

9   offer from Victory Upholstery Studio, from Victor, and

10  what is Victor's last name?

11       INMATE CORDOBA:  That's my father's friend.

12       PRESIDING COMMISSIONER HARRIS-RITTER:  Okay.  I

13  can't read his handwriting, so I don't know his last

14  name.  You know what it is?

15       INMATE CORDOBA:  No, ma'am.

16       PRESIDING COMMISSIONER HARRIS-RITTER:  Okay.

17  He's willing to offer you, it's okay if you don't --

18       INMATE CORDOBA:  (inaudible)

19       PRESIDING COMMISSIONER HARRIS-RITTER:    -- I'm

20  willing to offer him an entry level position with our

21  firm and the position will begin at minimum wage

22  earnings and that's located in Los Angeles.  Then

23  there's a letter dated Friday, August 18th, 2006, from

24  Jerry's Upholstery (sic), from Jerry Walsh saying he's

25  a friend of the family and he would offer you a job in

26  his welding shop.  And there's a letter from

27  (inaudible) Preschool in Los Angeles on Vermont,

33

1    offering you -- from Faron Davison, a owner, Davison,

2    D-A-V-I-S-O-N, Faron, F-A-R-O-N, offering you an entry

3    level position with the childcare center, dated, the

4    envelope is dated August 25th.  And then a letter from

5    Bob's Sewer and Drain Cleaning, Incorporated, offering

6    you a job.  And offering to assist you financially in

7    any small way.  And that's also dated August 28th, with

8    the envelope. There's the original letter from your

9    brother, from Empire Mainstay, that I've already

10   referred to.  Then there's another letter, this one is

11   from Columbus, Georgia, from (inaudible) dated June 5th,

12   2006, she's your aunt?

13        **INMATE CORDOBA:**  Yes, ma'am.

14        **PRESIDING COMMISSIONER HARRIS-RITTER:**  And she

15   supports (inaudible) another copy of the letter from

16   Reverend Martini from the Church of the Transfiguration

17   that I've already referred to.  And here's a letter

18   dated June 22nd from a (inaudible) Alexander and this is

19   a letter of support as well.  And that's dated June

20   22nd.  There's another copy of the letter from your aunt

21   (inaudible) in Georgia.  Here we have (inaudible) a

22   letter from your father that I already read, another

23   copy, and another copy of the letter from your mother.

24   So we seem to have some confusion to be determined

25   here related to whether or not you'd be deported to

26   Panama, if you are paroled.  That will, that will need

27   to be cleared up.  So I would recommend that you

34

1    contact your counselor and try to get that straightened

2    out. But anyway, you have job offers here or you have

3    a job offer in Panama, and you also have a residence in

4    Panama and a residence with your mother, is that right?

5     Did I remember that correctly? All right. And, is

6    there anything else that you would like to add related

7    to your parole plans that we haven't talked about?

8         INMATE CORDOBA: No, ma'am.

9         PRESIDING COMMISSIONER HARRIS-RITTER: Okay.

10   Do you have any questions regarding parole plans that

11   you'd like to ask, Commissioner Estrada?

12        DEPUTY COMMISSIONER ESTRADA: No.

13        PRESIDING COMMISSIONER HARRIS-RITTER: All

14   right. Then I'll move on to note that the Penal Code

15   section 3042 notices were sent out and in response to

16   those notices we do have Mr. Montagma from the district

17   attorney's office in L-A County here.

18        DEPUTY COMMISSIONER ESTRADA: I do have a

19   question.

20        PRESIDING COMMISSIONER HARRIS-RITTER: Okay.

21        DEPUTY COMMISSIONER ESTRADA: Okay, I'll make

22   it quick here. And this is in regards to the appellate

23   decision. You (inaudible) correct?

24        INMATE CORDOBA: Correct.

25        DEPUTY COMMISSIONER ESTRADA: You've never been

26   a member of the (inaudible) Crips?

27        INMATE CORDOBA: No, sir.

35

1       **DEPUTY COMMISSIONER ESTRADA:**  Or the

2   (inaudible)?

3       **INMATE CORDOBA:**  No, sir, I just live in the

4   neighborhood.

5       **DEPUTY COMMISSIONER ESTRADA:**  You just live in

6   the neighborhood, huh?

7       **INMATE CORDOBA:**  Yes, sir.

8       **DEPUTY COMMISSIONER ESTRADA:**  Okay (inaudible)

9   on page (inaudible) as they drove by and then fired one

10   shot.

11       **INMATE CORDOBA:**  That's not true.

12       **DEPUTY COMMISSIONER ESTRADA:**  Okay.  Then the

13   next paragraph, at the bottom, the last sentence,

14   (inaudible) to check out the story and (inaudible) was

15   interviewed by police detective and told him that

16   Defendant Smith had told him that he and Defendant

17   Cordoba just shot at some Bloods on 9th Avenue.  The

18   following morning, February 3rd, Luke saw Defendant

19   Smith again (inaudible) was dead and Smith had said

20   "Then Loco is in trouble." Are you Doc or Loco Doc?

