IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ROGELIO CORDOBA,                        No. C 07-04579 CW (PR)

      Petitioner,               ORDER GRANTING PETITION
                                        FOR WRIT OF HABEAS
    v.                               CORPUS

BEN CURRY, Warden,

      Respondent.

_____/

    On September 5, 2007, Petitioner Rogelio Cordoba filed a petition for a writ of habeas corpus pursuant to title 28 U.S.C. § 2254, challenging as a violation of his constitutional rights the seventh denial[1] of parole by the California Board of Parole Hearings (Board) on September 12, 2006.

    On February 7, 2008, the Court issued an order to show cause why the writ should not be granted.  Respondent filed an answer on May 7, 2008.  Petitioner filed a traverse on May 20, 2008. Petitioner also asks the Court to conduct an evidentiary hearing. (Pet. at 23; Traverse at 7.)

    Having considered all of the papers filed by the parties, the Court grants the petition and remands the matter to the Board to reevaluate Petitioner's parole suitability in accordance with this Order.

_____

[1]  The denial was for one year.  (Resp't Ex. D, Board Transcript at 46.)  The record contains no information regarding any subsequent parole hearings, and Petitioner has not filed another habeas petition with the Court.

United States District Court
For the Northern District of California

BACKGROUND

I.   The Commitment Offense

The following summary of the facts of Petitioner's commitment offense is derived from the June 30, 1988 opinion of the California Court of Appeal.  (Resp't Ex. B, Appellate Opinion at 5-9.)

On February 2, 1985, Ronnie Luke observed Petitioner (street name "Loco Doc")[2] and Rodney Smith (street name "Snowman") departing in Smith's car.  At about 7 p.m., Willie Rubin and Marvin McIntosh (street name "M Bone") were standing on the sidewalk in front of 4817 South Ninth Avenue, Los Angeles, California.  Rubin observed a beige car approaching.  The car slowed down and turned off its lights.  The car passed Rubin and McIntosh, then stopped in front of the property next door.  Rubin and McIntosh, suspecting trouble, took refuge behind two cars parked in the driveway of 4817 South Ninth Avenue.  Two shots were fired from the beige car, one of which struck McIntosh in the head and killed him.  Kendall Turner, who had observed the shooting, testified that he had "heard a pop that sounded like a small caliber gunshot, followed by two loud bangs, which sounded like large caliber gunshots."  (Id. at 7.)  The beige car then sped away.

Later on the evening of February 2, 1985, Ronnie Luke saw Smith.  Smith said that he and Petitioner had driven through the

---

[2] At the parole suitability hearing, Petitioner stated that "back in the days when [he] was playing basketball and the coach wanted [them] to . . . take the name of a very good basketball player," he chose "Doctor J."  (Resp't Ex. D, Board Transcript at 16.)  He claims that his friends called him "Doc," and not "Loco Doc."  (Id.)  He further states that he is "not allowed to go by that name" because he became a Muslim and changed his name to "Malachi."  (Id. at 35.)

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

"Fifties hood."[3]  Smith also said that he and Petitioner had "blasted some Fifties." (<u>Id.</u> at 6.)  Luke subsequently went to the neighborhood of the shooting to check out Smith's story.  He was interviewed by some police detectives and told them that Smith had said that he and Petitioner had just shot at some Bloods on Ninth Avenue.  The following morning, when Smith was told that "M Bone" was dead, Smith said, "Then Loco Doc is in trouble."  (<u>Id.</u> at 7.)

On February 5, 1985, Los Angeles Police Detective Johnson interviewed Petitioner.  At trial, Detective Johnson testified that Petitioner had told him that he was a passenger in the car driven by Smith on or about 7 or 7:30 p.m. on February 2, 1985.  As they passed a residence on the 4800 block of Ninth Avenue, they were fired on by rival gang members.  Smith stopped the car and backed up a few feet.  He handed Petitioner a .38 caliber revolver and told him to shoot at them.  Petitioner hesitated, but Smith told him not to be a coward.  Petitioner then leaned or partially crawled out of the passenger window and fired over the top of the car in the direction of the persons standing in front of the residence.  Detective Johnson also testified that Petitioner did not know that anyone had been hit and killed until the following day.

II.  Conviction and Sentencing

Petitioner and Smith were charged with the murder of Marvin McIntosh and with assault with a firearm on Willie Rubin.  (<u>Id.</u> at

---

[3] "The 'Fifties' is a gang associated with the 'Bloods' . . . .  The 'hood' refers to a neighborhood, an area where members of a particular gang live or gather; the 'Fifties hood,' therefore, is a neighborhood where 'Fifties' live or gather."  (Resp't Ex. B, Appellate Opinion at 6.)

**United States District Court**
For the Northern District of California

2.)  Both waived their right to a jury trial.  (<u>Id.</u> at 3.)  At a
bench trial, both were found guilty of second degree murder and
assault with a firearm.  (Resp't Ex. A, Judgment in <u>People v.</u>
<u>Cordoba</u>, No. A762389 (Cal. Super. Ct. entered Jan. 7, 1986).)  On
January 7, 1986, the court sentenced Petitioner to seventeen years
to life for second degree murder and five years for assault, to run
concurrently.  (<u>Id.</u>)  The life term began on June 11, 1986, and the
minimum eligible parole date was November 12, 1995.  (Resp't Ex. D,
Board Transcript at 1.)  Petitioner is currently incarcerated at
the Correctional Training Facility at Soledad.  (<u>Id.</u>)

III. September 12, 2006 Board Hearing

     Petitioner had been incarcerated for over twenty years at the
time of his September 12, 2006 parole suitability hearing.  He was
represented by counsel at the hearing.  (<u>Id.</u> at 2.)  During his
incarceration, Petitioner has had two documented disciplinary
violations.  The first, dated November 19, 1987, was for
threatening prison staff.  (<u>Id.</u> at 23.)  The second, dated June 23,
1988, was for theft of government food.  (<u>Id.</u>)  The record
indicates that Petitioner has had six administrative violations,
the last of which occurred in 1995.  (<u>Id.</u> at 50.)

     Petitioner presented the Board with an extensive record of his
positive prison performance and rehabilitation.  While
incarcerated, Petitioner has earned his high school equivalency
diploma.  (<u>Id.</u> at 19.)  He has earned a certification as a welder,
a welder's license, and a certification in vocational printing.[4]

---

[4]  The Board Transcript refers to a certification in
"vocational training technology" that Petitioner received on
February 5, 2004.  (Resp't Ex. D, Board Transcript at 18-19.)
However, Petitioner's Life Prisoner Post-Conviction Progress Report

United States District Court
For the Northern District of California

(Id. at 18.)  At the time of the hearing, Petitioner was working in the recreation department, organizing the football and basketball leagues.  (Id. at 21.)  He has received laudatory chronos from his supervisor and two work evaluations, which rate him as "exceptional" (the highest grade possible) in all areas of performance.  (Pet'r Ex. E, Chronos and Certificates.)