21       **INMATE CORDOBA:**  Doc sir.  I'm not allowed to

22   go by that name, I changed my name:  I'm a Muslim, my

23   name is Malachi, sir.

24       **DEPUTY COMMISSIONER ESTRADA:**   -- Okay, I have

25   nothing else.

26       **PRESIDING COMMISSIONER HARRIS-RITTER:**  Thank

27   you.  As I indicated Penal Code section 3042 notices

36

1   were sent out.  Those notices go to agencies with a

2   direct interest in the case and in response to that we

3   have Mr. Montagma from the district attorney's office

4   in Los Angeles County who is going to be able to ask

5   you questions and make a closing statement.  At this

6   time, if you have, do you have any additional questions

7   Commissioner Estrada on any area?

8           **DEPUTY COMMISSIONER ESTRADA:**  I have none.

9           **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay.

10  Thank you.  Then I'll go to the deputy district

11  attorney, Mr. Montagma, do you have any questions for

12  Mr. Cordoba?

13          **DEPUTY DISTRICT ATTORNEY MONTAGMA:**  Mr.

14  Cordoba, when you described to the commissioner, how

15  you fired the shot, you had you hand up higher than

16  your head, apparently the gun pointed (inaudible)?

17          **INMATE CORDOBA:**  To the side, inaudible) over

18  the top of the car.

19          **DEPUTY DISTRICT ATTORNEY MONTAGMA:**  You were on

20  the passenger side, is that correct?

21          **INMATE CORDOBA:**  Yes, sir.

22          **DEPUTY DISTRICT ATTORNEY MONTAGMA:**  And did you

23  fire with your right or your left hand?

24          **INMATE CORDOBA:**  Right hand.

25          **DEPUTY DISTRICT ATTORNEY MONTAGMA:**  So you

26  would have had to go like this?

27          **INMATE CORDOBA:**  No.  (inaudible) on this side.

37

1            PRESIDING COMMISSIONER HARRIS-RITTER:   So the

2    victim was on the driver's side?

3            INMATE CORDOBA:   On the driver's side.

4            PRESIDING COMMISSIONER HARRIS-RITTER:   Of the

5    car.  And you shot over the car.

6            INMATE CORDOBA:   Over the car.

7            DEPUTY DISTRICT ATTORNEY MONTAGMA:   You shot

8    over the top of the car?

9            INMATE CORDOBA:   Yes.

10            PRESIDING COMMISSIONER HARRIS-RITTER:   From the

11    passenger side.

12            DEPUTY DISTRICT ATTORNEY MONTAGMA:   From the

13    passenger side.  You're on the passenger side.

14            PRESIDING COMMISSIONER HARRIS-RITTER:   Yes.

15            DEPUTY DISTRICT ATTORNEY MONTAGMA:   (inaudible)

16    like this, is that correct?

17            INMATE CORDOBA:   Yes, sir.

18            DEPUTY DISTRICT ATTORNEY MONTAGMA:   This was a

19    blue stone revolver?

20            INMATE CORDOBA:   Excuse me?

21            DEPUTY DISTRICT ATTORNEY MONTAGMA:   A blue

22    stone revolver?

23            INMATE CORDOBA:   I don't remember (inaudible)

24            DEPUTY DISTRICT ATTORNEY MONTAGMA:   You know

25    Rodney Luke, is that correct sir?

26            INMATE CORDOBA:   Yeah, I know Rodney Luke.

27            DEPUTY DISTRICT ATTORNEY MONTAGMA:   Did you

38

1    ever have this or a similar type gun or any gun at all

2    in your possession before this day?

3           INMATE CORDOBA:  No, sir.

4           DEPUTY DISTRICT ATTORNEY MONTAGMA:  Mr. Luke

5    told the police that he'd seen you in the recent past

6    with a blue stone revolver, is that true?

7           INMATE CORDOBA:  No, sir.

8           DEPUTY DISTRICT ATTORNEY MONTAGMA:  It's not

9    true?

10          INMATE CORDOBA:  No, sir.

11          DEPUTY DISTRICT ATTORNEY MONTAGMA:  At any

12   prior board hearing did you indicate that you were a

13   member of (inaudible) Crips?

14          INMATE CORDOBA:  Never.

15          DEPUTY DISTRICT ATTORNEY MONTAGMA:  How many

16   shots did you fire?

17          INMATE CORDOBA:  I only remember one but

18   (inaudible) they say that I fired two, so I guess two

19   shots.

20          DEPUTY DISTRICT ATTORNEY MONTAGMA:  But you

21   were trying to point your gun in the direction of these

22   two men?

23          INMATE CORDOBA:  Excuse me?

24          DEPUTY DISTRICT ATTORNEY MONTAGMA:  You were

25   trying to point your gun in the direction of these two

26   men?

27          INMATE CORDOBA:  No, I didn't even know where

39

1   they was at.  I was firing in the direction where Mr.