Petitioner presented evidence that he had availed himself of many self-help, self-improvement and community programs in prison. He has completed a number of self-help programs, including Alternatives to Violence, Values and Morals, Breaking Barriers Program, Anger Management, and several self-help videos.  (Resp't Ex. D, Board Transcript at 21-22; Resp't Ex. E, Mental Health Assessment at 2.)  At the time of the hearing he was participating in a Re-entry Activity Group Program.  (Resp't Ex. D, Board Transcript at 22.)  Despite having no history of alcohol or drug abuse, Petitioner voluntarily attended Alcoholics Anonymous and Narcotics Anonymous because he thought he could benefit from them. (Resp't Ex. E, Mental Health Assessment at 2.)

The Board began by asking Petitioner how he felt about his participation in the crime.  Petitioner responded that he was very remorseful and took full responsibility for the crime.  (Id. at 10.)  The Board questioned Petitioner regarding his involvement with gang members.  Petitioner denied being in a gang or participating in other criminal activity with the gang members involved in his crime.  (Id. at 10, 34-35.)  He admitted that he

clarifies that the certification received on February 5, 2004 was in vocational printing.  (Pet'r Ex. C, Life Prisoner Post-Conviction Progress Report 10/03-9/04.)

United States District Court
For the Northern District of California

was acquainted with gang members and that he spent time around them. (Id. at 12-13.) He explained that he had grown up in the same area with these persons, attended school with them, and played on the same sports teams in high school. (Id. at 14-15, 35.) He also admitted that his companion on the night of the murder was a gang member. (Id. at 30.)

Petitioner agreed to discuss the commitment offense with the Board. (Id. at 28.) He explained that he was riding with Smith on the night of the crime because he had asked Smith to give him a ride to a party. (Id.) He claimed that, as they passed the scene of the shooting, Smith said that someone was shooting at them. (Id.) Smith handed Petitioner a gun and told him to shoot at the people firing on them. (Id.) Petitioner fired the gun out the window, and then Smith drove away. (Id.) Petitioner claimed that he did not intend to shoot anyone, but shot in the direction Smith had indicated because he was scared. (Id. at 29, 38-39.) He admitted, however, that he understood the serious risk caused by his action. (Id. at 29.)

The Board examined Petitioner's pre-incarceration history and noted that he had two previous arrests, one as a juvenile for robbery and one for trespassing, neither of which resulted in a conviction. (Id. at 11-12.)

The Board reviewed a 2006 report by Dr. M. Macomber, a staff psychologist. Dr. Macomber noted that Petitioner has no history of drug or alcohol abuse. (Resp't Ex. E, Mental Health Assessment at 2.) Petitioner has never been involved in gang activities while incarcerated. (Id.) Dr. Macomber agreed with the two previous psychological evaluations that Petitioner poses a very low risk to

6

United States District Court
For the Northern District of California

society.  (Id. at 3.)  Dr. Macomber stated that Petitioner "does not pose any more risk to society than the average citizen.   In fact, due to his life experiences, he probably poses less risk to the community than the average citizen."  (Id. at 4.)  Petitioner has no mental or emotional problems that would interfere with his parole planning.  (Id. at 4.)  He has an excellent prognosis for successful adjustment to the community.  (Id.)  Dr. Macomber also noted that Petitioner accepts full responsibility for his actions in the commitment offense and demonstrates apparently sincere and genuine sorrow at the victim's death.  (Id. at 3.)  Dr. Macomber described the commitment offense as "very situational" and apparently related to immaturity, poor judgment, impulsive behavior, and peer pressure.  (Id.)  He describes the offense as singularly out of character with Petitioner's pre- and post-conviction history.  (Id.)  Petitioner's insight and self-awareness are assessed as "very good."  (Id. at 2.)  The Board particularly noted that Dr. Macomber's report indicated that Petitioner used the word "accidentally" when describing his version of the shooting. (Resp't Ex. D, Board Transcript at 24, 29.)  When questioned about it, Petitioner initially denied having said "accidentally" when describing his offense to Dr. Macomber, but later admitted that he might have.  (Resp't Ex. D, Board Transcript at 24, 29.)

The Board noted that Petitioner, who as a child immigrated to the United States from Panama, needed to clarify the status of his naturalization.  (Id. at 27.)  However, Petitioner has family members both in Panama and the United States who are prepared to help him transition back to the community.  (Id.)  The Board specifically noted that Petitioner was raised in a two-parent home

and still has a close relationship with his parents and siblings. (Resp't Ex. D, Board Transcript at 13, 16.)  The Board considered Petitioner's thirteen letters of support, including three offers of a place to live and seven offers of employment, including one in Panama.  (<u>Id.</u> at 30-33.)  In its decision, the Board characterized these parole plans as "excellent."  (<u>Id.</u> at 49.)

Finally, the Board considered the opposition to Petitioner's parole.  Los Angeles County Deputy District Attorney Michael Montagma attended the hearing and stated that he opposed parole based on his concern that Petitioner's "explanation of the crime leaves a lot to be desired.  Whether or not he was actually a gang member, he clear [sic] was associating with the Crips, for the record, we oppose parole at this time."  (<u>Id.</u> at 40.)

The Board concluded that Petitioner was not suitable for parole and would pose an unreasonable risk of danger to society or threat to public safety if released.  (<u>Id.</u> at 46.)  While the Board commended Petitioner for his vocational and educational achievements and his long discipline-free history, it found that these gains did not outweigh his present unsuitability for parole. (<u>Id.</u> at 50.)

The Board's finding of unsuitability for parole was based on the commitment offense.  (<u>Id.</u> at 46.)

> This is a one-year denial.  It is based on the commitment offense.  The offense was carried out in an especially callous manner.  The offense was carried out in a dispassionate and calculated manner.  The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.  The motive for the crime was very trivial in relation to the offense.

(<u>Id.</u> at 46.)  The Board also found that Petitioner had an

escalating pattern of criminal conduct.  (Id. at 49.)

The Board members expressed their concern regarding the perceived discrepancy between Dr. Macomber's indication that Petitioner used the word "accidentally" when describing the shooting and Petitioner's denial that he had used that word. (Resp't Ex. D, Board Transcript at 49.)  The Board requested another psychological evaluation to clarify this.  (Id. at 51.) The Board advised Petitioner that he needs "to better articulate his participation in the commitment offense and his relationship to the others involved."  (Id. at 51.)  It also believed that Petitioner "need[ed] more insight into why [he was] associating with known gang members in a way that resulted in [him] committing murder."  (Id. at 50.)