2   Smith had told me they was at.

3          DEPUTY DISTRICT ATTORNEY MONTAGMA:   I have

4   nothing further.

5          PRESIDING COMMISSIONER HARRIS-RITTER:   Thank

6   you.  Miss Tardiff?

7          ATTORNEY TARDIFF:   So originally you got into

8   the automobile for what purpose?

9          INMATE CORDOBA:   To go to a party, to DJ a

10  party in Riverside.

11         ATTORNEY TARDIFF:   And Mr. Smith was going to

12  that same party?

13         INMATE CORDOBA:   Yes, ma'am.

14         ATTORNEY TARDIFF:   So when he gave you the gun

15  why did you, I don't understand why you would be so

16  willing to shoot a gun?

17         INMATE CORDOBA:   He said, he said (inaudible)

18  out of fear I gave it a shot.

19         ATTORNEY TARDIFF:   Fear of who?

20         INMATE CORDOBA:   Fear of him, the gang member.

21         ATTORNEY TARDIFF:   You thought you would be

22  shot at, he told you that you would be shot at?

23         INMATE CORDOBA:   Yes, ma'am.

24         ATTORNEY TARDIFF:   Okay, so you did it to

25  prevent yourself from being shot?

26         INMATE CORDOBA:   Yes, ma'am.

27         ATTORNEY TARDIFF:   (inaudible)

40

1        PRESIDING COMMISSIONER HARRIS-RITTER:   Closing

2    statements?

3        DEPUTY DISTRICT ATTORNEY MONTAGMA:   I really

4    don't have much to say.   I think his explanation of the

5    crime leaves a lot to be desired.   Whether or not he

6    was actually a gang member, he clear was associating

7    with the Crips, for the record, we oppose parole at

8    this time.   Thank you.

9        PRESIDING COMMISSIONER HARRIS-RITTER:   Thank

10   you.   Miss Tardiff?

11       ATTORNEY TARDIFF:   Thank you.   In terms of Mr.

12   Cordoba's pre-incarceration history, he did come from a

13   stable family, a close family.   The probation officer's

14   report indicates he had a steady employment history.

15   He had no prior criminal history, as a juvenile or

16   adult, this was a first offense, first conviction.   His

17   story, his version of the commitment offense has always

18   been the same.   You go back and look, even in the

19   probation officer's report -- and I have found that

20   when someone, when an inmate's not being truthful about

21   his commitment offense the story usually does not stay

22   the same, but in this case it has.   And indeed it may

23   sound foolish or something, but it's never, it's never

24   changed.   So I think that in terms of truthfulness,

25   he's telling the truth.   This gang activity thing has

26   always been an issue and I'm not sure if this even

27   needs to keep being gone into, the fact is in the

41

1    probation officer's report they couldn't verify he was

2    a member of a gang. Let's see -- The problem is, you

3    know, when you live down in that area and you go to

4    school with those guys, it's inevitable that you're

5    going to be hanging out with them at some point, but in

6    any event, I can't find it now -- but the probation

7    officer's report says although defendant denies any

8    gang membership, he states he lives in the area of the

9    (inaudible) Crips. It couldn't be verified that he was

10   a member of a gang. The, which one was it, the psych

11   eval from '04, it was an addendum to deal with one

12   issue only, and that is address the gang affiliation

13   issue. And in that report it states that, okay, on one

14   hand, there's a, it does get confusing, and I think the

15   confusion comes from page 4 of the '02 psych points

16   out, or states, regarding the question about gang

17   involvement Inmate Cordoba states "I have never been

18   involved in gangs before, that was the first time I'd

19   used a gun." In the July 29[th], '99 report it states "on

20   one hand he was associated with the Crips." The next

21   paragraph it states although "though he may not have

22   been a member of the Crips gang he obviously did know

23   them." He has no apparent criminal history, no

24   apparent juvenile criminal history. Due to several

25   factors it's concluded that, this is a conclusion,

26   concluding no substantiation of any gang activity other

27   than what appears to be written in previous psych

42

1    reports.  So, they conclude that there is no gang

2    involvement.  Since he's been incarcerated he's

3    educationally upgraded himself, with a GED, two

4    vocations.  He has participated in self-help for many

5    years, more recently anger management and another anger

6    management course.  He's continued to work in a steady

7    fashion.  His psych evals from '96 have been positive.

8    The most recent one, the '06, states that there's no

9    indication of gang membership, doing well, no gang

10   involvement in CDC, there's no substance abuse history.

11   His remorse and sorrow appear genuine.  The crime was

12   related to immaturity, poor judgment and peer pressure.

13   He has zero violent history, both in and out of CDC,

14   and note that the prior two evaluations states the

15   inmate poses no risk of danger.  He's been involved in

16   no violence (inaudible), possession of weapons or

17   aggressive behavior.  The testing procedure, level of

18   service inventory revised, gave him a 1.4, which is

19   extremely low risk.  And due to his life experiences,

20   his risk is the same of the average citizen.  It

21   concluded that there was no mental, emotional

22   disorders, strong family support, acquired vocational

23   skills, job offers, the trades he's learned are in high

24   demand.  He has dual parole plans.  His prognosis is

25   excellent for successful adjustment in the community.