IV.  California Supreme Court Petition for Writ of Habeas Corpus

On March 20, 2007, Petitioner filed a petition for a writ of habeas corpus in the California Supreme Court challenging the Board's Decision.  (Resp't Ex. F, California Supreme Court Petition at 1.)  On August 8, 2007, the court summarily denied the petition. (Resp't Ex. G, California Supreme Court Denial.)

DISCUSSION

I.  Standard of Review

Because this case involves a federal habeas corpus challenge to a state parole eligibility decision, the applicable standard is contained in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  McQuillion v. Duncan, 306 F.3d 895, 901 (9th Cir. 2002).

Under AEDPA, a district court may not grant habeas relief unless the state court's adjudication of the claim:

**United States District Court**
For the Northern District of California

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); <u>Williams v. Taylor</u>, 529 U.S. 362, 412 (2000). A federal court must presume the correctness of the state court's factual findings.  28 U.S.C. § 2254(e)(1).

Where as here the state court gives no reasoned explanation of its decision on a petitioner's federal claim and there is no reasoned lower court decision on the claim, the standard of review under AEDPA is somewhat different.  In such a case, a review of the record is the only means of deciding whether the state court's decision was objectively reasonable.  <u>Plascencia v. Alameida</u>, 467 F.3d 1190, 1197-98 (9th Cir. 2006); <u>Himes v. Thompson</u>, 336 F.3d 848, 853 (9th Cir. 2003); <u>Greene v. Lambert</u>, 288 F.3d 1081, 1088 (9th Cir. 2002); <u>Bailey v. Newland</u>, 263 F.3d 1022, 1028 (9th Cir. 2001); <u>Delgado v. Lewis</u>, 223 F.3d 976, 982 (9th Cir. 2000).  When confronted with such a decision, a federal court should conduct "an independent review of the record" to determine whether the state court's decision was an objectively unreasonable application of clearly established federal law.  <u>Plascencia</u>, 467 F.3d at 1198; <u>Himes</u>, 336 F.3d at 853; <u>Delgado</u>, 223 F.3d at 982; <u>accord</u> <u>Lambert v. Blodgett</u>, 393 F.3d 943, 970 n.16 (9th Cir. 2004).  The federal court need not otherwise defer to the state court decision:  "A state court's decision on the merits concerning a question of law is, and should be, afforded respect.  If there is no such decision on the merits, however, there is nothing to which to defer."  <u>Greene</u>, 288 F.3d at 1089.  Nonetheless, "while we are not required

to defer to a state court's decision when that court gives us
nothing to defer to, we must still focus primarily on Supreme Court
cases in deciding whether the state court's resolution of the case
constituted an unreasonable application of clearly established
federal law."  Fisher v. Roe, 263 F.3d 906, 914 (9th Cir. 2001).

II.  Analysis

Petitioner argues that: (1) he was denied due process because
the Board's decision was not supported by some evidence that he is
presently dangerous and because the Board disregarded evidence
tending to establish his suitability for parole; (2) the Board
failed to follow California law because it did not compare his
conduct to other instances of the same type of crime and then use
its proportionality matrix to determine a parole date; and (3) the
Board's decision was motivated by a systematic bias against
granting parole to indeterminately sentenced inmates and therefore
violates the legislative intent.

A.  Due Process Claim

The United States Supreme Court has clearly established that a
parole board's decision deprives a prisoner of due process with
respect to his constitutionally protected liberty interest in a
parole release date if the board's decision is not supported by
"some evidence in the record," or is "otherwise arbitrary."  Sass
v. California Bd. of Prison Terms, 461 F.3d 1123, 1128 (9th Cir.
2006) (citing Superintendent v. Hill, 472 U.S. 445, 457 (1985)).

Respondent argues that California inmates do not have a
federally protected liberty interest in parole release and that the
Ninth Circuit's holding to the contrary in Sass is not clearly
established federal law for the purposes of AEDPA.  However, this

11

Court is bound by Ninth Circuit authority. <u>See, e.g.</u>, <u>Irons v. Carey</u>, 505 F.3d 846, 850 (9th Cir. 2007) (all California prisoners whose sentences provide for the possibility of parole are vested with a constitutionally protected liberty interest in the receipt of a parole release date, a liberty interest that is protected by the procedural safeguards of the Due Process Clause); <u>McQuillion</u>, 306 F.3d at 898 ("under clearly established Supreme Court precedent, the parole scheme in California . . . [gives] rise to a constitutionally protected liberty interest").  Therefore, Respondent's argument fails.

When assessing whether a state parole board's suitability determination was supported by "some evidence," the court's analysis is framed by the statutes and regulations governing parole suitability determinations in the relevant state. <u>Sass</u>, 461 F.3d at 1128; <u>Irons</u>, 505 F.3d at 851.  Accordingly, in California, the court must look to California law to determine the findings that are necessary to deem a prisoner unsuitable for parole, and then must review the record to determine whether the state court decision constituted an unreasonable application of the "some evidence" principle.  <u>Id.</u>

California law provides that a parole date is to be granted unless it is determined "that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration . . . ."  Cal. Penal Code § 3041(b).

The California Code of Regulations sets out the factors showing suitability or unsuitability for parole that the Board is

United States District Court
For the Northern District of California

required to consider.  See Cal. Code Regs. tit. 15, § 2402.  These include "[a]ll relevant, reliable information available," such as,

> the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in finding of unsuitability.

Id. at § 2402(b).

Circumstances tending to show unsuitability for parole include the nature of the commitment offense and whether "[t]he prisoner committed the offense in an especially heinous, atrocious or cruel manner."  Id. at § 2402(c).  This includes consideration of the number of victims, whether "[t]he offense was carried out in a dispassionate and calculated manner," whether the victim was "abused, defiled or mutilated during or after the offense," whether "[t]he offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering," and whether "[t]he motive for the crime is inexplicable or very trivial in relation to the offense."  Id.  Other circumstances tending to show unsuitability for parole are a previous record of violence, an unstable social history, previous sadistic sexual offenses, a history of severe mental health problems related to the offense, and serious misconduct in prison or jail.  Id.

Circumstances tending to support a finding of suitability for parole include no juvenile record, a stable social history, signs of remorse, that the crime was committed as a result of significant

13

**United States District Court**
For the Northern District of California

stress in the prisoner's life, a lack of criminal history, a reduced possibility of recidivism due to the prisoner's present age, that the prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release, and that the prisoner's institutional activities indicate an enhanced ability to function within the law upon release. Id. at § 2402(d).  The California Supreme Court stated that due process is denied when "an inquiry focuse[s] only upon the existence of unsuitability factors."  In re Lawrence, 44 Cal. 4th 1181, 1208 (2008).  In Lawrence, the court reiterated "our conclusion that current dangerousness (rather than the mere presence of a statutory unsuitability factor) is the focus of the parole [suitability] decision . . . ."  Id. at 1210.  Similarly, in Irons, the Ninth Circuit stated that due process is denied when the Board fails to consider evidence of suitability as well as unsuitability.  505 F.3d at 851.