26   The '04 doesn't really reach a conclusion.  The 1/31/03

27   is positive.  He demonstrates good judgment, impulse

43

1    control, expressed genuine remorse.  This went into the

2    gang involvement on page 4.  It states Inmate Cordoba's

3    statement that I've never been involved in gangs.  It

4    concludes, in light of his statements it would appear

5    he has never been properly implicated or trained by a

6    responsible, law-abiding adult in the use of firearms.

7    And thus did not fully understand the impact of his

8    behavior and the resultant consequences.  He showed

9    insight and empathy, and his potential, his risk

10   potential is no more than the average citizen in the

11   community.  And in '99, his current level of insight

12   and judgment supports a positive prediction of

13   successful adaptation to community living, no more than

14   the average citizen.  In '96 it was the same.  So, for

15   10 years he's had good psych evals.  He's got good

16   parole plans, and I will submit on that, thank you.

17           PRESIDING COMMISSIONER HARRIS-RITTER:  Thank

18   you.  Mr. Cordoba, do you have a statement you'd like

19   to make?

20           INMATE CORDOBA:  Yes, there is, I have a

21   letter, I wrote this down.  Dear Commissioner, it is

22   with deep and sincere remorse and regret that I accept

23   full and complete responsibility for the crime of

24   murder, committed against Mr. Marvin McIntosh, and his

25   family.  The crime of murder was committed by me during

26   a drive-by shooting in which I was the responsible

27   person (inaudible) laws of God and the laws of this

44

1   society (inaudible). My actions were wrong and with my

2   heart and soul I pray daily for forgiveness. Over the

3   years of this imprisonment I've made an honest effort

4   to make amends for the negative behavior that has

5   characterized my life in the past, and in order to

6   improve my conscious contact with (inaudible) I've

7   relied on daily prayers and meditation of God

8   (inaudible). Fortunately, the California Department of

9   Correction has made this process of improvement

10   possible through the self-help programs and I have

11   taken (inaudible) program. It has been essential for

12   my life to have the strong support from family and

13   friends, my parents, (inaudible) Cordoba have provided

14   a strong (inaudible) foundation for my life. It is a

15   strong belief in the Lord. We have maintained a

16   healing fellowship. Every human life is precious in

17   the sight of the Lord. And this understanding God

18   (inaudible) all life is in (inaudible) the holy God and

19   every soul is connected in life, each one is a member

20   of the human family. To emphasize (inaudible) life of

21   Marvin McIntosh, which I am guilty of taking away and

22   shall remain in remorse, with prayers for his soul and

23   forgiveness on earth as it is in heaven. To you, as

24   the board of prison terms, and as commissioner of the

25   board, I submit this letter of responsibility, in

26   humble respect (inaudible) I do pray that the Lord

27   shall be with you in the work that you are doing on

45

1    behalf of this great state.    Thank you very much.

2            PRESIDING COMMISSIONER HARRIS-RITTER:    Thank

3    you Mr. Cordoba.    It is now 22 minutes before 6:00 p.m.

4    We will recess to deliberate.

5

6

7                        R E C E S S

8                        --o0o--

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

47

1    and Crenshaw in Los Angeles.  Defendant

2    Rodney Tommy Smith came around a corner,

3    approached the group, and said 'now

4    what's up', and then started shooting.

5    Defendant Smith, known on the street as

6    Snowman, fired four shots and a bullet

7    struck Harris just above the ankle.

8    Harris received medical attention for

9    this injury.  The bullet passed in and

10   out of Harris's ankle and leg and he has

11   scars as a result.  The next day, on

12   February 1st, 1985, before 3:00 and 4:00

13   p.m., Roy Rubin, Andre West, and Maurice

14   McIntosh were at the intersection of 9th

15   Avenue and 48th Street in Los Angeles.

16   Defendant Smith drove up to that

17   location in a beige automobile.  There

18   were a number of passengers in the

19   vehicle, including some girls.

20   Defendant Smith fired a shot towards Roy

21   Rubin and Andre West, but did not hit

22   either of them, and drove away.  The

23   following day, on February 2nd, 1985,

24   Ronnie Luke saw Defendant Smith and

25   Defendant Cordoba together.  He saw them

26   depart in Defendant Smith's automobile.

27   ROGELIO CORDOBA D-22031  DECISION PAGE 2  9/12/06

48

1     At about 7:00 p.m. Roy Rubin and Marvin

2     McIntosh were standing on the sidewalk

3     in front of the residence at 4817 South

4     9th Street, Los Angeles, waiting for a

5     friend.  Rubin observed a beige

6     automobile coming down the street.  The

7     car slowed down, the lights were turned

8     off, the car continued proceeding

9     towards Rubin and McIntosh and passed

10    them.  Rubin and McIntosh, having seen

11    the car approaching with the lights off,

12    thought the situation suspicious and

13    took refuge behind two cars parked in

14    the driveway at 4817.  The car passed

15    4817 and continued to the front of the

16    property next door, where it stopped.