Respondent contends that, even if California prisoners do have a liberty interest in parole, the due process protections to which they are entitled by clearly established Supreme Court authority are limited to an opportunity to be heard and a statement of reasons for denial.  This position, however, has likewise been rejected by the Ninth Circuit, which held in Irons that a prisoner's due process rights are violated if the Board's decision is not supported by "some evidence in the record," or is "otherwise arbitrary."  505 F.3d at 851.  The "some evidence" standard identified is thus clearly established federal law in the parole context for purposes of 28 U.S.C. § 2254(d).  Sass, 461 F.3d at 1128-29.  Petitioner argues that the higher standard of "clear and

14

**United States District Court**
For the Northern District of California

convincing evidence" should be applied.  (Traverse at 4-6 (citing <u>Santosky v. Kramer</u>, 455 U.S. 745, 767-69 (1982)).)  This Court is bound by Ninth Circuit authority and therefore must apply the "some evidence" standard established in <u>Sass</u>.

Respondent next argues that the Board did identify "some evidence" to support its denial, namely: (1) the gravity of the commitment offense (Resp't Ex. D, Board Transcript at 46); (2) Petitioner's "escalating pattern of criminal conduct" (<u>id.</u> at 49); (3) his inability satisfactorily to articulate his degree of participation in the crime (<u>id.</u> at 50); (4) his failure adequately to explain how he became involved with individuals he knew to be gang members (<u>id.</u> at 50-51); (5) his lack of insight into the nature of the crime (<u>id.</u>); and (6) the need for another psychological evaluation (<u>id.</u> at 51-52).

### 1.   Gravity of the Commitment Offense

The Board quoted a portion of the summary of facts from the appellate opinion but did not identify any specific facts in the record which it felt supported its findings that the offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.  (<u>Id.</u> at 46-49.)

Contrary to the Board's description, there is no evidence in the record that Petitioner's crime was carried out in a dispassionate and calculated manner.  In the appellate opinion upholding Petitioner's conviction (in a portion which the Board did not mention during the hearing), the court stated:

> It should be noted that neither of these defendants was convicted of murder in the first degree, which is defined as "Murder is the unlawful kiling [sic] of a human being, or a fetus, with malice aforethought."  (Pen. Code, § 187, subd. (a).)  While the prosecution sought

conviction for first degree murder, the prosecutor argued also that the evidence could be interpreted to show the commission of second degree murder . . . on an implied malice theory.

(Resp't Ex. B, Appellate Opinion at 11-12.)  Petitioner was convicted of second degree murder under a theory of implied malice, which does not entail calculation or a lack of passion.  (See id. at 14.)

There is also no evidence to support the Board's assertion that Petitioner's crime was committed in an especially callous manner.  The evidence instead shows that Petitioner was reluctant to fire the weapon when his co-defendant handed it to him.  (Id. at 13.)  Moreover, the Board did not mention Kendall Turner's testimony (he observed the shooting and heard "a pop . . . followed by two loud bangs"), which tended to corroborate Petitioner's claim that he shot in response to shots fired at him and Smith from outside the car.  (Id. at 7.)  Thus all the relevant evidence indicates that Petitioner's crime was not committed in a manner especially callous compared to other second degree murders.  See Irons, 505 F.3d at 852 (relying on In re Dannenberg, 34 Cal. 4th 1061 (2005), to hold that the relevant inquiry with respect to the commitment offense is whether it shows more than the minimum level of viciousness required to be convicted of second degree murder).

The record provides no evidence to support the Board's assertion that Petitioner's crime demonstrated exceptionally callous disregard for human suffering.  Detective Johnson testified that Petitioner was not aware anyone had been hit when he left the scene.  (Resp't Ex. B, Appellate Opinion at 9.)  The evidence tends to show that Petitioner believed someone was shooting at him.  (Id.

16

**United States District Court**
For the Northern District of California

at 7, 8; Resp't Ex. C, Probation Report at 3.)  Therefore, his decision to depart without checking to see if anyone had been injured does not demonstrate callous disregard for human suffering. In addition, Smith, not Petitioner, was in control of the car and made the decision to drive away.  (Id. at 6, 11.)  Even if Petitioner had stayed, it is unlikely that he could have offered any assistance to the victim, who had sustained a gunshot wound to the head.  (Id. at 6.)

The Board's finding that Petitioner's motive was extremely trivial in relation to the offense is also unsupported by the record.  As noted above, the evidence indicates that Petitioner believed that someone was shooting at him and his companion.  While Petitioner's response was criminally reckless, given that he and Smith could have simply left the scene, his belief that he was under attack does not qualify as an extremely trivial motive.

Even if some evidence did support the Board's findings that Petitioner's commitment offense was particularly egregious, the commitment offense's value as a predictive indicator of present dangerousness two decades later is questionable.  In Biggs v. Terhune and Sass, the Ninth Circuit made observations on the effect of continued denial of parole based solely on unchanging factors such as the inmate's commitment offense and prior criminal history. See Biggs v. Terhune, 334 F.3d 910, 917 (9th Cir. 2003); Sass, 461 F.3d at 1129.  In Biggs, the court, in dicta, stated that "continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation."  334 F.3d at 917.

The Ninth Circuit's opinion in <u>Irons</u> sheds further light on whether reliance on an immutable factor such as the commitment offense violates due process.  505 F.3d at 850.  In <u>Irons</u>, the District Court for the Eastern District of California granted a habeas petition challenging the parole board's fifth denial of parole where the petitioner had served sixteen years of a seventeen-years-to-life sentence for second degree murder with a two-year enhancement for use of a firearm, and where all factors indicated suitability for parole; however, the Ninth Circuit reversed.  358 F. Supp. 2d 936, 947 (E.D. Cal. 2005), <u>rev'd</u>, 505 F.3d 846 (9th Cir. 2007).  The Ninth Circuit limited its holding to inmates deemed unsuitable prior to the expiration of their minimum sentences and left the door open for inmates deemed unsuitable after the expiration of their minimum sentences.  <u>Irons</u>, 505 F.3d at 854.  The Ninth Circuit stated:

> We note that in all the cases in which we have held that a parole board's decision to deem a prisoner unsuitable for parole solely on the basis of his commitment offense comports with due process, the decision was made before the inmate had served the minimum number of years required by his sentence.  Specifically, in <u>Biggs</u>, <u>Sass</u>, and here, the petitioners had not served the minimum number of years to which they had been sentenced at the time of the challenged parole denial by the Board. <u>Biggs</u>, 334 F.3d at 912; <u>Sass</u>, 461 F.3d at 1125.  All we held in those cases and all we hold today, therefore, is that, given the particular circumstances of the offenses in these cases, due process was not violated when these prisoners were deemed unsuitable for parole prior to the expiration of their minimum terms.