17    Two shots were fired from the car.

18    McIntosh was struck in the head by a

19    bullet, fell to the ground, and died

20    from the wound.  Rubin heard someone

21    inside the car say 'cuz', C-U-Z, and the

22    car sped from the scene.  There was

23    testimony that the word cuz was one that

24    would likely be used by some gang member

25    who was (inaudible) the Blood gang

26    member.  Ronnie Luke saw Defendant

27  ROGELIO CORDOBA D-22031 DECISION PAGE 3  9/12/06

50

1    your counselor and get that cleared up one way or the

2    other, just for your own benefit, but that'll need to

3    be done before -- I would recommend that you do that

4    before the next panel. Because then that can be

5    answered unequivocally. The hearing panel notes the

6    responses to PT3042 notices indicate opposition to a

7    finding of parole suitability, specifically the

8    district attorney for Los Angeles County. The panel

9    makes the following findings: The prisoner needs to

10   better articulate his participation in the commitment

11   offense and his relationship to the others involved.

12   Nevertheless the prisoner should be commended for

13   receiving his GED in 1997, vocational welding being

14   completed in 1992, receiving his welding license, his

15   vocational training technology certificate in 2004, and

16   18 years since the last 115 and 11 years since the last

17   128A. However, these positive aspects of his behavior

18   do not outweigh the fact of his unsuitability at this

19   particular time. Mr. Cordoba, the panel really is torn

20   in this, but we believe you need more insight into why

21   you were associating with known gang members in a way

22   that resulted in you committing a murder. We have

23   trouble with that. And it's true your counsel says you

24   haven't changed your story over the years, but there

25   are different shadings that are put into your story,

26   not necessarily by you.

27   ROGELIO CORDOBA D-22031   DECISION PAGE 5   9/12/06

51

1    We weren't comfortable with the way the situation is
2    right now, as far as the explanations. We needed more
3    than that and when you get a decision from a panel it
4    will be a tentative decision. It will have to go
5    through decision review and the governor's office. And
6    what happened and why you were there with those people
7    will have to be articulated clearly enough for it not
8    to just be the panel granting it tentatively, but also
9    it going through decision review and the governor's
10   office. And so your plans are excellent for wherever
11   you will go, whether it's California or Panama, you
12   know, you'll just need to update those, but the INS
13   hold question should be answered and we do think some
14   insight into -- they were known gang members to you,
15   and getting, in that kind of a situation, you've got to
16   think about how you put yourself in that place. We're
17   asking for a new psych report because we want to
18   clarify the problem with the way the last one was
19   written regarding the word accidentally, we don't think
20   that's fair to you to have that sitting like that, from
21   your testimony to us. So we've requested this report,
22   based on the panel's belief that the prisoner's current
23   mental health is an important issue. And in a new full
24   evaluation the panel requests that the clinician
25   specifically address the following and we request that
26   it be the extent to which the prisoner has explored
27   ROGELIO CORDOBA D-22031   DECISION PAGE 6   9/12/06 the

52

1   commitment offense and come to terms with the

2   underlying causes.  And a review of Dr. Macomber's

3   report regarding the commitment offense and clarify the

4   inmate's description of what actually occurred.  That

5   concludes the reading of the decision.  Commissioner

6   Estrada, if you have anything you'd like to add?

7        **DEPUTY COMMISSIONER ESTRADA:**  Good luck to you

8   Mr. Cordoba.

9        **PRESIDING COMMISSIONER HARRIS-RITTER:**  Thank

10  you.  That concludes the hearing, it is now 6:06 p.m.

11

12

13

14                    A D J O U R N M E N T

15                       --oOo--

16

17

18

19

20

21

22

23  PAROLE DENIED ONE YEAR

                              JAN 1 0 2007
24  THIS DECISION WILL BE FINAL ON:_____

25  YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT

26  DATE, THE DECISION IS MODIFIED.

27  ROGELIO CORDOBA D-22031  DECISION PAGE 7  9/12/06

53

## CERTIFICATE AND DECLARATION

## OF TRANSCRIBER

I, SHELLEY KELBER, a duly designated

transcriber, NORTHERN CALIFORNIA COURT REPORTERS, do

hereby declare and certify under penalty of perjury

that I have transcribed tape(s) which total one in

number and cover a total of pages numbered 1 - 52, and

which recording was duly recorded at CORRECTIONAL

TRAINING FACILITY, SOLEDAD, CALIFORNIA, in the matter

of the SUBSEQUENT PAROLE CONSIDERATION HEARING of

ROGELIO CORDOBA, CDC Number D-22031, on September 12,

2006, and that the foregoing pages constitute a true,

complete, and accurate transcription of the

aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party

in the above-captioned matter and have no interest in

the outcome of the hearing.  Dated NOVEMBER 25, 2006 at

Sacramento, California.