<u>Id.</u> at 853-54.  The court recognized that at some point after an inmate has served his minimum sentence, the probative value of his commitment offense as an indicator of an unreasonable risk of danger to society recedes below the "some evidence" required by due process to support a denial of parole.  <u>Id.</u>

**United States District Court**
For the Northern District of California

Unlike Biggs, Sass and Irons, Petitioner had served more than three years after the expiration of his minimum seventeen-year sentence at the time of the Board's decision.  In addition, much distinguishes the present case from Biggs, Sass and Irons, and pushes it beyond the point at which the circumstances of the commitment offense may be said to constitute "some evidence" in compliance with due process.  Biggs was convicted of first degree murder for playing a central role in a conspiracy to murder a witness.  Biggs, 334 F.3d at 912.  Biggs paid the actual murderers, assisted in luring the victim to his death by bludgeoning, and later returned to the scene to conceal the body better.  Id. at 912, 916.  After seven separate previous DUI convictions, Sass was convicted of second degree murder for a homicide while he was driving under the influence of alcohol.  Sass, 461 F.3d at 1125, 1126 n.2.  Irons, after an angry confrontation with his housemate Nicholson, "went to his room, retrieved his gun, and then went to Nicholson's room where he fired 12 rounds into Nicholson and, after Nicholson complained that he was in pain, stabbed him twice in the back."  Irons, 505 F.3d at 849.  Irons was convicted of second degree murder.  Id. Petitioner's offense was less egregious than each of those described above; he has no prior convictions; and his crime did not involve abuse of drugs or alcohol.  Cf. id. at 850 (noting that Irons was using drugs at the time of his offense). Furthermore, Petitioner's present age, forty-four, indicates a reduced likelihood of recidivism.

For the reasons above, the Court finds that there is no evidence to support the Board's finding of the factor tending to

indicate unsuitability that "[t]he prisoner committed the offense
in an especially heinous, atrocious or cruel manner."  Cal. Code
Regs. tit. 15, § 2402(b).  Furthermore, the Court finds that the
circumstances of the commitment offense no longer provide some
evidence that Petitioner is presently dangerous, in the light of
his efforts at rehabilitation discussed below.

2.    Escalating Pattern of Criminal Conduct

The Board found that Petitioner "has an escalating pattern of
criminal conduct."  (Resp't Ex. D, Board Transcript at 49.)   The
record shows five possible incidents of criminal conduct by
Petitioner, including the commitment offense.   There are two
arrests, neither resulting in a conviction, prior to the commitment
offense.   (Id. at 11-12.)   During his incarceration, Petitioner has
been cited for two criminal-level offenses: threatening prison
staff in 1987 and stealing food in 1988.   (Id. at 23.)

There is no evidence that Petitioner currently displays a
pattern of escalating criminal conduct.   The undisputed facts show
that he has avoided all criminal activity for eighteen years.
(Resp't Ex. D, Board Transcript at 49.)   Moreover, Petitioner has
accomplished this while in prison, an environment arguably more
conducive to violence, gang activity and criminal conduct than he
would face in normal society.   Petitioner's most recent
psychological evaluation specifically notes that he "has never been
involved in racial riots (although we have several of them),
assaults on others, possession of weapons, or other aggressive
behavior."  (Resp't Ex. E, Mental Health Assessment at 3.)   He has
no history of drug or alcohol abuse, or of gang membership.   (Id.
at 4.)   His psychological reports unanimously assess his potential

20

for violence as no more than the average citizen.  (Id. at 3.)

Petitioner's record can be compared to that of the petitioner in Biggs.  See 334 F.3d at 916.  Biggs had been convicted of first degree murder and had a prior conviction.  Id. at 912.  Noting that Biggs had been crime- and discipline-free for seventeen years and had positive psychological evaluations, the Ninth Circuit held that there was no evidence of an escalating pattern of criminal conduct.  Id. at 916.  Biggs committed his offense as part of his involvement in trafficking in stolen computer parts, for which he was convicted after the murder but two years prior to his arrest for it.  See id. at 912.  His pattern of criminal activity leading up to his commitment offense was more clearly established than Petitioner's, who had no prior convictions.  Even if Petitioner had an escalating pattern of criminal conduct at the time of conviction, the time has now passed when the Board can rely on that finding to conclude that Petitioner still poses a danger to the public.  See id. at 916.

For the reasons above, the Court finds that the record provides no evidence to support the Board's finding that Petitioner demonstrates an escalating pattern of criminal conduct.  The Court further finds that, even assuming both pre-commitment arrests were justified, Petitioner's twenty-year-old record of criminal conduct does not provide some evidence of Petitioner's present dangerousness.

> 3.   Inability Satisfactorily to Articulate His Degree of Participation in the Crime

The Board found, "The prisoner needs to better articulate his participation in the commitment offense . . . ."  (Resp't Ex. D, Board Transcript at 50.)  The Board further stated:

United States District Court
For the Northern District of California

> [I]t's true that your counsel says you haven't changed
> your story over the years, but there are different
> shadings that are put into your story, not necessarily by
> you.  We weren't comfortable with the way the situation
> is right now, as far as the explanations.  We needed more
> than that and . . . what happened and why you were there
> with those people will have to be articulated clearly
> enough for it not to just be the panel granting it
> tentatively, but also it going through decision review
> and the governor's office.

(Id. at 50-51.)  Petitioner answered all of the Board's questions

clearly, and his account of the incident was consistent with the

official facts, his original confession to Detective Johnson, the

description in Dr. Macomber's report, and the version in his

probation report.  Moreover, Petitioner agreed to discuss the

commitment offense with the Board in order to clarify any concerns

it might have.  (Id. at 26.)  Petitioner admitted that he knew that

his companion, Smith, and the victims were gang members.  (Id. at

30; Resp't Ex. C, Probation Report at 11.)  He admitted that he

deliberately fired the weapon in the direction from which Smith had

indicated shots were coming.  (Resp't Ex. D, Board Transcript at

36-39.)  He admitted that he understood the danger inherent in this

action.  (Id. at 29.)  When asked by the Board how he felt about

his participation in the crime, he responded, "I take full

responsibility for the crime which I committed against Mr. Marvin

McIntosh."  (Id. at 10.)  In his closing statement to the Board,

Petitioner said: "I accept full and complete responsibility for the

crime of murder, committed against Mr. Marvin McIntosh, and his

family.  The crime of murder was committed by me during a drive-by

shooting in which I was the responsible person . . . ."  (Id. at

43-44.)  There is no evidence that Petitioner has misrepresented

his crime or has told differing versions of it.  The Board's

**United States District Court**
For the Northern District of California

concern that Petitioner denies the intent to shoot anyone is
apparently based on Dr. Macomber's report that Petitioner used the
word "accidentally" in describing the killing.  However,
Petitioner's implied malice conviction for second degree murder is
corroborative of his account.  Petitioner has never taken the
position that he fired the gun accidentally, only that he did not
intend to kill anyone.  He recognizes the clear risk of killing
that he caused and accepts that responsibility.