Shelley Kelber, Transcriber

Northern California Court Reporters

# EXHIBIT "B"
# (PSYCH REPORT)

**MENTAL HEALTH EVALUATION FOR**
**THE BOARD OF PRISON HEARINGS**
June, 2006 Lifer Calendar

**CORRECTIONAL TRAINING FACILITY SOLEDAD**
**MAY, 2006**

| | |
|---|---|
| **NAME:** | **CORDOBA, ROGELIO** |
| **CDC#:** | **D-22031** |
| **DOB:** | **10/9/64** |
| **OFFENSE:** | **PC 187 MURDER, SECOND DEGREE** |
| **DATE OF OFFENSE:** | **2/2/85** |
| **SENTENCE:** | **17 YEARS TO LIFE** |
| **MEPD:** | **8/26/95** |
| **EVALUATION DATE:** | **5/5/06** |

## I.  IDENTIFYING INFORMATION:

Mr. Cordoba is a single, first term, 41 year old male, who was born in Panama. He was sentenced by Los Angeles County. He is a Muslim. He has served 21 years in custody. He does have a US-INS hold from Panama.

### SOURCES OF INFORMATION:

This evaluation is based upon a single one hour interview, plus review of the central and medical files.

This is the third psychological evaluation prepared for the Board of Prison Hearings, since the initial evaluation was done at CTF-Soledad, on 1/31/02, by Dr. Steward, Clinical Psychologist. His evaluation contains a Psychosocial Assessment that was reviewed with the inmate. This information is still current and valid and will not be repeated at this time.

CORDOBA, ROGELL
D-22031
5/5/06
PAGE 2

## CLINICAL ASSESSMENT

**XII.    CURRENT MENTAL STATUS/TREATMENT NEEDS**

Mr. Cordoba related during the interview in a serious, sober, open and cooperative manner. His mental status was within normal limits. He was alert and well oriented. His thinking was rational, logical and coherent. His speech was normal, fluent and goal oriented. His affect was appropriate. There was no evidence of anxiety or of depression. His eye contact was good. Intellectually, he was functioning in the average ranges. His memory was intact. His judgment was intact. His insight and self-awareness were very good.

Mr. Cordoba stated that he has not ever been an official gang member. He knew gang members in Los Angeles, because he went to school with them, and he played basketball with them. In fact, the victims were people with whom he played basketball. There is no indication in the written record that he has ever been a gang member. The Probation Report noted that he lived in the area of the Crips Gang, but he was not a gang member. He comes from a stable, non-criminal family. He is the only one in his family who has ever been in trouble. Previous Psychological Evaluations also document his statements indicating that he is not a gang member and has never been a gang member, and that he simply lived in an area where he knew some gang members.

Mr. Cordoba has been doing very well in the institutional environment. He has been disciplinary free for 18 years. In the institution he has never been involved in any gang activities, although we do have frequent racial, gang related riots at this prison. He also has no history of drug or of alcohol use. However, he voluntarily attended Alcoholics Anonymous and Narcotics Anonymous, simply because he thought that he could benefit from them as a self-help group. Since he does not need to attend, the sponsors have asked him not to continue to attend, due to the need of having other inmates in the program. He also has completed Alternatives to Violence, Values and Morals, Breaking Barriers Program, Anger Management, and several video tapes. In addition, he is certified in Vocational Printing and Vocational Welding.

## CURRENT DIAGNOSTIC IMPRESSION

| | |
|---|---|
| Axis I: | No mental disorder |
| Axis II: | No personality disorder |
| Axis III: | No physical disorder |
| Axis IV: | Life term incarceration |
| Axis V: | Current GAF: 85 |

CORDOBA, ROGELL
D-22031
5/5/06
PAGE 3

## XIII.  REVIEW OF LIFE CRIME

Mr. Cordoba accepts the official version of this offense. He accepts full
responsibility for his actions in the commitment offense, which resulted in the
death of the victim. He feels very badly about this offense. Someone was
accidentally killed as a result of his actions. He stated that he did not know
anything about guns, and he had never shot one before. When his crime partner
yelled at him and gave him the gun and ordered him to shoot, he did. It was dark,
and he did not aim it at anyone. However, he accidentally shot the 19 year old
victim. These were individuals with whom he had played basketball. He had no
animosity or hatred towards them at all.

His feelings of sorrow and remorse at the loss of life, due to his actions, appear to
be sincere and genuine. This offense appears to be related to inmate Cordoba's
immaturity, use of poor judgment, and impulsive behavior, and to the peer
pressure of being yelled at and told to shoot under the guise that they were
shooting at him. This offense is very situational. Mr. Cordoba does not have a
history of violence, and he has never been aggressive or violent in the institution
during his 21 years of incarceration.