The Court finds that there is no evidence in the record to
support the Board's findings that Petitioner has failed
satisfactorily to articulate his participation in the offense and
that his level of articulation of the commitment offense indicates
he is presently dangerous to the public.

> 4.   Failure Adequately to Explain How He Became Involved
>       with Individuals He Knew to Be Gang Members

In its decision, the Board found that Petitioner needed "more
insight into why [he was] associating with known gang members in a
way that resulted in [him] committing murder."  (Id. at 50.)  The
Board expressed this concern repeatedly, stating:

> The prisoner needs to better articulate . . . his
> relationship to the others involved [in the crime]. . . .
> We do think [you need] some insight into -- they were
> known gang members to you, and getting, in that kind of a
> situation, you've got to think about how you put yourself
> in that place.

(Id. at 50-51.)  During the hearing, the Board questioned
Petitioner regarding his association with gang members.

> PRESIDING COMMISSIONER HARRIS-RITTER:  Were you involved
> in a gang?
>
> INMATE CORDOBA:  No, ma'am.
>
> PRESIDING COMMISSIONER HARRIS-RITTER:  Were you involved
> in other criminal activity with these same people?

23

**United States District Court**
For the Northern District of California

1    INMATE CORDOBA:  No, ma'am.

2    PRESIDING COMMISSIONER HARRIS-RITTER:  Can you tell us
     how you got yourself to in that situation that you were
3    in at the time the crime was committed?

4    INMATE CORDOBA:  That day, or that night, I was supposed
     to go and DJ at a party in Riverside and I didn't have no
5    way to get there, so I asked (inaudible) could he give me
     a ride.  So, but we decided to go to a McDonalds and on
6    the way back from McDonalds, that's when the incident
     happened.

7
(Id. at 10.)  The Board did not question him regarding whether he
8
had intended to join a gang, whether he understood the role that
9
his association with gang members played in precipitating his
10
crime, or how he would take steps to avoid involvement with gangs
11
upon release.
12
     PRESIDING COMMISSIONER HARRIS-RITTER:  Did you know those
13   people prior to that crime?

14   INMATE CORDOBA:  Yes, I knew them.

15   PRESIDING COMMISSIONER HARRIS-RITTER:  The people who
     were shot?
16
     INMATE CORDOBA:  Yes.
17
     PRESIDING COMMISSIONER HARRIS-RITTER:  And how did you
18   know them?

19   INMATE CORDOBA:  Because I used to play basketball at the
     high school.
20
     . . . .
21
     PRESIDING COMMISSIONER HARRIS-RITTER:  Okay.  And, were
22   these guys, that you were hanging out with, people who
     had been friends of yours since elementary school or
23   junior high?

24   INMATE CORDOBA:  I wouldn't say friends, it was just guys
     I had I [sic] been in (inaudible) same, you know, at the
25   same, you know, elementary school, I played basketball on
     an (inaudible).
26
     PRESIDING COMMISSIONER HARRIS-RITTER:  And that's why you
27   asked the guy for a ride, right?

28   INMATE CORDOBA:  Yes, because I knew him.

24

(_Id._ at 11, 14-15.)  The Board questioned Petitioner specifically

regarding his level of involvement with the Crips.

> DEPUTY COMMISSIONER ESTRADA:  You've never been a member
> of the (inaudible) Crips?
>
> INMATE CORDOBA:  No, sir.
>
> DEPUTY COMMISSIONER ESTRADA:  Or the (inaudible)?
>
> INMATE CORDOBA:  No, sir, I just live in the
> neighborhood.
>
> DEPUTY COMMISSIONER ESTRADA:  You just live in the
> neighborhood, huh?
>
> INMATE CORDOBA:  Yes, sir.
>
> DEPUTY COMMISSIONER ESTRADA:  Okay (inaudible) on page
> (inaudible) as they drove by and then fired one shot.
> ["Smith told Luke that Cordoba had yelled 'Harlem Crips,
> roll in thirties' as they drove by and had then fired one
> shot."  (Resp't Ex. B, Appellate Opinion at 7.)]
>
> INMATE CORDOBA:  That's not true.

(_Id._ at 34-35.)  Deputy District Attorney Montagma also focused on

Petitioner's level of association with the Crips gang, but offered

no evidence to rebut Petitioner's denial.

> DEPUTY DISTRICT ATTORNEY MONTAGMA:  At any prior board
> hearing did you indicate that you were a member of
> (inaudible) Crips?
>
> INMATE CORDOBA:  Never.

(_Id._ at 38.)

   None of Petitioner's answers conflicts with the official facts

or with his other accounts of the offense.  His acquittal of the

charge of first degree murder and conviction under a theory of

implied malice indicate that the trial court found the portrayal of

his level of gang involvement accurate.  (Resp't Ex. B, Appellate

Opinion at 11-12.)  While the Board may not find his story

credible, there is no evidence in the record that Petitioner has

ever been seriously involved in gang activity.

Whatever his involvement may have been before the commitment offense, Petitioner has completely avoided any gang involvement during his more than two decades of incarceration, despite frequent gang-related incidents at the institution. (Resp't Ex. E, Mental Health Assessment at 1.) He has accomplished this in a prison environment, in which the pressure to join a gang, particularly if he had been previously associated with one, would be more intense than in normal society. His psychological evaluation concluded, "His insight and self-awareness [are] very good." (Id.) He comes from a stable family background. (Id.; Resp't Ex. D, Board Transcript at 13, 15-16.) He has significant support from his immediate and extended family and friends, including multiple offers of jobs and places to live. (Resp't Ex. D, Board Transcript at 30-34.) He has mastered two vocational skills and has earned his GED. (Id. at 18-19.) He is presently forty-four years of age. These factors indicate that Petitioner has a strong chance of reintegrating himself as a productive, law-abiding member of the community upon release and make him very unlikely to become involved with gangs.

For the reasons above, the Court finds that there is no evidence that Petitioner failed adequately to explain his involvement with known gang members. Furthermore, the Court finds that his pre-commitment involvement with gang members and his level of insight into that involvement provide no evidence of present dangerousness.

5.   Lack of Insight into the Nature of the Crime

Respondent argues that the Board made a separate finding that

26

Petitioner lacks insight into the nature of the crime, citing the
Board's finding that Petitioner "need[s] more insight into why [he
was] associating with known gang members in a way that resulted in
[him] committing murder." (Resp't Ex. D, Board Transcript at 50.)
The Board also expressed concern about "the extent to which the
prisoner has explored the commitment offense and come to terms with
the underlying causes." (Id. at 51-52.) The Board does not point
to any specific facts in the record as evidence of Petitioner's
lack of insight.