## XIV.  ASSESSMENT OF DANGEROUSNESS

A.  In considering potential for dangerous behavior in the institution, this man
has been seen since 2002 by two additional psychologists. This is his third
examination by a licensed psychologist to assess dangerousness. They all
agree that he does not pose a risk to the institution or to society at this
point in his life. He has never been involved in racial riots (although we
have several of them), assaults on others, possession of weapons, or other
aggressive behavior. Compared to other inmates, violence potential is
definitely below average.

B.  In considering potential for dangerous behavior when released to the
community, I agree with the prior three psychologists that stated that he
poses no more risk to society than the average citizen in the community.
This is supported by the administration of the Level of Service Inventory-
Revised, which is an actuarial measure that assesses criminal history,
substance abuse history, vocational achievement, social relationships and
other factors to determine current risk level on parole. His score places
him at the 1.4 cumulative frequency for prison inmates. This means that if
100 men were released on parole, he would do better on parole than 98 of

them. This is a very low risk level. He does not pose any more risk to society than the average citizen. In fact, due to his life experiences, he probably poses less risk to the community than the average citizen.

C. This man has no history of drug or alcohol abuse, or of gang membership. There are no significant risk factors in this case.

## XV.  CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS

There are no mental or emotional problems in this case that would interfere with routine parole planning. He has strong family support in the community. He has acquired vocational skills, and he is certified in Vocational Welding, as well as in Vocational Print Shop and Graphic Design. He has several job offers in the community. He also has a job offer from his brother in Los Angeles, who owns a print shop. Also, his skills as a welder could result in instant employment in the community. This is a trade that is in high demand and pays very well. Employment will not be a problem in this case. He does have a US-INS hold from Panama. His family is now legal, naturalized citizens. He was arrested before he was able to go through that process. However, he does have residence available in Panama, as well as a job offers there from family members, who live there. The prognosis for successful adjustment in the community in this case is excellent.

*M. Macomber, PhD*

M. Macomber, Ph.D.
Correctional Psychologist
Correctional Training Facility, Soledad

*B. Zika, Ph.D.*

B. Zika, Ph.D.
Senior Psychologist
Correctional Training Facility, Soledad

**D:**    **5/5/06**
**T:**    **5/6/06**

Cordoba          D-22031          CTF-Soledad          5/5/06

# EXHIBIT "C"
# (COUNSELOR'S REPORT)

LIFE PRISONER EVALUATION REPORT
SUBSEQUENT PAROLE CONSIDERATION HEARING
NOVEMBER 2005 CALENDAR


CORDOBA, ROGELIO                                                    D22031


I.    COMMITMENT FACTORS:

    A.    Life Crime: Count 1, Murder with a Firearm (187 PC). Received in CDC 10/31/85 from Los Angeles County, Case Number A762389. Victim: Marvin James McIntosh, deceased – instant offense. Age 19 at time of death.

        1.    Summary of Crime: All relevant documents from the previous hearings have been considered and that information remains valid.

        2.    Prisoner's Version: In an interview for this report, Cordoba stated that his version remains the same as that presented in the previous report.

        3.    Aggravating/Mitigating Circumstances:

           a.    Aggravating Factors:

              1.    During the commission of the crime the prisoner had a clear opportunity to cease but instead continued.
              2.    The manner in which the crime was committed created a potential for serious injury to persons other than the victim of the crime.

           b.    Mitigating Factors: None.

    B.    Multiple Crime(s): None.

        1.    Summary of Crime: None.

        2.    Prisoner's Version: None.


II.    PRECONVICTION FACTORS:

    A.    Juvenile Record: Documents from the previous hearings have been considered and that information appears valid. This writer has no further information to add.

COPY TO INMATE ON 9-23-05

LIFE PRISONER EVALUATI... REPORT                                          2
PAROLE CONSIDERATION ...EARING
NOVEMBER 2005 CALENDAR

 

B.    <u>Adult Convictions and Arrests</u>:  Documents from the previous hearings have been considered, and that information appears valid.  This writer has no further information to add.

C.    <u>Personal Factors</u>:  Documents from the previous hearings have been considered, and that information appears valid.  The writer has no further information to add.


III.    <u>POSTCONVICTION FACTORS</u>:

A.    <u>Special Programming/Accommodations</u>:  None.

B.    <u>Custody History</u>:  Cordoba was received into the California Department of Corrections on January 17, 1986.  Cordova has remained housed at the Correctional Training Facility since February 9, 1993 established at Medium A.

C.    <u>Therapy and Self-Help Activities</u>:  Cordova successfully received certification of completion in Printing Technology (Offset Printing Program) during this period.  Cordova has been unassigned since September 2004 and is currently on the waiting list for a new assignment.  There are no documents referencing to any activity in academics or self help programs during this period.

D.    <u>Disciplinary History</u>:  Cordoba overall pattern of behavior since his last Subsequent Hearing is considered exceptional.