Petitioner's most recent psychological evaluation concludes
that his "insight and self-awareness were very good." (Resp't Ex.
E, Mental Health Assessment at 2.) The Board noted that Dr.
Macomber concluded that Petitioner has no mental or personality
disorders, that he accepts the official version of the crime, that
he takes full responsibility for his actions, and that he is
remorseful. (Resp't Ex. D, Board Transcript at 24.) As discussed
above, Petitioner's statements to the Board reflect a clear
understanding of the gravity of his actions and his responsibility
for the taking of a human life. He admits that he intentionally
fired the gun in a direction where he believed persons were
located. (Resp't Ex. D, Board Transcript at 29, 36-39.) While he
does deny any intent to hit or injure anyone, this denial is
supported by his conviction under a theory of implied malice.

For the reasons above, the Court finds that there is no
evidence to support the Board's findings that Petitioner lacks
insight into the nature of his crime and that his present level of
insight into his crime indicates that he still poses a danger to
society.

6.    Need for Another Psychological Evaluation

Finally, the Board found that Petitioner required a new psychological evaluation,[5] stating:

> We're asking for a new psych report because we want to clarify the problem with the way the last one was written regarding the word accidentally, we don't think that's fair to you to have that sitting like that, from your testimony to us.  So we've requested this report, based on the panel's belief that the prisoner's current mental health is an important issue.  And in a new full evaluation the panel requests that the clinician specifically address the following and we request that it be the extent to which the prisoner has explored the commitment offense and come to terms with the underlying causes.  And a review of Dr. Macomber's report regarding the commitment offense and clarify the inmate's description of what actually occurred.

(Resp't Ex. D, Board Transcript at 51-52.)  As noted above, the Board was particularly troubled by the fact that Dr. Macomber used the word "accidentally" when reporting Petitioner's description of the commitment offense.  The report stated:

> Mr. Cordoba accepts the official version of this offense. He accepts full responsibility for his actions in the commitment offense, which resulted in the death of the victim.  He feels very badly about this offense.  Someone was accidentally killed as a result of his actions.  He stated that he did not know anything about guns, and he had never shot one before.  When his crime partner yelled at him and gave him the gun and ordered him to shoot, he did.  It was dark and he did not aim it at anyone. However, he accidentally shot the 19 year old victim.

(Resp't Ex. E, Mental Health Assessment at 3.)  The Board used this as the basis for ordering another psychological evaluation to "clarify [Petitioner's] description of what actually occurred" and to examine "the extent to which [Petitioner] has explored the commitment offense and come to terms with the underlying causes." (Resp't Ex. D, Board Transcript at 51-52.)  Respondent

---

[5]    The record does not show whether a new psychological evaluation has been completed since his September 12, 2006 parole suitability hearing.

28

United States District Court
For the Northern District of California

characterizes this issue as a discrepancy between the versions of
the crime that Petitioner presented to Dr. Macomber and to the
Board, suggesting a lack of insight into the crime.  (Answer at 11-
12.)  As discussed above, the Court finds that there is no evidence
that Petitioner has not adequately explored the nature of the
commitment offense and come to terms with the underlying causes,
i.e., taken responsibility for his actions.  With regard to the
alleged discrepancy, there is no inconsistency between the version
reflected in the report and the one that Petitioner told the Board.
In both versions, Petitioner admits that he deliberately fired the
weapon.  (Resp't Ex. D, Board Transcript at 28-29; Resp't Ex. E,
Mental Health Assessment at 3.)  A plain reading of the report
shows that Petitioner described the hitting of the victim as
accidental, not the act of shooting.

The Board seemed to make much of the fact that Petitioner
initially denied using the word "accidentally" when describing the
crime to Dr. Macomber:

> DEPUTY COMMISSIONER ESTRADA:  Now, in regards to the view
> of the life crime, [the psychological evaluation]
> indicates that you accept the official version of the
> offense and you accept full responsibility for your
> actions (inaudible) feel badly about (inaudible)
> accidentally killed as a result of your action.
> (inaudible) accidentally killed?
>
> INMATE CORDOBA:  No, sir.  I did not say accidentally.
>
> DEPUTY COMMISSIONER ESTRADA:  Huh?
>
> INMATE CORDOBA:  I did not say accidentally.
>
> . . . .
>
> PRESIDING COMMISSIONER HARRIS-RITTER:  Okay.  The report
> says that you accidentally, that somebody accidentally
> got shot.  You indicated you did not use that word
> accidentally.  Do you recall what you did say to the
> psychologist?

1   INMATE CORDOBA:  No, I don't recall.

2   PRESIDING COMMISSIONER HARRIS-RITTER:  Okay.  Go ahead.

3   INMATE CORDOBA:  The reason why -- I may have said
    accidentally is because, like I said, when he got shot,
4   because I didn't mean to kill anyone or hurt anyone, I
    was just shooting because they scared me.

5
(Id. at 24, 29.)  Whether or not Petitioner said "accidentally,"
6
there is no discrepancy between the two versions of Petitioner's
7
story.
8
        Despite the Board's concerns, the psychological report
9
unreservedly supports Petitioner's suitability for parole.  It
10
provides no evidence of discrepancies in his story or insufficient
11
insight into his crime.  Therefore, the Court finds that
12
Petitioner's current psychological evaluation provides no evidence
13
that he is presently dangerous to society.
14
        As discussed above, the Court finds no evidentiary support for
15
the Board's findings tending to indicate unsuitability.  Therefore,
16
Petitioner demonstrates none of the factors tending to show
17
unsuitability which are established in Cal. Code Regs. tit. 15,
18
§ 2402(c):  (1) his commitment offense was not committed in an
19
especially heinous, atrocious, or cruel manner; (2) he has no
20
previous record of violence -- i.e., he had not, prior to the
21
commitment offense, inflicted or attempted to inflict serious
22
injury on a victim; (3) he does not have an unstable social
23
history; (4) he has no history of sadistic sexual offenses; (5) he
24
has no record of severe mental problems related to the offense; and
25
(6) he has not engaged in serious misconduct while incarcerated.
26
        "The Board must determine whether a prisoner is presently too
27
dangerous to be deemed suitable for parole based on the
28
'circumstances tending to show unsuitability' and the

30

**United States District Court**
For the Northern District of California

'circumstances tending to show suitability' set forth in Cal. Code.
Regs. tit. 15, § 2402(c)-(d)." <u>Irons</u>, 505 F.3d at 851; <u>cf.</u>
<u>Lawrence</u>, 44 Cal. 4th at 1208, 1211-12 (focusing only on
unsuitability factors violates due process).  The Board reviewed
Dr. Macomber's report during the hearing. (Resp't Ex. D., Board
Transcript at 24-25.)  In its decision, however, the Board
disregarded the report as evidence of suitability. (<u>Id.</u> at 49.)
In light of the importance of this evidence in describing
Petitioner's rehabilitative progress, the fact that it
unequivocally supported Petitioner's suitability for parole and the
mandate of <u>Irons</u>, 505 F.3d at 851, that the Board must consider
evidence of suitability as well as unsuitability, the Board's
failure to consider this evidence supports Petitioner's claim of
denial of due process.