CDC 115s

| <u>Date</u> | <u>Location</u> | <u>Rule#</u> | <u>Disposition</u> |
|---|---|---|---|
| 06/23/88 | CCI | 3005(a) | <u>Guilty</u>:  Theft of State Food, 20 hours extra duties. |
| 11/19/87 | CCI | 3053 | <u>Guilty</u>:  Threatening Staff; 30 days loss of credits for Div. F Offense, 60 days LOP, suspended 90 days clean conduct and 40 hours extra duty. |

CDC 128A

| <u>Date</u> | <u>Location</u> | <u>Counseling offense</u> |
|---|---|---|
| 12/27/95 | CTF | Counseled on his responsibility for count. |

LIFE PRISONER EVALUATI[.]  REPORT                                          3
PAROLE CONSIDERATION ... ARING
NOVEMBER 2005 CALENDAR

|            |       |                                                    |
|------------|-------|----------------------------------------------------|
| 12/18/94   | CTF   | Counseled on his flagging.                         |
| 09/04/90   | RJD   | Counseled on his being absent from his assignment. |
| 03/12/88   | CCI   | Counseled on inappropriate cell vent covered.      |
| 04/14/88   | CIM   | Counseled on his being disrespectful to staff.     |
| 03/04/87   | CIM   | Counseled for his being out of bounds.             |

E.  **Other:** The panel for Cordoba's last Subsequent Parole Consideration Hearing on 11/1/04 acted to deny parole consideration for one year, get self help, stay disciplinary free, earn positive chrono and get a GED.

IV.  **FUTURE PLANS:**

A.  **Residence:** Residence plans remain the same as those presented for his last hearing.

B.  **Employment:** Employment plans remain the same as those presented for his last hearing.

C.  **Assessment:** Cordoba's residence and employment plans appear realistic and appropriate.

V.  **USINS STATUS:** Not applicable.

VI.  **SUMMARY:**

A.  Prior to release the prisoner could benefit from:

1.  Maintaining a disciplinary free record.
2.  Participate in self help when available.
3.  Participate in work program or college correspondence courses,

B.  This report is based upon (1/2) hour interview with Cordoba, incidental contact in the housing unit, and a thorough review of his Central File.

CORDOBA, ROGELIO          D22031                CTF-SOLEDAD            NOV/2005

LIFE PRISONER EVALUAT    : REPORT
PAROLE CONSIDERATION    ARING                                        4
NOVEMBER 2005 CALENDAR

    C.    Cordoba was afforded an opportunity to examine his Central File, however declined to do so.

    D.    No accommodation was required per the Armstrong vs. Davis BPT Parole Proceedings Remedial Plan (ARP) for effective communication.

LIFE PRISONER EVALUAT    REPORT                                          5
PAROLE CONSIDERATION : ⸻ARING
NOVEMBER 2005 CALENDAR


_L.R. Baker cr1 9-20-05_
L.R. Baker                          Date
Correctional Counselor I


_[signature] 9-70-5_
J.L. Sareli                         Date
Correctional Counselor II


_[signature] 9-7-05_
J.L. Clancy                         Date
Facility Captain


_Levorse C&PR 9-23-05_
D. S. Levorse                       Date
Classification and Parole Representative


CORDOBA, ROGELIO        D22031              CTF-SOLEDAD          NOV/2005

9/12  MM

BOARD OF PRISON TERMS                                                    STATE OF CALIFORNIA
LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐  DOCUMENTATION HEARING

☒  PAROLE CONSIDERATION HEARING                    **ADDENDUM**

☐  PROGRESS HEARING

INSTRUCTIONS
    TO CDC STAFF: DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
    TO BPT STAFF: FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
    ESTABLISHED, ie., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 8/05 to 8/06 (Present) | | | **PLACEMENT**: Remained at CTF-Soledad, housed in the general population. **CUSTODY**: Medium A. **VOC. TRAINING**: None noted during this report period. **ACADEMICS**: None noted during this report period. **WORK RECORD**: Recreational Worker as of 10/4/05, no CDC 101's during this reporting period. **GROUP ACTIVITIES**: None noted during this report period. **PSYCH. TREATMENT**: None noted. **PRISON BEHAVIOR**: Cordoba has remained disciplinary free during this report period. **OTHER**: None noted. |

*Inmate Copy*

CORRECTIONAL COUNSELOR'S SIGNATURE

DATE  8/24/06

CORDOBA                    D22031                    CTF-SOLEDAD

Sent to Inmate on ___8/31/06___

BPT 1004 (REV 7/86)

LIFE PRISONER: POSTCONVICTION PROGRESS REPORT                    **ADDENDUM**


_____     8/24/06
P.L. Baltazar                                        Date
Correctional Counselor I



_____     8/25/06
S. Martin                                            Date
Correctional Counselor II



_____     8/28/06
E.A. DaRosa                                          Date
Facility Captain (A)



_____ CPR 8.25.06
D.S. Levorse                                         Date
Classification and Parole Representative



CORDOBA                    D22031                    CTF-SOLEDAD


BPT 1004 (REV 7/86)