Of the nine factors tending to show suitability listed in Cal.
Code Regs. tit. 15, § 2402(d),[6] Petitioner demonstrates at least
six[7]: (1) Petitioner has a stable social history and maintains
close relationships with his parents and siblings; (2) he shows
signs of remorse; (3) his violence-free years before he was

---

[6]   Whether the prisoner was suffering from Battered Woman
Syndrome at the time of the crime is a circumstance tending to
indicate suitability.  Cal. Code Regs. tit. 15, § 2402(d)(5).
However, this factor does not apply to Petitioner.  The other
factor which Petitioner does not demonstrate is that the crime was
committed as a result of significant stress in the prisoner's life.
<u>Id.</u> at § 2402(d)(4).

[7]   Petitioner arguably also satisfies the remaining
suitability factor -- that of no juvenile record.  <u>Id.</u> at
§ 2402(d)(1).  The record only shows one juvenile arrest (for
robbery), which the complainant refused to prosecute. (Resp't Ex.
C, Probation Report at 7.)  According to Petitioner, he was
recovering his cousin's stolen bicycle. (<u>Id.</u>; Resp't Ex. D, Board
Transcript at 11-12.)  There is no other evidence that Petitioner
has a juvenile record.

United States District Court
For the Northern District of California

arrested indicate that he lacks any significant history of violent crime; (4) his current age, forty-four, reduces the probability of recidivism; (5) his educational achievements, including his high school equivalency diploma and his certifications as a welder and vocational printer, have given him valuable marketable skills that can be put to use upon release; and (6) his institutional activities, including self-help, self-improvement and community programs, indicate an enhanced ability to function within the law upon release. (Resp't Ex. D, Board Transcript; Resp't Ex. E, Mental Health Assessment; Pet'r Ex. E, Chronos and Certificates.) Moreover, Petitioner's rehabilitation is evidenced by his relatively minor prison record containing only two disciplinary violations -- the last of which was for theft of food eighteen years prior to the Board hearing. He has numerous letters from family members and friends indicating that they can provide employment and housing to assist him in becoming a productive, law-abiding member of society.

The Court DENIES Petitioner's request for an evidentiary hearing because the material facts in this case are not in dispute and because Petitioner's claims do not rely upon new or extra-record evidence.

In light of the analysis above, the Court finds that Petitioner has been deprived of the due process guaranteed by the Fifth and Fourteenth Amendments. Petitioner is entitled to relief under 28 U.S.C. § 2254(d) because the Board's finding of unsuitability was not supported by "some evidence" and the state court's decision upholding it was an unreasonable application of federal law.

United States District Court
For the Northern District of California

1  Accordingly, the Court GRANTS the petition for a writ of

2  habeas corpus and remands to the Board to evaluate Petitioner's

3  suitability for parole in accordance with due process of law.

4  Petitioner also raises two alternative grounds for habeas

5  relief.  While there is no need to address these claims because

6  Petitioner is entitled to relief based on his first claim, the

7  Court will do so below.

8  B.   Petitioner's State Law Claim

9  Petitioner claims that the Board failed to follow California

10  law.  (Pet. at 16.)  This claim is without merit.  He relies upon

11  In re Ramirez, 114 Cal. Rptr. 2d 381, 397 (Cal. App. Ct. 2001), for

12  the proposition that the Board must grant him a parole date that

13  will result in a sentence commensurate with that served for similar

14  crimes.  (Pet. at 16.)  Ramirez, however, has been overruled by

15  Dannenberg, 34 Cal. 4th at 1083, 1100.  The California Supreme

16  Court there held that the Board should not engage in a

17  proportionate sentence analysis unless it first finds the prisoner

18  suitable for parole.  Id. at 1083; see also Lawrence, 44 Cal. 4th

19  at 1205.

20  More importantly, Petitioner supports his argument only with

21  state statutes and case law.  "In conducting habeas review, a

22  federal court is limited to deciding whether a conviction violated

23  the Constitution, laws, or treaties of the United States."  Estelle

24  v. McGuire, 502 U.S. 62, 67 (1991).  Federal habeas relief is not

25  available for violations of state law or for alleged errors in the

26  interpretation or application of state law.  Id.  Accordingly,

27  Petitioner's state law claim is DISMISSED.

28

33

C.   Petitioner's Systematic Bias Claim

Petitioner contends that the Board failed to act impartially in his case due to a systematic bias in the California parole system. (Pet. at 17.) Petitioner asserts that the Board routinely denies parole, doing so in 98.5 percent of all cases. (Id.) He claims that this systematic bias violates his due process rights. (Id.) It may be logical to deduce that the current parole denial rates evidence a predisposition on the part of the Board and the Governor to deny parole. However, Petitioner has not proven that this alleged predisposition played any role in the Board's decision in his case. Therefore, this claim fails.

CONCLUSION

For the foregoing reasons, Petitioner's request for an evidentiary hearing is DENIED, and the petition for a writ of habeas corpus is GRANTED. The Board shall hold a new parole hearing within sixty (60) days and re-evaluate Petitioner's suitability for parole in accordance with this Order. If the Board finds Petitioner suitable for parole and sets a release date and the Governor does not reverse, the Court will stay Petitioner's actual release for two (2) weeks to allow Respondent to request a stay from this Court, and if necessary from the Court of Appeals, of the release date pending appeal. The Court retains jurisdiction to review compliance with its Order. The Clerk of the Court shall terminate all pending motions, enter judgment and close the file. Each party shall bear his own costs.

IT IS SO ORDERED.

Dated: 10/22/09

_____
CLAUDIA WILKEN
United States District Judge

United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT
FOR THE
NORTHERN DISTRICT OF CALIFORNIA

ROGELIO CORDOBA,

      Plaintiff,

v.

BEN CURRY et al,

      Defendant.

_____/

Case Number: CV07-04579 CW

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on October 22, 2009, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Rogelio  Cordoba D-22031
CFT-Soledad
ZW-240L
P.O. Box 689
Soledad,  CA 93960-0689

Dated: October 22, 2009

                          Richard W. Wieking, Clerk
                          By: Sheilah Cahill, Deputy Clerk

**United States District Court**
For the Northern District of California